UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

)
Luis Rivera,                        )
    Petitioner;                     )
                                    )
    v.                              )          Civil Action No. 04-12717-RGS
                                    )
David Nolan.                        )
    Respondent;                     )
_____)

## MEMORANDUM OF LAW IN SUPPORT OF
## APPLICATION FOR WRIT OF HABEAS CORPUS
(Pursuant to, 28 U.S.C. sec. 2254)

Comes now, Luis Rivera, petitioner in pro-se, and supports his
application for Writ of Habeas Corpus, with his; memorandum of law, evidence
included in the record appendix and, the incorporated trial transcripts,
hearing transcripts and motions of the petitioner and codefendant Raymond
Rebello. Pursuant to the Ruling of, Collins, U.S.M.J. (P.3�) on March 10,
2008, Rivera presents his claims on the merits to follow.

### STANDARD OF REVIEW

The Standard of Review as applies to Rivera's habeas corpus petition
is set forth in 28 U.S.C. sec. 2254(d) as amended by the "Anti-Terrorism
and Effective Death Penalty Act" (AEDPA), under this standard a Federal
court may not grant a writ of habeas corpus unless the underlying state
court's adjudication "resulted in a decision that was contrary to or an
unreasonable application of, clearly established Federal law, as determined
by the United States Supreme Court (USSC)." 28 U.S.C. sec. 2254(d)(1),
as the USSC explained:

> A Federal habeas court may issue the writ under the
> 'contrary to' clause if the state court applies a
> rule different from the governing law set forth in
> our cases, or if it decides a case differently than
> we have done on a set of materially indistinguishable
> facts ...

see, Bell v. Cone, 535 U.S. 685, 122 S.Ct. 1843, 1850, 152 L ED2d 914

(2002)( "an unreasonable application is different from an incorrect one.")

Id. and citing, McCambridge v. Hall, 303 F.3d 24 (1st. Cir. 2002) ("This

increment 'need not necessarily be great, but it must be enough to make

the decision unreasonable in the independent and objective judgment of the

Federal court.'" Id. "Thus, a habeas petitioner 'must do more than merely

identify an incorrect result.'" Jackson v. Coalter, 337 F.3d 74, 81 (1st.

Cir. 2003). Rivera contends that the instant petition is well within the

scope of cases the U.S. Supreme Court envisioned in adopting its standards

for issuance of the great writ. To follow, Rivera will identify the precedent

violated, the manner of the violation, and support the contentions with

the record(s). Rivera additionally contends that the depth of the infection

of due process violations requires this court to determine the errors to

be structural in nature.

## ISSUE No. I

### PROSECUTION FAILURE TO FULLY DISCLOSE THE INDUCEMENTS USED AS INCENTIVE FOR KEY WITNESS' TESTIMONY, VIOLATED DUE PROCESS, PER BRADY v. MARYLAND, 373 U.S. 83 (1963)

## ISSUE No. II

### JUDICIAL MISCONDUCT AND MALFEASANCE ACTING IN CONNIVANCE WITH PROSECUTORIAL MISCONDUCT, IMPUGNED THE DUE PROCESS RIGHTS OF THE PETITIONER UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION

Tr. Volume/page = Rivera's Trial Transcripts;
Postconviction documents are identified as exhibits in the Record Appendix.

## ISSUE ONE

### PROSECUTION FAILURE TO FULLY DISCLOSE THE INDUCEMENTS USED AS INCENTIVE FOR KEY WITNESS' TESTIMONY VIOLATED DUE PROCESS, PER BRADY v. MARYLAND, 373 U.S. 83 (1963)

From the filing of the indictment through trial and direct appeal the prosecution has denied the existence of any deals or other inducements other than 'consideration' for the falsely contrived inculpatory testimony of the key witness, Jose Pacheco.

Mr. Pacheco's testimony at trial was that he "...hoped for consideration (from the prosecution) but that there was no deals and further testified that "...his lawyer told him he was going to have a trial, and would most likely do time." (Tr. 6/152).

Due in large part to that highly inculpatory testimony Rivera was convicted for First Degree Murder on June 29, 1992. Unbenounced to Rivera, four days after that erroneous conviction, on July 2, 1992, Jose Pacheco was released by Rivera's trial judge on a personal recognizance reduced from a two million dollar bail bond, pending trial by agreement with the prosecution. ( see Trial transcript, Com. v. Rebello, Ex. 6) see also, Affidavit of Jose Pacheco. (Ex. No. 1)

Jose Pacheco, now avers that he did not witness the defendant commit any crimes and did not witness the murders of which Rivera was accused. (Ex. No. 1) Pacheco's current testament is corroborated by the trial evidence of other witnesses. In that, Pacheco's trial testimony failed to depict that his armed codefendants had followed him on foot to where, he allegedly lured the victims into his car.

4
Obviously this testimony would have had
exculpatory ramifications for Rivera and his wrongfully convicted
codefendants.

Rivera's defense was primarily focused on impeaching the erroneous
testimony of Pacheco. Rivera called two witnesses to impeach Pacheco; David
Lindholm, at one time imprisoned with Pacheco who told Lindholm that he
would say anything to avoid returning to prison and, Dr. Martin Markey
a psychologist who attested that during an evaluation of Pacheco for Social
Security Disability stipends, Dr. Markey concluded that Pacheco suffered
from auditory hallucinations and was probably schizophrenic.

Mr. Pacheco's revaluation of his honesty, has now been supported with
court docket entries and polygraph validation that he was not present when
he deceived the jury that Rivera was culpable for the murders. In as much
as this revelation discredits the entire prosecution case, this newly
discovered evidence supports Rivera's actual innocence.

> (a)n actual innocence based due process violation
> or right to a fundamentally fair trial because a
> state cannot leave a conviction in place after a
> credible recantation by a key witness most likely
> would have changed the outcome of the trial ...
> Sanders v. Sullivan, 900 F.2d 601, 602-08 (2nd. Cir.
> 1990) ( Release ordered by writ of habeas corpus
> when key main witnesses postconviction affidavit
> filed, admitted the affiant shot and killed someone.)

Although in cases such as the case at bar, where the prosecutor knowingly
uses false testimony the Circuit courts have sometimes applied the "Larrision"
'might' standard. see; U.S. v. Sanchez, 969 F.2d 1409 (2nd. Cir. 1992);
Sanders v. Sullivan, 900 F.2d 601, 602-08 (2nd Cir. 1990); U.S. v. Sinclair,
109 F.3d 1527 (10th. Cir. 1997) also adopted from U.S. v. Agurs, 427 U.S.
97, 49 LED 2d. 342, 95 S.Ct. 2392 (1976) ("the standard that the verdict

must be set aside only if there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'") The First Circuit has adopted, along with most of its peers the standard set in, Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 LED 2d 490 (1995).(" Evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" "A reasonable probability of a different result is shown when suppression undermines confidence in the outcome of the trial." Graves v. Dretke, 442 F.3d 334, 340 (5th. Cir. 2006).

The argument proceeds to the first of two competing contentions; First, does the evidence presented both on the record and as concluded in the evidentiary hearing of codefendant "Rebello" (Exhibit No. 6) rise to the level to apply, Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 LED2d 215 (1963) surmising prosecutial misconduct? Or, in alternative, the standard established in, Gigilo v. U.S., 405 U.S. 150, 154-55, 31 LED2d 104, 92 S.Ct. 763 (1972)? In answering that question in, United States v. Patrick, 248 F.3d 11, (1st. Cir. 2001) the First Circuit stated that "The Government has a Constitutional duty to disclose evidence that is favorable to a criminal defendant, be it exculpatory or impeachment evidence." citing Kyles v. Whitley, supra. Compared to; U.S. v. Martinez-Medina, 279 F.3d 105 (1st. Cir. 2002) where, "Wrongly withheld impeachment evidence, if powerful enough, can be prejudicial and grounds for a new trial." citing U.S. v. Bagley, 473 U.S. 667, 676-77, 87 LED2d 481, 105 S.Ct. 3375 (1985). And again in U.S. v. Patrick, supra, "this is particularly true where the evidence is highly impeaching or when the witness' testimony is uncorroborated and essential

to the conviction." quoting Giglio v. U.S., supra.

"The suppression of favorable evidence violated due process if the evidence is material to guilt or punishment, () where the evidence is never forthcoming, we ask whether that nondisclosure ' might have affected the outcome of the trial.'"Kyles v. Whitley, supra. However, the different standards apply when the defendant / petitioner premises his (new trial motion) on the prosecution's use of perjury. If the perjury was used knowingly, the conviction, "must be set aside if there is any reasonable likelihood that false testimony could have effected (sic) the judgment of the jury." State v. Young, 17 F.3d 1201, 1203 (9th. Cir. 1994) quoting U.S. v. Agurs, supra. If the defendant cannot show that the prosecution knowingly used false testimony, the conviction will be set aside "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." U.S. v. Endicott, 869 F.2d 452, 455 (9th. Cir. 1989) citing U.S. v. Bagley, supra. Therefore, whether the record(s) demonstrates to the court's satisfaction, that the government aided and abetted in the production of the perjured testimony, or merely failed to provide the exculpatory evidence to the defense. There is the predominate fact before this court that there has been a clear and convincing miscarriage of justice imposed upon the petitioner, Rivera.

JUDICIAL MISCONDUCT AND MALFEASANCE
ACTING IN CONNIVANCE WITH PROSECUTORIAL
MISCONDUCT, IMPUGNED THE DUE PROCESS
RIGHTS OF THE PETITIONER UNDER
THE FOURTEENTH AMENDMENT OF THE U.S.
CONSTITUTION

Whereas the recantation of Jose Pacheco, directly indicts the

prosecution to the incitement of perjured testimony by manner of Pacheco's affidavit, and that said affidavit warranted and received judicial recognition at the Evidentiary hearing of Raymond Rebello. The Government's complicity is affirmed. There is additionally trial evidence which corroborates the recanted testimony that Pacheco avowed.

There is not sufficient evidence to imply that Judge Daniel A. Ford, had foreknowledge of the perjured testimony. There is however, significant information on the record to support the inference that four days after the conclusion (and consequent guilty finding of Petitioner Rivera), that Judge Ford granted the release on personal recognizance to Jose Pacheco the prime prosecution witness. Knowing that, days earlier, Mr. Pacheco had actively testified that his credibility was valid due to his mutual culpability to criminal prosecution, further, avering that there were no deals agreed upon. (Tr.6/152)

It was eleven (11) years later when Mr. Rivera, submitted his postconviction motion for a new trial pursuant to Mass.R.Cr.P. 30(b) and procedurally the motion was docketed before Judge Ford. Judge Ford, knew the circumstances surrounding the errant testimony and his implied complicity in the collateral proceedings and yet he failed to entertain an evidentiary hearing to ascertain the facts, or in the alternative, recuse himself from further consideration of the motion due to Judicial bias. This action and or inaction creates a prima facie implication for malfeasance. see, Clemmens v. Wolf, 377 F.3d 322, 328 (3rd. Cir. 2004); Commonwealth v. Adkinson, 442 Mass. 410, 813 N.E.2d 506 (2004) ("To show

that a judge abused his discretion by failing to recuse himself, a defendant must ordinarily show that the judge demonstrated a bias or prejudice arising from an extrajudicial source, and not something learned from participation in the case.") Premises' of law axiomatically support the contention that where the judge was compelled to avoid extrajudicially derived information, he is thus concurrently compelled to include all admissible collateral evidence as well, where his potential recusal might be required.

On June 1st., 1993, while released on personal recognizance, Jose Pacheco's Indictments to these murders were dismissed without opposition by then Judge Fransis X. Spina. In matter of fact, the Motion for Dismissal of Indictments were supported by the District Attorney's Office (Ex. No. 6).

When Mr. Rivera suffered the summary dismissal of his new trial motion he sought review in Supreme Judicial Court for Leave to Appeal pursuant to G.L. c. 278 sec. 33E. (P.2 8/5/04) Mr. Rivera had to seek extraordinary relief due to Judge Ford's ineptitude in submitting the Notice of Appeal, late. (P.3) On September 14th. 2004, Justice Sosman issued a Modified Order allowing Rivera to file his application without a hearing. (P.11)

Mr. Rivera, was not then aware of the trial court decision by then Judge Spina, dismissing Pacheco's indictments. Therefore there was no implied significance to him when Rivera's petition was denied by Justice Spina on December 14th. 2004. (P.14)

On May 19, 2005, Rivera was transferred from MCI Cedar Junction to

9

MCI Norfolk. Upon arrival Rivera renewed associations with codefendant Raymond Rebello. During the course of their conversations Rivera learned that Rebello had been granted an evidentiary hearing, bringing several factors to light for Rivera. He obtained a copy of Rebello's Docket Entries, revealing the aforementioned release four days after Rivera's conviction and the involvement of then Judge Spina in dismissing the four count Murder indictment against Jose Pacheco. Learning as well that a great deal of the deliberations concerning the dismissal of the indictments were held extrajudicially in unrecorded lobby conference. (Ex. Nos. 6, 10 at 13)

Enlightened as to the conduct of both Judge Ford and now Justice Spina's involvement in the prosecution's connivance regarding the testimony of Jose Pacheco. As well as the Judges complecity in rewarding this contemptuous deception of the jury. Demonstrating clearly, that Rivera's due process rights were violated. Indeed, The United States Supreme Court has identified two types of errors in Habeas proceedings: Structural and Trial. see; Arizona v. Fulminante, 499 U.S. 279, 306-10, 111 S.Ct. 1246, 113 L ED2d 303 (1991). A defect in the trial mechanism itself affecting the entire trial process is a structural error and is pre se prejudicial. see Yohn v. Love, 76 F.3d 508, 522 (3rd. Cir. 1996) ("The determination of whether an error is structural depends on not only the right violated, but the 'nature, context and significance of the violation.'") United States v. Pearson, 203 F.3d 1243, 1261 (10th. Cir 2000). Further, that "(a) structural is never harmless, but a trial error, "is amenable to harmless-error analysis because it ' may ... be quantitatively assessed

in the context of other evidence presented in order to determine the effect it had on the trial.'" Brect v. Abrahamson, 507 U.S. 619, 629, 113 S.Ct. 1710, 123 L ED2d 353 (1993).

Rivera posits that the record demonstrates with sufficient validity the due process violations which implicitly lie at the feet of the judiciary. This is neither the venue or the proper methodology to imply further innuendo. The contention raises that River's due process rights were violated and clearly that is presented herein.

## SUMMARY OF THE ARGUMENTS

With the submission of the verified affidavit by Jose Pacheco and the polygraphed confirmation attesting to the truth that Pacheco's trial testimony was false, there remains no corroborated evidence implicating Rivera to the crime. Indeed, Rivera has been swearing his innocence for all these years. The trial was a mockery of justice and Rivera's due process rights were thrashed at every turn. Because "little direct or circumstantial evidence supported either side's version of events and the material inquiry is a context specific determination" there remains no basis for guilty finding. citing, Ellsworth v. Warden, 333 F.3d 1, 9 (1st. Cir. 2003)(en banc) quoting Spicer v. Roxbury Corr' Inst., 194 F.3d 547, 560 (4th. Cir. 1999). And then relief must be granted, Ely v. Matesanz, 983 F. Supp.2d 21, 35-45 (D.C. Mass. 1997); Jenkins v. Artuz, 294 F.3d 284, 292-297 (2nd. Cir. 2002); William v. Taylor, 529 U.S. 420, 437 (2000); Phoenix v.

11

Matesanz, 189 F.3d 20, 27-29 (1st. Cir. 2001) and, <u>Banks v. Dretke,</u> 124
S.Ct. 1256, 1268-69 (2004).

## CONCLUSION

Rivera therefore prays this court consider the sum of the evidence
and contentions submitted and issue forth the Writ of Habeas Corpus.
Granted, there are other less potent remedies available to the court to
remedy the egregious conduct of the government; the court could order an
Evidentiary hearing to verify the factual and legal basis for Rivera's
claims, however that would be redundant as the evidentiary hearing in
Rebello's case proffered the facts to the petitioner's case, this court
could issue a conditional habeas remedy vacating the conviction and
compelling a conditional release, this remedy requires the state to retry
the petitioner, or else release him. see e.g. <u>Dugas v. Coplan,</u> 428 F.3d
317, 342 n.37 (1st. Cir. 2005); <u>Ouber v. Guarino,</u> 293 F.3d 19, 35 (1st.
Cir. 2002). Rivera, submits that although he has not exhausted a claim
of insufficiency of evidence, with the omission of the exclusive and key
witness against him, there remains little if any credible evidence to
support the conviction. For that reason among others, Rivera moves this
court to adopt the reasoning in, <u>Foxworth v. Maloney,</u> ___ F3d. ___ (1st
Cir. 2008) (docket no. 06-2379, 1/24/08 before Lynch, C.J., Campbell, C.J.
and Selya, Senior Judge.) and in application of Foxworth, issue the great
writ forthwith.

UNDER THE PAINS AND PENALTIES OF PERJURY

Dated: April **5**, 2008

Luis Rivera, pro-se  _Luis J. Rivera Jr_

Mr. Luis F. Rivera Jr
N.C.C.I Gardner
P.O. Box 466
Gardner, MA. 01440-0466

January 2, 2001.

Clerk Of Courts
Marie G. Mazza, ESQ
Hampden Superior Court
P.O. Box 559
Springfield, MA. 01102-0559

Ex H 1

**RE:** Docket Entries Of Jose A. Pacheco,
A Co-defendant. <u>Indictment NO: 91-2243-46.</u>

Dear Clerk:

I am requesting that a copy of Mr. Pacheco's
Docket Entries. be mail to me at the above address
Thank you for your Time, and Attention to this matter.

Sincerely,

*Luis F. Rivera Jr*

Luis F. Rivera Jr

cc:File

COMMONWEALTH OF MASSACHUSETTS

HAMPDEN COUNTY

SUPERIOR COURT
NO(S) 91-2247-2251

COMMONWEALTH

V.

LUIS FERNANDO RIVERA, JR.

### AFFIDAVIT TO RECANT FACTS OF TESTIMONY
### I GAVE AT THE DEFENDANT'S TRIAL

I, Jose Pacheco, do hereby swear and attest that the following facts are true to the best of my knowledge and belief.

I make this affidavit in support of my wish to recant certain facts I gave in my testimony at the trial of the above named defendant.

1. I am presently an inmate incarcerated at M.C.I. Concord. My inmate identification number is $W70662$

2. At trial, in June of 1992, I testified that the defendant held a gun to my head because I was running traffic lights and was likely to call attention my vehicle. The defendant never held a gun to my head or to any other part of my person.

3. At trial, I testified that I witnessed the defendant shoot Angel Carcano and Guillermo Santiago as I claimed I was at the scene of this crime. I was not at this, or any other crime scene, during the commission of the aforementioned shootings and did not witness any crime being committed by the defendant.

4. At trial, I testified that I accompanied the defendant to the stated crime scene. I did not as the defendant dropped me off at my mother's home on Main Street in Holyoke prior to the time

the alleged crime was said to have been committed.

I am willing to testify to the above matters in court and under oath.

Signed and sworn to under the pains and penalties of perjury on this   15th   day of November, 2002, at M.C.I. Concord in Concord, Massachusetts.

_____   9/15/02
JOSE PACHECO

_____ 9/15/02
WITNESSED BY

COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, ss                          SUPERIOR COURT DEPARTMENT
                                     CRIMINAL DIVISION

                                     Docket No.(s) 91-2247-2251

Commonwealth

v.

Luis Fernando Rivera, Jr.

### AFFIDAVIT TO RECANT FACT OF TESTIMONY
### I GAVE AT THE DEFENDANT'S TRIAL

I, Jose Pacheco, do hereby swear and attest that the
following facts are true to the best of my knowledge and
belief.

I make this affidavit in support of my wish to recant
certain facts I gave in my testimony at the trial of the
above named defendant.

1. I am presently an inmate incarcerated at M.C.I.
_____, my inmate identification number is
W-70663.

2. At trial, in June of 1992, I testified that I did
not get a deal or promises for my testimontagainst the
defendant, when in fact I had a verbal agreement with the
A.D.A. Howard Safford, that after testifiying against the
defendant that I would be released on low bail and would
not face prosecution.

3. I am willing to testify to the above matters in
Court and under oath. Also, I am willing to take a
Polygraph if all parties agree. Signed and sworn under
the pains and penalties of perjury on this _16_ day, of _May_
2003, at M.C.I. Cedar Junction in Walpole _____, Massachusetts.

_____
Jose Pacheco, W-70663

_____
Witnessed by

Common Wealth  10/11/2007

Superior Court No.(S)91-2247-2251

COMMONWEALTH

V.

Luis Fernando Rivera, Jr.

### AFFIDAVIT TO RECANT FACTS OF TESTIMONY I GAVE AT THE DEFENDANT'S TRIAL

I, Jose Pacheco, do hereby swear and attest that the following facts are true to the best of my knowledge and belief.

I make this affidavit in support of my wish to recant certain facts I gave in my testimony at the trial of the above named defendant.

1.) I am presently an inmate incarcerated at M.C.I. Walpole. My inmate identification number is W70663.

2.) At trial, in June of 1992, I testified that the defendant held a gun to my head because I was running traffic lights and was likely to call attention to my vehicle. The defendant never held a gun to my head or to any other part of my person.

3.) At trial, I testified that I witnessed the defendant shoot Angel Carcano and Guillermo Santiago as I claimed I was at the scene of this crime. I was not at this, or any other crime scene, during the commission of the aforementioned shootings and did not witness any crime being committed by the defendant.

4.) At trial, I testified that I accompanied the defendant to the stated crime scene. I did not, as the defendant dropped me off at my mother's home on Main Street in Holyoke prior to that time.

5.) At trial, in June of 1992, I testified that I did not get a deal or promises for my testimony against the defendant, when in fact I had a verbal agreement with A.D.A. Howard Safford, that after testifying against the defendant that I would be released on low bail and would not face prosecution.

6.) I am willing to testify to the above matters in Court and under oath. Also, I am willing to take a Polygraph if all parties agree.

Signed and sworn under the pains and penalties of perjury

on this ___7th.___ day, of ___October___ 2003, at M.C.I.

Cedar Junction ___ in ___Walpole___ , Massachusett.

Jose Pacheco, W70663

Witnessed by

Ethel A Lavally, Notary
Comm. exp 10/15/2107

ExH 2

## EXHIBIT #2

January 2,2001 Affidavit of Francis Pabon (3 pages)

Commonwealth of Massachusetts

Hampden, SS:

Superior Court

Criminal Action

Ind No. **91-2247**
**91-2248**
**91-2249**

Commonwealth

VS.

Luis F. Rivera Jr

### Affidavit of Francis Pabon

Upon information and belief, I, Francis Pabon, hereby depose and
aver as follow:

1) My name is Francis Pabon A.K.A. Antonio Vasquez, on or about
Aug 26, 1991 I was incarcerated at York Street Jail under the
name Antonio Vasquez.

2) I was habed into the Hampden Superior court and placed in a
cell, I met with my Attorney John Woodruff and A.D.A. Howard Safford

3) While confined in the court lock-up, Jose Pacheco came from
the Street and was placed into the same cell as I. Attorney
Allen Black was representing Jose.

4) A.D.A. Safford had both transported to the Northampton County
Correctional Center, Northampton, Ma.

5) While confined at northampton, Jose and I met daily. Jose tried
to talk me into making up a story about " Pete " by saying that
while I was confined at York Street that I over heard " Pete "
ordering the murders of two informants regarding a pending drug
case; I refused to get involved with this suggestion from Jose.
Jose was confined in " A " Block and I was confined in " B " Block.

6) I knew Jose Pacheco for approximately four (4) years.

7) Jose told me that on Aug 24, 1991 at 1:00 am, he was in his
car with Angel Carcano and some other guys and that Jose was dropped
off at his mother's house and Angel wanted to know why Jose wanted
to be dropped off and Jose stated that he had to take care of
something and told Angel go with these guys and get the weed and
come back and pick me up; At 1:30 am these guys came back and picked
Jose up. Then they went to Jackson Parkway.

8) Before the murder, there was another kid in Holyoke and he
was from N.Y. I know that because he had a red pick up truck
with N.Y. license plates; he use to hang with my friends all
the time.

9) About this kid from Boston, I only seen him two (2) or three
(3) occasions, I bought weed from him and I never seen him with
my boys.

10) In Sept 1991, Jose Pacheco and I were talking about the murders
of Angel and Guillelmo. I asked him if he was there when they
got killed; I was curious about what happened that night as Angel's
Uncles are my friends. Jose told me that he had to lie and say
that he was there, so A.D.A. Safford could convict everyone. Jose
told me that he didn't know the kid from Boston and that kid was
not in his car at all on Aug 24, 1991. Jose said he lied so he
would stay out of jail.

11) Jose was always telling me to " lie " so that I could get a
small sentence and go home.

12) A.D.A Safford was always telling me to lie, he told me if you
" Lie " you will do your time in Northampton and when you go up
state, I will have you transferred back and have your tome cut
in half.

13) I was not thinking straight at that time, I was 19 years old,
with no responsibilitys, no future, I was using drugs and facing
state time and was mixed up and confused.

14) Jose was constantly on me, he wanted me to lie. I can't say
anything about the kid because he was not there, I couldn't lie
about him but I could lie about the other guys. Now I've grown up
and matured and I am a real man. I realize now that i was doing
the wrong thing and will feel better if I can say what really
happened and why I couldn't say anything about the kid. Jose Pacheco
is a liar and he lied from the beginning to the end. He never had
a gun put to his head.

" Jose told me if I had a gun put to my head that night, do you
think they would of let me live ? I wasn't there and have no idea
what happened, A.D.A. Safford coached me on what to say when the
trial would take Place. "

-2-

15) In October 1991 I received a 9 to 10 year sentence and went
to MCI Concord, In Dec 1991 A.D.A. Safford had me transferred back
to the Northampton County Correction Center, Northampton, Ma.
16) Jose was constantly trying to brain wash me, he said that A.D.A.
Safford would take away the 9 to 10 year sentence inexchange for
me to make up a story and lie about " Pete " allegedly ordering
the murders of the two (2) informants.
Signed under the pains and penalties of perjury on this ___2___ day
of January 2001.

Mr. Francis Pabon
A.K.A.
Antonio Vasquez
N.C.C.I. Gardner
P.O. Box 466
Gardner, Ma.
01440-0466
Tele# 978-632-2000

Witnessed by

Margaret A. McCarthy, Notary Public
Commonwealth of Massachusetts
My Commission Expires 10/20/2006

Sworn and transcribed on this ___2___ day
of January 2001.

-3-

$\mathcal{E}\chi H\ 3$

## EXHIBIT #3

October 29,2004 Affidavit of Charles K. Stephenson (4 pages)

.

C.A. 32

AFFIDAVIT

My name is Charles K. Stephenson.  Under oath, I
depose and say that:

> 1.  I am an attorney licensed to practice in
> the Commonwealth of Massachusetts.  My Board
> of Bar Overseers registration number is
> 479150.  In the early 1990's, I served as
> appointed counsel to Jose Pacheco, who was
> one of five or six men who were charged with
> committing a double murder in Holyoke.
>
> 2.  Mr. Pacheco's case was resolved in 1994,
> and I have destroyed whatever records I
> originally retained from the case.  For that
> reason, I have only my memory to rely upon in
> completing this affidavit.  Although I
> clearly remember the important events in the
> case, I cannot recall other details, and I am
> uncertain as to the precise order of some
> events; when that is the case, I have tried
> to so indicate.
>
> 3.  From the outset, based on conversations
> with Mr. Pacheco and the Holyoke police, and
> my ongoing review of discovery materials, it
> was my impression that Mr. Pacheco had been
> an unwilling participant in the offense.  I
> was appointed to represent Mr. Pacheco on a
> Sunday afternoon; by the end of the same
> week, I had called District Attorney Bennett
> to suggest that he seek an order immunizing
> Mr. Pacheco from prosecution because he was a
> witness rather than a co-venturer.  Mr.
> Bennett did not take my suggestion seriously,
> and countered that he might consider
> permitting Mr. Pacheco to plead guilty to
> second degree murder.  It was not my
> impression that even that suggestion was in
> the nature of a serious offer, and it was
> certainly wholly unacceptable to me, so I
> decided to pursue a different strategy.



1

C.A. 33

4.    Based on the discovery and my research on
the subject of duress, I concluded that
although there still exists doubt that
Massachusetts courts will recognize that
defense in a homicide case (I remember one
case was entitled <u>Commonwealth</u> v. <u>Robinson</u>,)
it nevertheless would be an appropriate
defense to offer on Mr. Pacheco's behalf
should his case ever come to trial.  To that
end, as the government began preparing their
cases for trial and when I was contacted by
Howard Safford, I agreed to discuss with Mr.
Pacheco whether he would be willing to
testify as a witness against his co-
defendants.                     .

5.    Although I have been contacted by
Attorney Leslie O'Brien, whom I know, and
advised that Mr. Pacheco has signed a waiver
of his attorney/client privilege, I have not
actually seen that waiver, and decline to
discuss my communications with Mr. Pacheco in
this affidavit; he did, however, appear as a
witness in the trials of the other
defendants, and in addition to describing the
actions of those men, characterized his own
participation (as driver) as being forced
upon him at gunpoint and on threat of death--
both for himself and for the members of his
immediate family, which included his wife and
several children.

6.    I believed that, having relied on Mr.
Pacheco as its central witness in every
trial, and having elicited on each such
occasion Mr. Pacheco's testimony that he had
acted under extreme duress, the government
would be effectively estopped from opposing a
duress defense if Mr. Pacheco should ever be
brought to trial; it was also my intention,
later put into practice, to file a motion to
dismiss the indictment against him (a
"<u>Brendano</u>" motion,) again premised on the
theory that the government could not then
reasonably claim Mr. Pacheco had been
anything more than a third victim, although
one who had avoided being killed.



2

C.A. 34

7. While I must have described Mr. Pacheco
as a witness/victim in my discussions with
Mr. Safford, at no time did I discuss my
planned <u>Brendano</u> motion with him. Although I
cannot be certain that I was present on every
occasion when Mr. Pacheco discussed the case
with Mr. Safford, at no time in my presence
did Mr. Safford make any offers to Mr.
Pacheco, except on their first meeting, when
he explained that all he could promise Mr.
Pacheco was that his "cooperation would be
taken into consideration" when his case was
evaluated. For the reasons I have explained,
I never asked for any further assurances, nor
did I ever press to have Mr. Pacheco's case
resolved.

8. It is my best recollection that Mr.
Pacheco was still in custody when he first
testified, because I remember buying him
clothing (although he could have arrived for
another trial without suitable clothes.) At
some point before the trials were completed,
however, he was released on bail. Although
that action could be construed as
"consideration," and the government must have
agreed to the reduction or elimination of
what was originally a prohibitive bail order,
I never made his release a condition for Mr.
Pacheco's cooperation; it was a request, not
a demand. In addition, because Mr. Pacheco
later appeared as a civilian witness, not in
custody or restraints, it is my assumption
that the other defense lawyers were aware of
that circumstance and attempted to exploit
it.

9. At one point after Mr. Pacheco was
released on custody, I remember visiting him
the night before he was to testify. He was
staying with his family in a room at the
Hampton Inn on Riverdale Street in West
Springfield. I am confident that the
government must have paid for that room. I
also recall that he spent at least some of
the time between his release and the
dismissal of the charges against him
somewhere out of the area, although I do not
recall whether it was in east/central
Massachusetts or Connecticut. I also have a



3

C.A. 35

vague recollection that at some point he
travelled to Puerto Rico, but I have no
memory of the reason, or whether the
government might have borne some or all of
that expense. On one or perhaps two
occasions, when preparing Mr. Pacheco to
testify during an evening meeting, Mr.
Safford or one of his colleagues provided Mr.
Pacheco and me with soft drinks and
sandwiches.

10. After all of the co-defendants' cases
were tried, I filed my planned motion to
dismiss the indictment. The motion was heard
by then Superior Court Justice Francis X.
Spina. My only clear recollection of that
hearing is that after I gave my explanation
of the facts and theory supporting the
motion, Judge Spina asked Mr. Safford if,
having essentially sponsored Mr. Pacheco's
version of events through four trials, he
could then claim that Mr. Pacheco had been a
willing participant. While I do not recall
Mr. Safford's exact response, he in essence
conceded that he could not make such a claim.
The motion was allowed on the basis of the
theory I argued.

Signed under penalties of perjury, this twenty-ninth

day of October, 2004, at Granby, Massachusetts.

Charles K. Stephenson

4

Exh 4

## EXHIBIT #4

March 6,2004 Superior Court Notice of Appeal
(1 page)

Proof of March 1,2004 mailing from Superior Court
(1 page)

March 12,2004 Correspondence from Superior Court Clerk
(1 page)

COMMONWEALTH OF MASSACHUSETTS

HAMPDEN,SS.                              SUPERIOR COURT DEPARTMENT
                                        Nos 91-2247 thru 91-2251
                              *
COMMONWEALTH                  *
                              *                         HAMPDEN COUNTY
V.                            *                         SUPERIOR COURT
                              *                              FILED
                              *
LUIS RIVERA                   *                         MAR - 9 2004
************************       *
                                                        CLERK-MAGISTRATE
NOTICE OF APPEAL OF NEW TRIAL MOTION DENIAL RECEIVED
MARCH 3,2004 WITH MOTION JUDGE FORD ORDER CLERK    TO
ENTER MARCH 1,2004 LATE NOTICE ON DOCKET FOR PURPOSE
OF 30 DAY LIMITED C.278,SECTION 33E S.J.C.    APPEAL

          Now comes the defendant and, pursuant to
Appellate Rules 3,4 and 14(b), files his notice of appeal
from the clearly erroneous abuse of discretion of Judge Ford
denying a Rule 30(b) motion for a new trial purportedly on
November 20,2003, which the clerk gave first notice of by mailing
such decision on March 1,2004, where only 30 days are allowed
for filing a c.278,§ 33E single justice gatekeeper application
for leave to appeal,COMMONWALTH V. MAINS,433 Mass 30,37 n.10
(2000) and Judge Ford is know for cheating defendants out of appeals
by a pattern of either backdated rulings, or maliciously late
notice.see e.g. COMMONWEALTH V. THOMAS,Berkshire# 98-922(Ford,J.
Rule 30 denial on 8/30/02 given notice of on 9/19/03 late
appeal pending after Ford refused to correct error on 2/13/04).

          The defendant shall be filing his SJC Single
Justice petition winning reversal for a full evidentiary hearing
within 30 days of the March 1,2004 late notice and suggests that
Judge Ford make required Rule 30(b) findings of fact at this
time with respect to the several meritorious grounds presented in
the pro se new trial motion.

March 6,2004                       MOST RESPECTFULLY SUBMITTED,
COPY SERVED ON HAMPDEN
COUNTY DISTRICT ATTORNEYS OFFICE
                                   Luis Rivera pro se
                                   PO Box 100
                                   S.Walpole,MA.02071

MARIE G. MAZZA, ESQUIRE
Clerk of Courts
Hampden Superior Court
P.O. BOX 559
Springfield, MA 01102-0559

Sjs

LEGAL.

02071+0100  01

13

Luis F. Rivera, Jr. W-52832
P.O. Box 100
South Walpole, MA 02071

**MARIE G. MAZZA, ESQUIRE**
**CLERK OF COURTS**

ADDRESS ALL COMMUNICATIONS TO:
**CLERK, SUPERIOR COURT**
**DEPARTMENT OF THE TRIAL COURT**
**HALL OF JUSTICE**
**P.O. BOX 559, 50 STATE STREET**
**SPRINGFIELD, MASSACHUSETTS 01102-0559**



**Hampden Superior Court**
**Commonwealth of Massachusetts**
**Office of the Clerk of Courts**

Office (413) 735-6016 or 6017
Fax (413) 737-1611 TTY (413) 827-9379

<u>**FIRST ASSISTANT CLERK**</u>
**DAVID M. CHERNOCK**

<u>**ASSISTANT MAGISTRATE**</u>
**STEPHANIE A. ROSCOE, ESQ.**

<u>**ASSISTANT CLERKS**</u>
**KEVIN J. CLAFFEY, ESQ.**
**CHERYL A. COSSABOOM**
**MARY C. CULLINAN**
**WILLIAM L. EASON**
**JOHN J. FITZGERALD**
**LAURA S. GENTILE, ESQ.**
**TERRENCE C. GINLEY**
**DAPHNE G. MOORE, ESQ.**

March 12, 2004

Luis F. Rivera, Jr., W-52832
P.O. Box 100
S. Walpole, Mass. 02071

RE.: COMMONWEALTH VS. LUIS RIVERA
    Hampden Superior Court case nos. 91-2247-2251

Dear Sir:

Please be advised we are in receipt of your notice of appeal and the same has been filed and docketed in your case. However, you are referred to M.G.L. C.278, §33E for determining proper venue and procedure for filing such an appeal.

Very truly yours,

Nancy Ann Kedzior
Deputy Assistant Clerk

NAK/




EXHIBIT
# 5
3 pages

APPEAL



## United States District Court
### District of Massachusetts (Boston)
**CIVIL DOCKET FOR CASE #: 1:04-cv-12717-RCL**

Rivera v. Nolan
Assigned to: Judge Reginald C. Lindsay
Cause: Petition for writ of habeas corpus

Date Filed: 12/28/2004
Jury Demand: None
Nature of Suit: 530 Habeas Corpus
(General)
Jurisdiction: Federal Question

**Petitioner**

**Luis Rivera**

represented by **Luis Rivera**
W-52832
P.O. Box 43
Norfolk, MA 02056
PRO SE

V.

**Respondent**

**David Nolan**
*Superintendent*

represented by **Maura D. McLaughlin**
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
617-727-2200, ext 2857
Fax: 617-727-5755
Email:
maura.mclaughlin@ago.state.ma.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/28/2004 | 1 | PETITION for writ of habeas corpus pursuant to 28:2254 $ 5, receipt number 61106, filed by Luis Rivera. (Attachments: # 1 Attachment) (Stanhope, Don) (Entered: 12/30/2004) |
| 12/28/2004 | 2 | MOTION for New Trial with Evidentiary Hearing and Assignment of Counsel Requests. by Luis Rivera.(Stanhope, Don) (Entered: 12/30/2004) |
| 01/03/2005 | 3 | Judge Reginald C. Lindsay : Electronic ORDER entered. SERVICE ORDER re 2254 Petition. Order entered pursuant to R.4 of the Rules governing Section 2254 cases for service on respondents. Answer/responsive pleading due w/in 20 days of rcpt of this order. (Hourihan, Lisa) (Entered: 01/03/2005) |
|  |  |  |

| 02/01/2005 | 4 | MOTION to Dispense with Conference Requirements of Local Rule 7.1 by David Nolan.(McLaughlin, Maura) (Entered: 02/01/2005) |
|---|---|---|
| 02/01/2005 | 5 | MOTION to Dismiss *Petition for Writ of Habeas Corpus as Time-Barred* by David Nolan.(McLaughlin, Maura) (Entered: 02/01/2005) |
| 02/01/2005 | 6 | MEMORANDUM in Support re 5 MOTION to Dismiss *Petition for Writ of Habeas Corpus as Time-Barred* filed by David Nolan. (McLaughlin, Maura) Additional attachment(s) added on 2/4/2005 (Stanhope, Don). (Entered: 02/01/2005) |
| 02/08/2005 | 7 | Petitioner's Preliminary Opposition to 5 Respondent's MOTION to Dismiss *Petition for Writ of Habeas Corpus as Time-Barred* filed by Luis Rivera. (Attachments: # 1 Affidavit)(Stanhope, Don) (Entered: 02/10/2005) |
| 02/08/2005 | 8 | Petitioner's Cross- MOTION to Appoint Counsel for Habeas Rule 8 Full Evidentiary Hearing. filed by Luis Rivera.(Stanhope, Don) (Entered: 02/10/2005) |
| 02/09/2005 | | Judge Reginald C. Lindsay : Electronic ORDER entered granting 4 Motion To Dispense with the Conference Requirement of Local Rule 7.1 filed by David Nolan. Any motion filed pursuant to this order shall: state the following in a prominent place thereon: "By order of the court, the moving party was not required to confer with other parties before filing this motion." (Hourihan, Lisa) (Entered: 02/09/2005) |
| 05/21/2005 | | Judge Reginald C. Lindsay : Electronic ORDER entered denying 8 Petitioner's Motion to Appoint Counsel, without prejudice to a renewal of the motion should the court determine that an evidentiary hearing is necessary for the resolution of the issues raised in the petition. (Lindsay, Reginald) (Entered: 05/21/2005) |
| 05/23/2005 | 9 | NOTICE of Change of Address filed by Luis Rivera (Stanhope, Don) (Entered: 05/23/2005) |
| 06/08/2005 | 10 | MOTION to Amend/or Supplement the Pleadings by Luis Rivera.(Bell, Marie) (Entered: 06/09/2005) |
| 06/08/2005 | 11 | AFFIDAVIT of Luis F. Rivera re 10 MOTION to Amend/or Supplement the Pleadings by Luis Rivera. (Bell, Marie) (Entered: 06/09/2005) |
| 06/17/2005 | 12 | Judge Reginald C. Lindsay : ORDER entered granting 5 Motion of respondent to dismiss petition for writ of habeas corpus as time-barred; finding as moot 10 Motion of petitioner to amend/or supplement the pleadings; and finding as moot 2 Motion of petitioner for new trial with evidentiary hearing and assignment of counsel requests. The reasons for these rulings are set forth in the accompanying memorandum and order. The clerk shall enter a judgment for the respondent, dismissing the petition and shall terminate this case on the court's docket.(Lindsay, Reginald) (Entered: 06/17/2005) |
| 06/21/2005 | 13 | Judge Reginald C. Lindsay : ORDER entered. JUDGMENT in favor of respondent against petitioner(Hourihan, Lisa) (Entered: 06/21/2005) |

| 06/28/2005 | 14 | MOTION to Amend 13 Judgment by Luis Rivera.(Patch, Christine) (Entered: 06/29/2005) |
|---|---|---|
| 07/12/2005 | 15 | MOTION to Withdraw 14 MOTION to Amend 13 Judgment by Luis Rivera, FILED.(Boyce, Kathy) (Entered: 07/14/2005) |
| 07/12/2005 | 16 | MOTION for Reconsideration of 12 Order by Luis Rivera, FILED, c/s. (Attachments: # 1 Exhibit A# 2 Exhibit B)(Boyce, Kathy) (Entered: 07/14/2005) |
| 09/08/2005 | | Judge Reginald C. Lindsay : Electronic ORDER entered withdrawing 14 Motion to Amend, granting 15 Motion to Withdraw, denying 16 Motion for Reconsideration (Hourihan, Lisa) (Entered: 09/08/2005) |
| 09/16/2005 | 17 | NOTICE OF APPEAL by Luis Rivera. $ 255 NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov/clerks/transcript.htm MUST be completed and submitted to the Court of Appeals. Appeal Record due by 10/11/2005. (York, Steve) (Entered: 09/19/2005) |
| 09/22/2005 | 18 | Certified and Transmitted Record on Appeal to US Court of Appeals re 17 Notice of Appeal, (Ramos, Jeanette) (Entered: 09/22/2005) |
| 09/30/2005 | 19 | USCA Case Number 05-2418 for 17 Notice of Appeal, filed by Luis Rivera.. (Ramos, Jeanette) (Entered: 09/30/2005) |
| 10/06/2005 | 20 | MOTION for the Issuance of a Certificate of Appealability by Luis Rivera.(York, Steve) (Entered: 10/06/2005) |
| 10/28/2005 | | Judge Reginald C. Lindsay : ElectronicORDER entered denying 20 Motion for Certificate of Appealability For Reasons Stated In The Memorandum and Order of 06/17/2005 (York, Steve) (Entered: 10/31/2005) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 11/15/2005 09:09:15 | | |
| **PACER Login:** us0081 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** 1:04-cv-12717-RCL |
| **Billable Pages:** 2 | **Cost:** | 0.16 |

# 06

## EXHIBIT #6

Clerk's Log for Indictment No: 91-2243
(2 pages)

Indictment No: 91-2243 (1 page)

Clerk's Log for Indictment No: 91-2244 (1 page)

Indictment No: 91-2244 (1 page)

Clerk's Log for Indictment No: 91-2245 (1 page)

Indictment No: 91-2245 (1 page)

Clerk's Log for Indictment No: 91-2246 (1 page)

Indictment No: 91-2246 (1 page)

Memorandum of Decision
In re: Commonwealth v. Rebello
SJC 09174 (9-Pages)

Hampden Division
Superior Court Department
William J. Martin Jr.
Clerk/Magistrate

PAGE 2
CLERK'S LOG

Case No.  91-2243    28

COMMONWEALTH  V.      JOSE ANTONIO PACHECO, ALIAS

| Date | Judge | Procedure | Clerk | Ct. Reporter |
|------|-------|-----------|-------|--------------|
| 7-10-92 | Sweeney | Status Report  10-30-92 | EASON | Tape |
| 2-16-93 | Moriarty | Per possible plea  2-18-93 | EASON | Torruella |
| 2-18-93 | Moriarty | Status Report  2-22-93 | EASON | Parker |
| 2-22-93 | Moriarty | Motion Hearing  4-14-93 | EASON | Santino |
| 5/25/93 | Spina | Cont'd to 4/1/93 mot. hearing | Malta | Leer |
| 6-1-93 | Spina | Case ordered Dismissed by the court | EASON | Freer |

true copy.

Attest:

William L Casse

Assistant Clerk

Hampden Division
Superior Court Department
William J. Martin, Jr.
Clerk/Magistrate

**CLERK'S LOG**

Case No. **91 2243**    29

COMMONWEALTH    v.

JOSE ANTONIO PACHECO, ALIAS    Assistant District Attorney

| Date 9-4-91 | Judge --- | Procedure Order to Notify. | Clerk | Ct. Reporter |
|---|---|---|---|---|
| 9/6/91 | Alberti, G | PLEA: P.N.G. $1,000.000 C.S BAIL: W/O prej. Date of: Pretrial Conference: 9/16/91 | Eason | Freer |
| 9/16/91 | Ford, J. | attys Conference 9/24/91 | Eason | Freer |
| 10/1/91 | Kirby | Motion Heard | Martin | Bier |
| 11-25-91 | Ford | After a Review of | Eason | Sullivan |
|  |  | Bail court sets Bail at |  |  |
|  |  | 500,000. c/s on this indictment |  |  |
| 3/2/92 | Sweeney J | This case along with | Eason | Freer |
|  |  | all Co-defts is assigned |  |  |
|  |  | to Judge Ford cresed status 4/6/92. |  |  |
|  |  | by order of the Court |  |  |
| 7/2/92 | Ford J | Lula 34 waiver approved | Vaughan | Toal |
|  |  | at to 10/30/92 -Rel on |  |  |
|  |  | personal suretied of |  |  |
|  |  | $75,000.00 Special |  |  |
|  |  | condition - deft. report |  |  |
|  |  | 3 days weekly to Holyoke |  |  |
|  |  | Armory. |  |  |
| 7-6-92 | Ford | Bail Remains at 75,000 personal | Eason | Tape |
|  |  | Surety But the 3 days weekly |  |  |
|  |  | Reporting To Holyoke Armory is |  |  |
|  |  | ordered vacated |  |  |

COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, ss.

SUPERIOR COURT
INDICTMENT NO. 91 2243 $^{30}$

COMMONWEALTH

vs.

JOSE ANTONIO PACHECO
WHO ALSO IS KNOWN AS CARLOS

INDICTMENT
MURDER
GENERAL LAWS CHAPTER 265, SECTION 1

At the SUPERIOR COURT, begun and holden at SPRINGFIELD, within and for the COUNTY of HAMPDEN, on the first Monday of September 1991.  THE JURORS for the Commonwealth of Massachusetts on their oath present that:

JOSE ANTONIO PACHECO
WHO ALSO IS KNOWN AS CARLOS

defendant herein, of HOLYOKE in the COUNTY of HAMPDEN, on or about August 24, 1991, at HOLYOKE in the COUNTY of HAMPDEN, did assault and beat Guillermo Santiago with intent to murder him, and by such assault and beating did kill and murder the said Guillermo Santiago.

A TRUE BILL

· Foreman of the Grand Jury

William M. Bennett

District Attorney

RETURN

HAMPDEN, ss.   On this 4th day of Sept , 1991, this indictment was returned and presented to said Superior Court by the Grand Jury, and ordered to be filed and filed.

ATTEST:

William L. Casse

Assistant Clerk

07991

A true copy.

Attest:
William L. Casse

Hampden Division
Superior Court Department
William J. Martin, Jr.
Clerk/Magistrate

**CLERK'S LOG**

**91 2244** 31

Case No. _____

COMMONWEALTH   v.

JOSE ANTONIO PACHECO, ALIAS.

Assistant District Attorney

_____

Attorney for Defendant

| Date 9-4-91 | Judge | Procedure Order to Notify, | Clerk | Ct. Reporte |
|---|---|---|---|---|
| 7/6/91 | Hilberh. J | Held w/c Right PLEA: P.N.G.   BAIL: to Bail w/o Date of: prej. Pretrial Conference: | Eason | Fair |
| 11-25-91 | Ford | After a Review of Bail the court sets Bail on this indictment pt 500,000 cls | Eason | Sullivan |
| 7/2/92 | Ford 2 | See # 91-2243 Bail : consideres the same - | Ferguson | Lope |
| 7-6-92 | Ford | | | |
| 7-6-92 | Ford | See # 91-2243 Bail conditions the same | Eason | Tape |
| 6-1-93 | Spina H | Dismissed by order of the court | Eason | Freek |
| A true copy. | | | | |
| Attest: William d Casse | | | | |
| | Assistant Clerk | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, ss.                                    SUPERIOR COURT                32
                                                INDICTMENT NO. 91 2244

COMMONWEALTH

VS.

JOSE ANTONIO PACHECO
WHO ALSO IS KNOWN AS CARLOS

---

INDICTMENT
MURDER
GENERAL LAWS CHAPTER 265, SECTION 1

---

At the SUPERIOR COURT, begun and holden at SPRINGFIELD, within and for the COUNTY of HAMPDEN, on the first Monday of September 1991.  THE JURORS for the Commonwealth of Massachusetts on their oath present that:

JOSE ANTONIO PACHECO
WHO ALSO IS KNOWN AS CARLOS

defendant herein, of HOLYOKE in the COUNTY of HAMPDEN, on or about August 24, 1991, at HOLYOKE in the COUNTY of HAMPDEN, did assault and beat Angel L. Carcano with intent to murder him, and by such assault and beating did kill and murder the said Angel L. Carcano.

A TRUE BILL

Foreman of the Grand Jury          District Attorney

---

RETURN

HAMPDEN, ss.   On this 4th day of Sept , 1991, this indictment was returned and presented to said Superior Court by the Grand Jury, and ordered to be filed and filed.

ATTEST:

Assistant Clerk

07991
A true copy.

Attest:

Hampden Division
Superior Court Department
William J. Martin, Jr.
Clerk/Magistrate

**CLERK'S LOG**

Case No. 91 2245          33

COMMONWEALTH      v.

JOSE ANTONIO PACHECO, ALIAS

Assistant District Attorney

Attorney for Defendant

| Date | Judge | Procedure | Clerk | Ct. Reporter |
|------|-------|-----------|-------|--------------|
| 5/6/91 | Hibert, J | PLEA:  P.N.G.   BAIL:<br>Date of:<br>Pretrial Conference: | Eason | Freer |
| 6-1-93 | Spina | Dismissed by order of the court | Eason | Freer |
| | A true copy. | | | |
| | Attest:<br>William a Cosing<br>Assistant Clerk | | | |
| | | | | |
| | | | | ! |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, ss.

SUPERIOR COURT
INDICTMENT NO. 91 2245

COMMONWEALTH

vs.

34

JOSE ANTONIO PACHECO
who also is known as CARLOS

---

INDICTMENT
CONSPIRACY TO MURDER
GENERAL LAWS CHAPTER 274, SECTION 7 AND COMMON LAW

---

At the SUPERIOR COURT, begun and holden at SPRINGFIELD, within and for the COUNTY of HAMPDEN, on the first Monday of September 1991.  THE JURORS for the Commonwealth of Massachusetts on their oath present that:

JOSE ANTONIO PACHECO
who also is known as CARLOS

defendant herein, of Holyoke, in the County of Hampden, beginning at a time unknown to the grand jury, but at least during or about August 1991, and continuing thereafter until on or about August 24, 1991, the exact dates being unknown to the grand jury, at Holyoke within the County of Hampden, did knowingly and intentionally combine, conspire, confederate and agree with Luis Fernando Rivera, Jr., who also is known as The Kid, Raymond Rios Rebello, who also is known as Ray Ray, Luiz Hernandez, Iran Diaz, who also is known as Cholo, and with other persons whose identities presently are not known to the grand jury to commit an offense against the Commonwealth, namely to murder Guillermo Santiago, in violation of General Laws chapter 265, section 1.

All in violation of the Common Law and General Laws chapter 274, section 7.

A TRUE BILL

_Gloria Lopez_
Foreman of the Grand Jury

_William L. Bennett_
District Attorney

---

RETURN

HAMPDEN, ss.    On this _4th_ day of _Sept_ , 1991, this indictment was returned and presented to said Superior Court by the Grand Jury, and ordered to be filed and filed.
    ATTEST:

_William A. Casoe_
Assistant Clerk

08921

A true copy.

Attest:
_William L. Casoe_
Clerk

Hampden Division
Superior Court Department
William J. Martin, Jr.
Clerk/Magistrate

**CLERK'S LOG**

Case No. **91 2246** 35

COMMONWEALTH    v.

_JOSE ANTONIO PACHECO, ALIAS_ .

Assistant District Attorney

Attorney for Defendant

| Date | Judge | Procedure | Clerk | Ct. Reporter |
|------|-------|-----------|-------|--------------|
| 9/6/91 | Albert, Q | PLEA: P.N.G.  BAIL: <br> Date of: <br> Pretrial Conference: | Eason | Freer |
| 6-1-93 | Spina | Dismissed by order of the court | Ehson | Freek |
| true copy. | | | | |
| Attest! <br> William d Easre <br> Assistant Clerk | | | | |
| | | | | |
| | | | | ! |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | — |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, ss.                              SUPERIOR COURT
                                         INDICTMENT NO.

                                              91 2246

COMMONWEALTH

36

VS.

JOSE ANTONIO PACHECO
who also is known as CARLOS

---

INDICTMENT
CONSPIRACY TO MURDER
GENERAL LAWS CHAPTER 274, SECTION 7 AND COMMON LAW

---

At the SUPERIOR COURT, begun and holden at SPRINGFIELD, within and for the COUNTY of HAMPDEN, on the first Monday of September 1991. THE JURORS for the Commonwealth of Massachusetts on their oath present that:

JOSE ANTONIO PACHECO
who also is known as CARLOS

defendant herein, of Holyoke, in the County of Hampden, beginning at a time unknown to the grand jury, but at least during or about August 1991, and continuing thereafter until on or about August 24, 1991, the exact dates being unknown to the grand jury, at Holyoke within the County of Hampden, did knowingly and intentionally combine, conspire, confederate and agree with Luis Fernando Rivera, Jr., who also is known as The Kid, Raymond Rios Rebello, who also is known as Ray, Ray, Luiz Hernandez, Iran Diaz, who also is known as Cholo, and with other persons whose identities presently are not known to the grand jury to commit an offense against the Commonwealth, namely to murder Angel L. Carcano, in violation of General Laws chapter 265, section 1.

All in violation of the Common Law and General Laws chapter 274, section 7.

A TRUE BILL

_Moreno D. Lopez_                        _William H. Bennett_
Foreman of the Grand Jury                District Attorney

---

RETURN

HAMPDEN, ss.   On this 4th day of Sept , 1991, this indictment was returned and presented to said Superior Court by the Grand Jury, and ordered to be filed and filed.
        ATTEST:
                                         _William P. Casol_
                                         Assistant Clerk

08021

true copy.

Attest:
    _William P. Casol_
    Assistant Clerk





## COMMONWEALTH OF MASSACHUSETTS

**HAMPDEN, ss.**

**SUPERIOR COURT
CRIMINAL NO.**

### COMMONWEALTH

vs.

### RAYMOND RIOS REBELLO

## MEMORANDUM OF DECISION AND ORDER DENYING DEFENDANT'S SUBSTITUTE MOTION FOR A NEW TRIAL

The defendant Raymond Rios Rebello was convicted in January 1993 of being an accessory before the fact to the deliberately premeditated first degree murders of Angel L. Carcano and Guillermo Santiago. In the appeal of his convictions to the Supreme Judicial Court, the defendant filed a "Substitute Motion For A New Trial" on the grounds that the Commonwealth violated the defendant's confrontation and due process rights by failing to fully disclose inducements to Jose Pacheco, a key prosecution witness, in exchange for his testimony and secondly, his right to a fair trial was violated by the admission of inflammatory and irrelevant evidence of uncharged misconduct. The motion was remanded to me, as the trial judge.

After consideration of the evidence presented during the new trial motion hearing, the submissions of the parties and my knowledge of the trial evidence, the defendant's substituted motion for a new trial is **DENIED** for the reasons stated herein.

## PRIOR PROCEEDINGS

In September 1991, a Hampden County Grand Jury returned indictments against the defendant charging him with being an accessory before the fact to the murders of Carcano and Santiago, as well as conspiring to murder them and being an accessory after the fact to their murders. The Commonwealth entered a nolle prosequi to the accessory after the fact indictments and the remaining indictments proceeded to trial before a jury in August 1992. The jury was unable to reach a verdict on any of the indictments and a mistrial was declared.

In January 1992, the defendant was retried on the accessory before the fact to murder indictments and was found guilty by the jury.[1] Within a week of the conviction, the defendant's trial counsel filed a "Motion for Entry of a Not Guilty Verdict Not Withstanding the Verdict And In The Alternative A Motion For A New Trial." I issued preliminary procedural orders to the parties in preparation for consideration of the motion. As the record reveals, the defendant filed some partial responses but the Commonwealth did not file any. As the procedural morass deepened, I was finally informed that a notice of appeal to the Supreme Judicial Court had been entered on the same day as the Motion for Judgment of Acquittal Not Withstanding the Verdict, thus this court no longer had jurisdiction of the case.

In late 2003, it was brought to my attention that our docket still showed that the case was on appeal, but the usual notifications we receive during the course of an appeal did not appear on the docket. I conducted a status hearing. The defendant's trial counsel claimed that he and the

---

[1] In his first trial, the defendant elected to have the accessory before the fact and the conspiracy indictments tried together. This did not occur in the second trial. The Commonwealth entered a nolle prosequi on the conspiracy indictment after the second trial.

2

## FACTS

From the trial evidence, the jury was warranted in finding that in 1991 the defendant was associated with Pedro Ramos in an extensive illegal narcotics distribution business in the City of Holyoke. Pedro Ramos controlled the business. Ramos and several of his cohorts were arrested on August 15, 1991 on charges of trafficking in cocaine.[3] The defendant was not present during the raids and was not arrested.

The defendant, along with other members of the organization, determined that the victims, Angel Carcano and Guillermo Santiago, had provided information to the police that led to the arrest of Ramos and some of his associates. Carcano and Santiago were, at the most, on the fringes of the Ramos organization. Several days before the murders of Carcano and Santiago, the defendant began to solicit individuals to kill Carcano and Santiago for their perceived treachery. In the ensuing days, the defendant arranged for Israel Diaz and Luis Rivera to carry out the murders. The defendant planned the method and means by which the killings would occur and procured the services of Jose Pacheco to drive the unwitting victims to the execution site.

On August 24, 1991, the killings were carried out in accordance with the defendant's directives. Guillermo Santiago was 32 years old when he was shot to death that day; Angel Carcano was fifteen years old.

Specifically, the trial evidence supporting the jury's verdict revealed that Pedro Ramos and David Soto were partners in a drug organization in New York City before 1991. Ramos

---

[3] See *Commonwealth v. Alvarez*, 422 Mass. 198 (1996) affirming the convictions of Ramos and others for trafficking in cocaine.

4

drugs were delivered to the Ramos apartment assistants would "work the table", meaning they would process and package the drugs for sale. Once the drugs were packaged, Ramos and Soto distributed them to the managers, who in turn would distribute them to the street dealers known as "pitchers." The pitchers would then sell the drugs to customers on the streets in Holyoke and parts of Springfield. Account ledgers were kept and ultimately discovered by the police.

Discipline within this inherently sordid organization was kept by equally sordid means. It was clear from the evidence that individuals who stole or did not follow orders were violently dealt with by designated enforcers within the organization. The defendant was aware of this and as a "manager" participated in it.

Needless to say, the ever-expanding Ramos organization came to the attention of law enforcement officials. On August 15th, Holyoke police officers searched the Hampden and Pleasant Street apartments pursuant to search warrants. At those locations the police found Pedro Ramos and some of his associates along with six vials of crack cocaine, a wallet belonging to one of the associates present in the apartment, Jeannette Pizarro. The wallet contained a receipt for a safety deposit box located at a New York bank. A search of the box by New York authorities revealed $19,000.00 in cash. A police scanner, numerous pagers and paperwork were also found at the Hampden Street location. In the adjacent 475 Pleasant Street location the officers discovered six loaded semiautomatic handguns and a sawed off shotgun. From a closet in that apartment, they unearthed a leather bag containing 650 vials of crack cocaine as well as a hamper containing 508 vials of crack cocaine and more than $6,500.00 in currency. A drug ledger as well as paraphernalia for the manufacture and distribution of narcotics were also seized from the Pleasant Street location. The defendant's name was found several times on the pages of

6

Pacheco encountered Hernandez, Diaz and the defendant. The three men informed Pacheco that the victims had informed on Ramos to the police. The defendant also told Pacheco that the victims stole items from Ramos's apartment. The defendant told Pacheco that Santiago and Carcano were going to be killed and that Ramos would pay individuals for assisting in killing them. He demanded to know what, if anything, Pacheco knew about the two men. Pacheco asserted at trial that he told the defendant he did not want to be involved and he also claimed that he later warned Santiago that he was a marked man.

However, a couple of days later, Pacheco and the defendant met and Pacheco drove the defendant to the parking lot behind 828 Hampden Street, where the two victims were working on a car. Pacheco testified that he did this so that the defendant could see what the victims looked like. Several hours before the murders Pacheco drove to the intersection of Elm and Hampshire Streets where he encountered Diaz, Rivera and the defendant. Pacheco drove the three men to a local convenience store at the defendant's direction. In the store, the defendant informed Pacheco that Pedro Ramos had ordered that Santiago and Carcano must be killed. The defendant told Pacheco that he would have to "get these people for us" because Pacheco was friendly with Santiago. In his testimony Pacheco claimed that he at first declined but when the defendant threatened to kill him and his family if he did not cooperate, Pacheco agreed to find Santiago and Carcano. He located them at their usual spot in the parking lot of 828 Hampden Street and invited them into his car so they could get "high." Pacheco testified that the victims were drunk and although he tried to warn them of what might happen, neither Santiago nor Carcano took the warning seriously.

Pacheco drove the unsuspecting victims back to the convenience store where Diaz and

8

## 1. **The Defendant's Claim of Violation of His Confrontation and Due Process Rights**

The same grand jury that indicted the defendant also indicted Jose Pacheco for the murder

of the victims. The murder indictment against Pacheco was dismissed on June 1, 1993 when the

court (Spina, J.) allowed Jose Pacheco's motion to dismiss.

The defendant contends that the jurors were never informed that Pacheco had been

promised he would receive a benefit for his testimony. That was not the case. The

Commonwealth never explicitly or implicitly promised Pacheco that his case would be

dismissed. Indeed the Commonwealth objected to the dismissal of the case by the court,

although they did not appeal the court's dismissal order. Before trial the Commonwealth did

provide an inducement to Jose Pacheco, who was represented by counsel. The inducement was

in writing and was provided to the defense. It states:

> Your cooperation will be taken into consideration by this office. Your
> complete and truthful testimony will benefit you on disposition of your
> case. It is our intention to treat you fairly.

During trial the prosecutor questioned Pacheco with respect to any understanding he had

with the Commonwealth. On this point, the prosecution established that Pacheco was charged

with the murders of Santiago and Carcano; that he had testified against other individuals charged

as a result of the murder; that he had been released and not held on bail. Pacheco testified that he

expected that he would be given consideration by the Commonwealth in exchange for his

cooperation. The defendant's trial counsel vigorously cross examined Pacheco as to his

motivation to testify including what he might expect from the Commonwealth in exchange for his

testimony. Both the prosecutor and trial counsel carefully followed the guidelines established in

10

charges against Pacheco on the grounds of duress. ADA Safford was the prosecuting attorney in the cases arising from the murders of Santiago and Carcano, including the indictments against the defendant. The dealings between Pacheco's attorney and the District Attorney's office fall into two categories. (1) negotiations for Pacheco's cooperation as a witness in return for consideration of the charges against him and (2) the positions taken by Pacheco's counsel and the District Attorney with respect to the motion to dismiss the murder charges against Pacheco.

As to the cooperation inducement, each attorney testified that Mr. Safford promised that Mr. Pacheco's testimony would be taken into consideration in evaluating any potential offer the District Attorney might make on the charges against Pacheco. ADA Safford testified that he knew the District Attorney would in all likelihood insist that Pacheco plead guilty to no less than second degree murder in exchange for his testimony. This was the District Attorney's standing policy and Mr. Safford complied with it by offering only "consideration" in exchange for Pacheco's testimony. Once Pacheco agreed to testify in exchange for "consideration" on the charges against him, Mr. Safford had no occasion to revisit the issue until 1993 when Pacheco's attorney filed a motion to dismiss the indictments.

Attorney Stephenson hoped that Mr. Pacheco's cooperation would bring more than an inducement for Pacheco to plead to second degree murder charges. Mr. Stephenson spoke with District Attorney William Bennett in the early stages of the cases against the various joint venturers, which includes the defendant. The District Attorney informed Mr. Stephenson that he might consider agreeing to Pacheco pleading to second degree murder but to nothing less than that. Mr. Stephenson was insistent that the charges against his client were vulnerable because of what he felt was an almost airtight defense of duress. The District Attorney was unswayed by this

12

the motion to dismiss the two murder indictments and the two conspiracy to commit murder indictments which the grand jury had handed down against Mr. Pacheco.

My role is not to review Judge Spina's decision. The question for me is whether or not there was any sub rosa agreement between the prosecutor and Pacheco's defense counsel to reward Pacheco for his testimony against the defendant by concocting a strategy to somehow convince a judge to dismiss the murder charges against Pacheco? There is no credible evidence that Attorney Stephenson and Assistant District Attorney Safford did anything other than that to which they testified.

I firmly reject Mr. Pacheco's testimony offered during the evidentiary hearing that he had no involvement in the murders nor did the defendant. Pacheco says his trial testimony was based on his expectation that the Commonwealth would arrange for his freedom if his testimony was in accord with the prosecution's theory of the case. The trial evidence established beyond question that Pacheco drove Santiago and Carcano to the execution site knowing full well that his other two passengers, Rivera and Diaz, intended to murder Santiago and Carcano. Indeed his description of how the wounds were inflicted on the victims was entirely consistent with the medical examiner's objective findings.

Mr. Pacheco walked away from these murders as a free man. Now he is in prison serving substantial sentences for armed robbery, assault and battery by means of a dangerous weapon and assault and battery, all arising from an unrelated incident. See the unpublished decision in *Commonwealth v. Pacheco*, 62 Mass.App.Ct.1114 (2004). There is little question that Pacheco's recantation is an effort to improve his lot among some of his fellow inmates, rather than a genuine desire to tell the truth.

14

exercised authority within it as contrasted with the *Rivera* defendant who was not a member of the Ramos organization. Also note should be made that the jury was instructed on the proper use of the challenged evidence.

## ORDER

The defendant's Substitute Motion for a New Trial is **DENIED**. The Hampden County Clerk of Courts will transmit a copy of this decision to the Clerk of the Supreme Judicial Court for filing in SJC No. 09174.

Constance M. Sweeney
Justice of the Superior Court

Dated: November 18, 2005

16

EXHIBIT#1
20 Pages

DeFeNDANt's First VERiFIED
Motion For NEW TriAL

June 14, 2004

Maura Doyle, Clerk
Supreme Judicial Court
Single Justice Session
One Beacon Street
Boston, Ma 02108

Re: Commonwealth v. Rivera, SJC #04- **0338**_____ Chapter 278,
    §33E Application For Leave To Appeal.

Dear Clerk Doyle:

Please find inclosed for filing in the above-entitled
matter, an exact **TYPED** copy of the "Defendant's First Verified
Mass. Crim. P. Rule 30(b) Motion For A New Trial With Evident-
iary Hearing And Assignement Of Counsel Requests."

For the Court's convenience, would you please **SUBSTITUTE**
this enclosed **TYPED** copy of the Defendant's Motion with the
hand-written copy originally filed.

Moreover, the defedant filed his Chapter 278, §33E Appli-
cation For Leave To Appeal on March 29, 2004, and he has yet
to receive a docket number and or response to his accompanying
motion (ASSIGNMENT OF COUNSEL}' The Defendant would greatly
appreciate it if the Clerk would inform him regarding these
matters.

Thank you very much for your time and attention to these
very important matters.

                              Very truly yours,

                              Luis Rivera, w-52832
                              POst Office Box 100
                              South Walpole, Ma 02071


Cc: William M. Bennett, Hampden County District Attorney

COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, SS.                    SUPERIOR COURT DEPT.

COMMONWEALTH                    ✕ No. 91-2247 THRU
                                      91-2251
V.                              HAMPDEN COUNTY
                                SUPERIOR COURT
                                     FILED

LUIS  RIVERA                    NOV 1 0 2003
✕ ✕ ✕ ✕ ✕ ✕
                                CLERK-MAGISTRATE

DEFENDANT'S FIRST VERIFIED
MASS. CRIM. P. RULE 30 (b) MOTION
FOR A NEW TRIAL WITH EVIDENTIARY
HEARING AND ASSIGNMENT OF COUNSEL REQUESTS

Now comes the defendant in the
above entitled matter, and moves this court
FOR A NEW TRIAL pursuant to MASS. CRIM. P.
Rule 30 (b), while requesting an evidentiary
hearing and also requesting Assignment
of counsel for such hearing, pursuant to
S.J.C. Rule 3:10 And MASS. GiL. c. 211D, 814,
presenting the following meritorious Grounds
One Issue of Ineffective Appellate counsel,
Ground Two Issue of both the Prosecutor
And Trial Judge misstating the meaning of
Reasonable doubt, Ground three Issue of
Ineffective Trial counsel who failed to
— 1 of 7 —

**Left margin (vertical text):**

I have a fairly clean memory of the witness Jose Pacheco's Testimony, having been at the trial of a co-defendant, Ivan Diaz. I it twice - I depth at this trial and at the having given the white serious consideration. Thereafter, the motion simply do not believe his alleged recantation, Thereafter, the other allegations are not truly see Commonwealth V Raymonds, 424 Mass 382, 397 (1997). The other allegations are not truly is Denied without a hearing - an evidentiary hearing requiring an evidentiary hearing - require a substantial issue requiring an evidentiary hearing.

11/20/10 n. 11-

**Bottom text:**

All statements made herein are made under
pain and penalty of perjury and all trial
transcript citations are true and accurate.
Also affidavits from Jose Pacheco and Frances Aabon.

COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, SS.                                    SUPERIOR COURT DEPT.
                                               NO. 91-2247 THRU 91-2251

```
                                    )
COMMONWEALTH                        )
                                    )
        V.                          )
                                    )
LUIS RIVERA                         )
                                    )
                                    )
```

DEFENDANT'S FIRST VERIFIED [1]
MASS. CRIM. P. RULE 30(B)
MOTION FOR A NEW TRIAL WITH
EVIDENTIARY HEARING AND ASSIGN-
MENT OF COUNSEL REQUESTS

Now comes the defendant, in the above-entitled matter,

and moves this court for a new trial pursuant to Mass. Crim.

P. Rule 30(b), while requesting an evidentiary hearing and also

requesting assignement of counsel for such hearing, pursuant

to S.J.C. Rule 3:10 and Masss. G.L.c. 211D, §14, presenting

the following meritorious ground one issue of ineffective appel-

late counsel, ground two issue of both the prosecutor and trial

judge misstating the meaning of reasonable doubt, ground three

issue of ineffective trial counsel who failed to prepare the

defendant to testify and failed to object to obvious closing

argument and instructional error, and ground four issue of the

main state witness revealing previously undisclosed and concealed

deals while recanting his perjured trial testimony.

---

[1] All statements made herein are made under pain and penalty
of perjury and all transcript citations are true and accurate.
Also affidavit from Jose Pacheco and Francis Pabon.

dentiary showing the judge should hold an evidentiary hearing,"
Commonwealth v. Stewart, 383 Mass. 254, 260-266 (1980); Common-
wealth v. Licata, 412 Mass. 654, 661-662 (1992); Commonwealth
v. Meggs, 30 Mass. App. Ct. 111 (1991); Commonwealth v. Com-
panonino, 420 Mass. 1003 (1995); Commonwealth v. Conley, 43
Mass. App. Ct. 385, 386-387 (1997); Commonwealth v. Hill, supra.

In decideing a Rule 30 (b) motion a judge should use a
"cumulative error" analysis, Commonwealth v. Gagliardi, 21 Mass.
App. Ct. 39 (1986); Commonwealth v. Cancel, 394 Mass. 5676 (1985);
Commonwealth v. Bassette, 21 Mass. App. Ct. 906 (1989); Common-
wealth v. Skinner, 408 Mass. 88 (1990) on the question of whether
cumulative errors denied the defendant a fundamentally fair
trial United States v. Dwyer, 843 F. 2d 60, 65 (1st Cir. 1988);
Floyd v. Meachum, 907 F. 2d 347, 355 (2nd Cir. 1990);Berryman
v. Morton, 100 F. 3d 1089, 1095, 1102 (3rd Cir. 1996); Cole
v. Peyton, 389 F. 2d 224, 226-227 (4th Cir. 1968); Moore v.
Johnson, 194 F. 3d 586, 622 (5th Cir. 1999); Cooper v. Sowders,
837 F. 2d 284, 286-287 (6th Cir. 1988); Williams v. Washington,
59 F. 3d 673, 682 (7th Cir. 1995); Freeman v. Class, 95 F. 3d
639, 644 (8th Cir. 1996); Conde v. Henry, 198 F. 3d 734, 741
(9th Cir. 1999); Fisher v. Gibson, 282 F. 3d 1283, 1307-1311
(10th Cir. 2000); Walker v. Davis, 840 F. 2d 834, 838 (11th
Cir. 1988); Chambers v. Mississippi, 410 U.S. 284, 302-303 (1973).

## STATEMENT OF MATERIAL FACTS

The absence of overwhelming evidence and weak, conflicting
testimony by cooperating witnesses with motives to lie is set

out in the defendant's decision, Commonwealth v. Rivera, 424
Mass. 266 (1997) incorporated herein, with incompetent atty
James Couture's appeal briefs to be filed as an exhibit.

The June 29, 1992 transcript pages 55 and 97 (attached
hereto) show prejudicial misstatements of reasonable doubt by
both the prosecutor and the trial judge.

The affidavit of Luis Rivera shows trial attorney Alan
Black's failure to prepare the defendant to testify and failure
to present a full defense.

The affidavit of Jose Pacheco truthfully states he was
at his mother's house and not at the crime scene; that he did
not witness the defendant commit any crime and reveals an undis-
closed deal, as corroborated by the affidavit of Francis Pabon.

## SUPPORTING LEGAL GROUNDS

> **GROUND ONE:** THE DEFENDANT'S CONVICTION WAS UNLAWFULLY
> AFFIRMED THROUGH THE NON-STRATEGIC OMISSION OF MERITOR-
> IOUS GROUND TWO AND GROUND THREE FROM THE DIRECT APPEAL
> BY INCOMPETENT AND INEFFECTIVE ASSIGNED C.P.C.S. ATTOR-
> NEY JAMES COUTURE, IN VIOLATION OF THE SIXTH AND FOUR-
> TEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION
> AND MASS. DECLARATION OF RIGHTS ARTICLE 12

### FACTS SUPPORTING GROUND ONE:

The defendant having no prior opportunity to prersent ineffec-
tive assistance of direct appeal counsel now supports a Mass.
Crim. P. Rule 30(b) finding that this gound has not been waived[2]
and attorney James Couture's failure to explain his non-strategic

---

[2] Such a finding of no waiver was made in Commonwealth v. Perrot,
Hampden No. 85-5415-18, 542-25 (09/11/01) Wernick, J., granting
new trial, opinion pages 13-14 citing Comonwealth v. Cormier,
41 Mass. App. Ct. 76, 77 (1996).

-5-

omissions supports this court holding a full evidentiary hearing
at which Couture is requested to explain such omissions.

Attorney Coutures's brief omitted ground two, infra, clos-
ing misstatement of law by the prosecutor and related erroneous
burden of proof instructional error, while also omitting ground
three infra, ineffective assistance of trial counsel related
to such constitutional errors not being objected to.[3]

Seven years prior to the defendant's 1992 trial these
constitutional errors were held to be obvious in Commonwealth-
v.  A Juvenile, 396 Mass 215, 217-220 (1995) and Commonwealth
v. Quirk, 27 Mass. App. Ct. 258, 264 (1989).

The cumulative errors in grounds two and three were obviously
stronger and more likely to win reversal of the defendant's
conviction than the weak issues attorney Couture briefed and
failed to federalize properly; thereby causing prejudice from
loss of 28 USC §2254 Federal Habeas Corpus review rights.

## APPLICATION OF THE LAW TO THE FACTS:

When reviewing this ground one claim a proper analysis
involves the question of "whether the issues which (the defen-
dant) claims appellate counsel failed to raise, would have been
clearly more likely to result in reversal or an order for a
new trial, and were obvious from the trial record that failure
to present such issues amounted to ineffective assistance of

---

[3] After being fired for covering up and gross incompetence in
pro se new trial win in Commonwealth v. Dellelo, Suffolk nos.
88-3-8809 (06/09/03 Ball, J.) so-called attorney Jeffrey Baler
tried to cover-up by refusing to screen and report ground one claims.

-6-

appellate counsel," Gaines v. Matesanz, 272 F. Supp. 2d 121, 143 (D.C. Mass. 2003) quoting Commonwealth v. Sowell, 34 Mass. App. Ct. 229, 232 (1993) quoting Gray v. Greer, 800 F. 2d 644, 646-647 (7th Cir. 1985) cited with approval in Smith v. Robins, 528 U.S. 259, 288 (2001).

This court must have attorney Couture testify at an evidentiary hearing providing his explaination, of, or admission to non-strategic omissions or a federal evidentiary hearing must be held, Mapes v. Coyle, 171 F. 3d 408, 427-429 (6th Cir. 1999); Williams v. Taylor, 120 S. Ct. 1479, 1490 (2000).

After such an evidentiary hearing, attorney Couture's non-strategic omission of grounds two and three support this court granting a new trial, Roe v. Delo, 160 F. 3d 416, 418-420 (8th Cir. 1999); Commonwealth v. Perrot, supra; Commonwealth v. Skinner, Plymouth nos 90030, 90031 (08/21/01 Tierney, J.), or vacating the conviction and reinstaing it to restart the one year time limit 28 USC §2244 federal habeas corpus review clock, Commonwealth v. Stubbs, 15 Mass. App. Ct. 955 (1983) because a sixth amendment "deprivation (is) subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation," United States v. Morrison, 449 U.S. 361, 364 (1981) and "the only appropriate remedy for a violation of the sixth amendment is to restore the defendant as much as possible ... to the circumstances that would have existed had there been no constitiutional error," United States v. Duran-Benitez, 110 F. Supp. 2d 135, 155 (E.D. N.Y. 2000).

GROUND TWO: THE DEFENDANT'S CONVICTION WAS UNLAWFULLY OBTAINED BY TWO RELATED MISSTATEMENTS OF PROOF BEYOND A

-7-

REASONABLE DOUBT IN THE PROSECTOR'S CLOSING ARGUMENT
AND IN THE JURY INSTRUCTIONS, WHICH PREJUDICIALLY IN-
FECTED THE ENTIRE TRIAL, IN VIOLATION OF THE SIXTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
AND MASS. DECLARATION OF RIGHTS ARTICLE 12.

### FACTS SUPPORTING GROUND TWO:

In conjunction with ground three, *infra*, incorporated herein
by reference, the defendant sets forth the following prejudicial
cumulative errors.

During closing argument the prosecutor misstated the legal
burden of proof by telling the jury:

" **It's not beyond every reasonable doubt** ... I mean
it's possible, ladies and gentlemen, that a horde
irate individuals rode by and shot those two individ-
uals.  That's possible, but **it's not probable.**"
(June 29, 1992 transcript page 55).

After the prosecutor told the jury that the defendant had
to show someone else committing the crime was "probable" and
that proof beyond a reasonable doubt did **"not"** mean proof "beyond
**every** reasonable doubt," trial judge Ford approved such misstate-
ments of law by erroneously instructing the jury that:

" **Proof beyond reasonable doubt does not mean** ...
proof **beyond all reasonable doubt,** the mere possibility
of innocence"
(June 29 1992 transcript page 97)

### APPLICATION OF THE LAW TO THE FACTS:

The combined misstatements of law created confusion as
to what degree of reasonable doubt was sufficient for acquital,
or skewed the meaning of "reasonable doube' to a degree that
it became incomprehensible, as decisional law, *infra*, supports
such findings.

This is not a case whewre a prosecutor made a single isolated

-8-

misstatement of law, United States v. Grassrope, 342 F. 3d 866 870-871 (8th Cir. 2003)(collecting cases), although even a single misstatement of law by a state prosecutor supports 28 USC §2254 Federal Habeas Corpus relief when trial evidence may be fairly characterized as weak, Pagano v. Allard, 218 F. Supp. 2d 26, 32-38 (D.C. Mass. 2002)[4]

This is also not a case where jury instructions merely "contain(ed) one slip" on reasonable doubt, Gaines v. Matesanz, 272 F. Supp. 2d 121, 133-134 (D.C. Mass. 2003), although a single isolated misstatement of reasonable doubt does support granting a new trial, Commonwealth v. Pickles, 393 Mass. 775, 776-780 (1984); Commonwealth v. Wood, 380 Mass 545, 547-551 (1980) and Justice Abrams did forewarn judges to avoid the mistake made in the case at bar four years before the defendant's 1992 trial, Commonwealth v. Santos 402 Mass. 775, 788 (1988).

The misconduct here was not "slight or confined to a single instance, but ... was pronounced and presistant, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential," Berger v. United States, 295 U.S. 78, 89 (1935).

In the case at bar the prosecutor deliberately and forcefully argued that proof beyond a reasonable doubt paralogically means the state's burden is "not beyond every reasonable doubt"

---

[4] At page 90 of the June 29, 1992 transcript Judge Ford complements the experienced state prosecutor for how he conducted the trial while no curative instructions were given for the obviously improper closing argument misstatements of law (06/29/92 Trans. page 55).

clearly approved by judge Ford instructing "proof beyond a reasonable doubt does **not** mean ... **proof beyond all reasonable doubt**," which "essentially told the jurors that they needed some undefined amount" of reasonable doubt, which "defied comprehension," Lanigan v. Maloney, 853 F. 2d 40, 46-47 (1st Cir. 1988)("a degree of moral certainty" ... "not beyond an absolute doubt"). The "cumulative effect" of two paralogical misstatements of reasonable doubt "was to obfuscate one of the essentials of due process and fair treatment," Dunn v. Perrin, 570 F. 2d 21, 25 (1st Cir. 1978) and falls into the catagory of "structural error," Sullivan v. Louisiana, 508 U.S. 275, 280-282 (1993).

With respect to the improper closing argument in the case at bar, this case falls under a cumulative prejudice analysis similar to "the comments in Caldwell (which) were approved by the trial judge, "Darden v. Wainwright, 477 U.S. 168, 183 n. 15 (1985)(distinguishing argument which did not implicate a specific constitutional right) citing Caldwell v. Mississippi, 472 U.S. 320, 339-340 (1985)(improper argument was "focused, unambiguous and strong").

The trial judge's repeating the obviously confusing misstatement of law by the prosecutor "placed a stamp of imprimature on the prosecutor's statement, ensuring the denial of the (defendant's) constitutional right," Pagano v. Allard, 218 F. Supp. 2d 26, 35 (D.C. Mass. 2002) to be proven guilty beyond a reasonable doubt, by creating the "appearance of judicial approval," Mahorney v. Wallman, 912 F2d 469, 473 n. 4 (10th Cir. 1990)(writ granted when prosecutor's misstatement of law

specifically allowed by state trial judge).

No physical evidence linked defendant Luis Rivers to the crime scene and only cooperating witnesses with deals and motive to lie testified directly against him at trial, Commonwealth v. Rivera, 424 Mass. 266 (1997). Such errors are not harmless where a case turns on witness credibility, Mahorney v. Wallman, supra, 917 F. 2d at 474; Pagano v. Allard, supra, 218 F. Supp. 2d at 36-37, or where a main government witness has questionable credibility, United States v. Beale, 921 F. 2d 1412, 1425 (11th Cir. 1991); United States v. Beckman, 222 F. 3d 512, 524-527 (8th Cir. 2000) or where there is a question of credibility of several witnesses, United States v. Crutchfield, 26 F. 3d 1098, 1103 (11th Cir. 1994) and is not harmless error where three cooperating witnesses with deals had a motive to lie, United States v. Blakey, 14 F. 3d 1557, 1561 (11th Cir. 1994) even when other evidence tends to circumstantially corroborate cooperating witnesses, Coppola v. POwell, 878 F. 2d 1562, 1569-1571 (1st Cir. 1989) and still does not become harmless error when eight(8) cooperating witnesses with deals implicate a defendant, United States v. Hands, 184 F. 3d 1322, 1326-1334 (11th Cir. 1999). Without a confession, an incorrect explaination of reasonable doubt cannot be harmless error, Lanigan v. Maloney, 853 F. 2d 40, 50 (1st Cir. 1988) even when other evidence "was substantial," Dunn v. Perrin, 570 F. 2d 21, 25 (1st Cir. 1978); Commonwealth v. Wood, supra; Commonwealth v. Pickles, supra; Commonwealth v. Sullivan, 20 Mass. App. Ct. 802, 803-807 (1983).

Where, as here, the trial depended on witnesses question-
able credibility, the two erroneous explanations of reason-
able doubt cannot be deemed to be harmless error, Commonwealth
v. Kelleher, 395 Mass 821, 8220828 (1985); Commonwealth v. Rem-
biszbuski, 391 Mass 123 (1984).

> GROUND **THREE:** THE DEFENDANT'S CONVICTION WAS UNLAW-
> FULLY OBTAINED THROUGH MULTIPLE NON-STRATEGIC OMISSIONS
> BY INCOMPETENT AND INEFFECTIVE ASSIGNED C.P.C.S.
> ATTORNEY ALAN BLACK, IN VIOLATION OF THE SIXTH AND
> FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
> AND MASS. DECLARATION OF RIGHTS ARTICLE 12

## FACTS SUPPORTING GROUND THREE:

As attorney Black is expected to admit in his evidentiary
hearing testimony that he had no strategic reason for failing
to object to ground two, supra, misstatements of the law on
reasonable doubt, that he totally failed to prepare the defen-
dant to testify, failed to interview witnesses and failed to
call the main state witnesses (Jose Pacheco's) mother to testify
he was with her at the time of the offenses.

The defendant's affidavit verfies he was not prepared to
testify by attorney Black and after he is prepared by new counsel
he shall testify truthfully to his actual innocence at the eviden-
tiary hearing in this case.

## APPLICATION OF THE LAW TO THE FACTS:

Following the 1985 decision in A Juvenile, supra, the 1986
decision in Quirk, supra, and the 1988 decision in Santos, supra,
any minimally competent lawyer would have made a strong contem-
poraneous objection to ground two supra, obviously prejudicial
misstatements of law on reasonable doubt by both the trial prose-

cutor and trial judge, Mello v. DiPaulo, 295 F. 3d 137, 148 (1st Cir. 2002)("the Commonwealth's contention that the prosecutor's closing argument must not have been so prejudicial if Mello's counsel failed to object plainly misses the point"). After attorney Alan Black testifies, this court should make a Mass. Crim. P. Rule 30(b) finding that defendnant Rivera "has shown that the failure(s) to object (were) based on simple incompetence and not on trial strategy," Washington v. Hofbauer, 228 F. 3d 689, 707 (6th Cir. 2000); Cargle v. Miller, 317 F. 3d 1196, 1217 (10th Cir. 2003); Cox v. Donnelly, 267 F. Supp. 2d 418 (E.D. N. Y. 2003); Corsa v. Anderson, 443 F. Supp. 176, 178 (E.D. Mich. 1977); Oyola v. Boles, 947 F. 2d 928, 930-935 (11th Cir. 1991); Gray Lynn, 6 F. 3d 263, 269-270 (5th Cir. 1993); Commonwealth v. Kane, 19 Mass. App. Ct. 129, 142 (1984).

Similarly, attorney Black being too lazy to obtain Jose Pacheco's bail hearing transcript of the undisclosed deal falls under ground four, infra, cumulative error analysis "in connection with a claim that petitioner's trial attorney was ineffective for failing to investigate adequately whether a witness had a deal with prescutor's," Cargle v. Mullin, 317 F. 3d 1196, 1216 (10th Cir. 2003) and "the prejudice flowing from such counsel error is magnified here by crucial nature of (Pacheco's) testimony to the state's case," Id. The related failure to interview and call Jose Pacheco's mother to testify that Pacheco was home with her at the time of the murders, thereby exposing the deliberately false testimony presented by prosecutors, clearly amounted to ineffective assistance of trial counsel,

-13-

Commonwealth v. Farley, 432 Mass. 153, 156 (2002); Pavel v.
Hollins, 261 F. 3d 210, 219-229 (2nd Cir. 2001); Berryman v.
Morton, 100 F. 3d 1089, 1096-1102 (3rd Cir. 1996); Griffin v.
Warden, 970 F. 2d 1355, 1358 (4th Cir. 1992); Harris v. Reed,
894 F. 2d 871, 878-879 (7th Cir. 1990); Chambers v. Armontrout,
885 F. 2d 1318, 1320-1224 (8th Cir. 1989); Lord v. Wood, 184
F. 3d 1083, 1093-1095 (9th Cir. 1999); Fisher v. Gibson, 282
F. 3d 1283, 1289-1311 (10th Cir. 2002); Scott v. Wainwright,
698 F. 2d 427, 429-430 (11th Cir. 1983) because "an attorney
who fails to interview a readily available witness whose non-
cumulative testimony may potentially aid the defense should
not be allowed automatically to defend his omissions simply
by raising the shield of trial strategy and tactics," Crisp
v. Duckworth, 743 F. 2d 580, 584 (7th Cir. 1994); United states
Ex Rel Cosey v. Wolff, 562 F. Supp. 871, 878-879 (N.D. Ill.
1983); grant of writ affirmed 727 F. 2d 656 (7th Cir. 1984);
Sullivan v. Fairman, 819 F. 2d 1382, 1389 (7th Cir. 1987).
This is true because "counsel's anticipation of what a poten-
tial witness would say does not excuse the failure to find out,"
United States v. Moore, 554 F. 2d 1086, 1093 (D.C. Cir. 1976);
United States v. Gray, 878 F. 2d 702, 711-712 (3rd Cir. 1989)
and "an attorney's performance is deficient when he or she
fails to conduct any investigation into exculpatory evidence
and has not provided any explaination for not doinf so, Stevens
v. Deleware Correctional Center, 152 F. Supp. 2d 561, 576 (D.
Del. 2001). Attorney Black's testimony must be taken at an
evidentiary hearing on his failure to obtain a bail hearing

transcript to verify Pacheco's deal, and failure to interview and call Pacheco's mother to testify, Commonwealth v. Aviles, 40 Mass. App. Ct. 440, 443-447 (1996) as well as both Black's and defendant's testimony taken at an evidentiary hearing on lazy attorney Black's complete failure to prepare the defendant to testify, Commonwealth v. Licata, 421 Mass. 654, 661-662 (1992).

The defendant's right to testiy is one of the most basic and fundamental components of the right to present a defense, Rock v. Arkansas, 483 U.S. 44 (1987) and a failure to prepare or a lack of knowing, intelligent and voluntary wavier claim cannot properly be resolved without an evidentiary hearing, Gallego v. United States, 174 F. 3d 1196, 1198-1199 (11th Cir. 1999) where, as here, attorney Black never advised the defendant that it was solely the defndant's decision, as required by C.P.C.S. Rules, and completely failed to prepare him to testify. After a full evidentiary hearing this sub-claim is sufficient standing alone to support an order for a new trial, Commonwealth v. Freeman, 29 Mass. App. Ct. 635, 639-641 (1990); United States v. Butts, 630 F. Supp. 1145, 1146-1148 (D. Me. 1986); Deluca v. Lord, 858 F. Supp. 1330, 1350-1360 (S.D. N.Y. 1994).

New assigned counsel is required to obtain evidence cor-robarating the defendant's new trial motion testimony.

> GROUND FOUR: THE DEFENDANT'S CONVICTION WAS UNLAW
> FULLY OBTAINED BY THE PROSECUTOR'S KNOWING AND DEL-
> IBERATE PRESENTATION OF FALSE TESTIMONY AND CONCEAL-
> MENT OF A BAIL RELEASE DEAL WITH CO-DEFENDANT JOSE
> PACHECO WHOSE CHARGES WERE DISMISSED AS A REWARD FOR
> HIS PERJURED TESTIMONY, IN VIOLATION OF THE FOURTEENTH
> AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES

AND ARTICLE 12 OF THE MASSACHUSETTS DECLARATION
OF RIGHTS

### FACTS SUPPORTING GROUND FOUR:

Prior to and during trial the prosecutor falsely
claimed there were no deals with the main state witness Jose
Pacheco, that he did not get out on bail as part of any deal,
and ground three, supra, ineffective attorney Alan Blck failed
to obtain Pacheco's bail release hearing transcript, which must
now be ordered with the prosecutor's file and notes also ordered
produced at the ground four evidentiary hearing.  The affidavit
of Jose Pacheco avers he was released on bail as part of a
deal.

Jose Pacheco did not witness the defendant commit any crime
and did not witness the murders [as corroborated by Pacheco's
testimony conflicting with crime scene evidence and other wit-
nesses].  Pacheco was at his mother's house in Holyoke at the
time of the murders and was not at the crime scene.  Although
not admissible into evidence without stipulation of agreement
from the prosecutor, Pacheco is willing to take a polygraph
to verify he did not witness the murders, as is standard prac-
tice for federal prosecutors and other state's prosecutors to
verify or refute a cooperating witnesses story.

Hampden County prosecutor Howard Safford verbally told
Jose Pacheco that in return for his testimony he would be re-
leased on low bail and not prosecuted for joint-venture par-
ticipation in the offenses.

Jose Pacheco's murder related charges were dismissed and

he was released on bail, as records newly assigned counsel is
obtaining shall verify.

## APPLICATION OF THE LAW TO THE FACTS:

As an initial matter the prosecutor's files and notes must
be ordered produced and, after In Camera Judicial inspection,
disclosed, while Pacheco's bail release hearing transcript
ordered and evidentiary hearing testimony heard from attorney
Charles Stephenson, prosecutor Howard Safford, witness Jose
Pacheco, and corroborating witness Francis Pabon; Commonwealth
v. Hill, 432 Mass. 704, 710 n. 15 (2000); Blackmon v. Scott,
22 F. 3d 560, 564-567 (5th Cir. 1994)[5].

The truthful affidavit of Pacheco with his polygraph verfied
evidentiary hearing truthful testimony of not being present
at the scene of the murders, presents an actual innocence based
independant due process violation or right to fundamentally
fair trial because a state cannot leave a conviction in place
after a credible recantation by a main witness most likely
would have changed the outcome of the trial, Sanders v. Sull-
ivan, 900 F. 2d 601, 602-608 (2nd Cir. 1990)(release ordered
by writ of habeas corpus when main witnesses' post-conviction
affidavit filed admitting the witness committed perjury by
falsely testifying at trial he saw a defendant shoot and kill
someone).

---

[5] The dismissal of Pacheco's charges and bail release presents
a more compelling foundation for a hearing than Commonwealth
v. Holmes, 46 Mass. App. Ct. 550, 560-561 (1999) Habeas Corpus
pending Holmes v. Pepe 06-10995-RCL (2002 briefing for 2004
decision).

Because "little direct or circumstatial evidence supported either side's version of events," Ellsworth v. Warden, 333 F. 3d 1, 9 (1st Cir. en banc 2003)(Torrudla, J., concurring) and "the materiality inquiry is a context specfic determination," Spicer v. Roxbury Correctional Institution, 194 F. 3d 547, 560 (4th Cir. 1999) the bail hearing transcript verification of a deal can support an order for a new trial based on the weak uncorroborated evidence in this case, even if the later dismissal of charges claim is not verified.

However, if dismissal of charges is found to be be part of the undisclosed deal, then a new trial must be granted, Commonwealth v. Collins, 386 Mass. 1, 8-12 (1982); Commonwealth v. Hill, supra, 431 Mass. at 711-720; Ely v. Matesanz, 983 F. Supp. 2d 21, 35-45 (D.C. Mass. 1997); Jenkins v. Artuz, 294 F. 3d 284, 292-297 (2nd Cir. 2002).

## CONCLUSION

Counsel must be assigned and after a full evidentiary hearing a new trial must be granted[6].

Most Respectfully Submitted,

November 6, 2003
given to prison staff to
mail November 5, 2003

Luis Rivera Pro Se
P.O. Box 100
South Walpole, Ma 02071

Copy served on:
District Attorney William Bennett
50 State Street Street
Springfield, Ma

---

[6] Or if either the Superior Court erroneously denies ground two
(continued next page)

-18-

---

(continued from previous page)
and three on the merits ground one relief of vacating and re-
imposing the condition to restart 28 USC §2244 one year clock
for 28 USC §2254 Federal Habeas Corpus review, must be allowed
as the appropriate remedy for ineffective assistance of direct
appeal counsel.

**EXHIBIT #8**

December 28,2004 Petition for Writ of Habeas Corpus w-attachments
(10 pages)

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

LUIS RIVERA,              )
                          )
        Petitioner,       )
                          )
        v.                )        Civil Action No. 04-12717-RCL
                          )
DAVID NOLAN,              )
                          )
        Respondent.       )

### PETITION FOR HABEAS CORPUS
### ATTACHMENT

A.   Ground One:   The convictions were unlawfully affirmed

through the non-strategic omission of meritorious grounds

from direct appeal by incompetent and ineffective appellate

counsel in violation of petitioner's Sixth and Fourteenth

Amendment rights and rights secured under Article 12 of

the Massachusetts Declaration of rights.

Supporting facts:   Although for years prior to peti-

tioner's 1992 trial the case law in Massachusetts made clear

that the errors asserted in ground two and three of this

petition warranted relief from conviction, appellate counsel

on direct appeal omitted these meritorious grounds from

his brief, thereby causing petitioner the loss of an other-

wise available substantial ground of defense and forcing

him to have to seek SJC gatekeeper permission to bring

these appellate grounds to the full bench.  These grounds,

particularly when viewed under the collective error standards,

were significantly stronger than the grounds actually raised

by appellate counsel, and more likely to result in the

reversal of the convictions at issue.  Due to appellate

5-241 (Rev. 5/85)

**PETITION UNDER 28 USC § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

## United States District Court

| | |
|---|---|
| District | OF MASSACHUSETTS |

| Name      LUIS RIVERA | Prisoner No.  W-52832 | Case No.  04-12717-RCL |
|---|---|---|

| Place of Confinement | MCI-CEDAR JUNCTION<br>POST OFFICE BOX 100<br>SOUTH WALPOLE, MA 02071 |
|---|---|

| Name of Petitioner (include name under which convicted) | Name of Respondent (authorized person having custody of petitioner) |
|---|---|
| LUIS RIVERA | V.   DAVID NOLAN, SUPERINTENDENT |

| The Attorney General of the State of:   MASSACHUSETTS (THOMAS REILLY) |
|---|

### PETITION

1. Name and location of court which entered the judgment of conviction under attack   HAMPDEN COUNTY
   SUPERIOR COURT, HALL OF JUSTICE, 50 STATE STREET, SPRINGFIELD, MA 01102

2. Date of judgment of conviction   JUNE 29, 1992

3. Length of sentence   2 NATURAL LIFE SENTENCES (NO PAROLE), 4-5 ON AND AFTER

4. Nature of offense involved (all counts)   2 COUNTS FIRST DEGREE MURDER, UNLAWFUL
   CARRYING OF A FIREARM.

5. What was your plea? (Check one)
   (a) Not guilty        ☒
   (b) Guilty            ☐
   (c) Nolo contendere   ☐
   If you entered a guilty plea to one count or indictment, and not a guilty plea to another count or indictment, give details:

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
   (a) Jury        ☒
   (b) Judge only  ☐

7. Did you testify at the trial?
   Yes ☐        No ☒

8. Did you appeal from the judgment of conviction?
   Yes ☒        No ☐

(2)

CO 241 (Rev. 5/85)

9. If you did appeal, answer the following:

    (a) Name of court     SUPREME JUDICIAL COURT

    (b) Result     JUDGMENT AFFIRMED

    (c) Date of result and citation, if known    FEBRUARY 13, 1997 (424 MASS. 266)

    (d) Grounds raised     SEE SJC'S DECISION (ATTACHED HERETO)

    (e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

        (1) Name of court        N/A

        (2) Result        N/A

        (3) Date of result and citation, if known     N/A

        (4) Grounds raised        N/A

    (f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:

        (1) Name of court     SUPREME JUDICIAL COURT

        (2) Result     CERTIORARI WAS DENIED ON 10/13/1998

        (3) Date of result and citation, if known     RIVERA V. MASSACHUSETTS,     U.S.    (19   )

              1. WHETHER DEFENDANT WAS DENIED A FAIR TRIAL BY THE COMMONWEALTH'S

        (4) Grounds raised INTERFERING WITH INTERVIEWING OF COMMONWEALTH'S WITNESS AND DEFENSE ATTORNEY; 2, WHETHER DEFENDANT WAS DENIED HIS RIGHT TO COUNSEL AND TO REMAIN SILENT.

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
    Yes ☒      No ☐

11. If your answer to 10 was "yes," give the following information:

    (a) (1) Name of court     UNITED STATES DISTRICT COURT

        (2) Nature of proceeding   HABEAS CORPUS PETITION

             1 ERRONEOUS DENIAL OF MOTION TO SUPPRESS PETITIONER'S STATEMENTS; 2, ERRONEOUS DENIAL OF WITNESSES; 3, ERRONEOUS ADMISSION OF PREJUDICIAL EVIDENCE; 4, IMPROPER CLOSING STATEMENTS BY PROSECUTOR.

        (3) Grounds raised        SUPRA

AO 241 (Rev. 5/85)

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐          No ☒

(5) Result _____

(6) Date of result _____

(b) As to any second petition, application or motion give the same information:

(1) Name of court _____ **HAM**PDEN SUPERIOR COURT _____

(2) Nature of proceeding _____ NEW TRIAL MOTION _____

(3) Grounds raised 1. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL BY OMISSION OF MERITORIOUS APPELLATE GROUNDS ON DIRECT APPEAL; 2. CONVICTION UNLAWFULLY OBTAINED DUE TO TWO RELATED MISTATEMENTS OF PROOF BEYOND A REASONABLE DOUBT IN PROSECUTOR'S CLOSING ARGUMENT AND JURY INSTRUCTIONS 3. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL FOR FAILURE TO OBJECT AND FAILURE TO CALL NECESSARY WITNESS FOR DEFENSE; AND 4. THE CONVICTION WAS UNLAWFULLY OBTAINED BY PROSECUTOR'S KNOWING AND DELIBERATE PRESENTATION OF FALSE TESTIMONY AND CONCEALMENT OF EXCULPATORY EVIDENCE, WHICH VIOLATED PETITIONER'S SIX AND FOURTEENTH AMENDMENT RIGHTS.

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐          No ☒

(5) Result _____ NEW TRIAL MOTION DENIED _____

(6) Date of result ____ NOVEMBER 20, 2003 (SEE SJ-2004-0338, denied 12/14/04)

(c) Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?
(1) First petition, etc.              Yes ☒     No ☐
(2) Second petition, etc.            Yes ☒     No ☐

(d) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

_____

_____

_____

12. State *concisely* every ground on which you claim that you are being held unlawfully. Summarize *briefly* the *facts* supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting the same.

Caution: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

AO 241 (Rev. 5/85)

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted you state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e) Conviction obtained by a violation of the privilege against self–incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(i) Denial of effective assistance of counsel.

(h) Denial of right of appeal.

A.    Ground one: _____

SEE ATTACHMENT

Supporting FACTS (state *briefly* without citing cases or law) _____

SEE ATTACHMENT

B.    Ground two: _____

SEE ATTACHMENT

Supporting FACTS (state *briefly* without citing cases or law) _____

SEE ATTACHMENT

(5)

AO 241 (Rev. 5/85)

C.    Ground three: _____

_____ SEE ATTACHMENT _____

Supporting FACTS (state *briefly* without citing cases or law) _____

_____

_____ SEE ATTACHMENT _____

_____

_____

_____

_____

D.    Ground four: _____

_____ SEE ATTACHMENT _____

Supporting FACTS (state *briefly* without citing cases or law) _____

_____

_____ SEE ATTACHMENT _____

_____

_____

_____

_____

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them: _____

_____

_____ N/A _____

_____

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
Yes ☐        No ☒

15. Give the name and address, if known, of each attorney who represented you in the following stages of judgment attacked herein:

(a)    At preliminary hearing     ALAN J. BLACK, 1383 MAIN STREET, SPRINGFIELD
                                   MA. 01103

(b)    At arraignment and plea    (SAME AS ABOVE)

_____

(6)

AO 241 (Rev. 5/85)

(c) At trial _____ (SAME AS ABOVE) _____

(d) At sentencing _____ (SAME AS ABOVE) _____

(e) On appeal _____ JAMES A COUTURE, 10 SOUTH MAIN STREET, P.O. BOX 63, BELCHERTOWN, MA 01007

(f) In any post−conviction proceeding _____ PRO SE _____

(g) On appeal from any adverse ruling in a post−conviction proceeding _____ PRO SE _____

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and the same time?
Yes ☒      No ☐

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☐      No ☒
(a) If so, give name and location of court which imposed sentence to be served in the future: _____

(b) Give date and length of the above sentence: _____

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ☐      No ☒

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_____ PRO SE
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed on

DECEMBER 20, 2004
(date)

_____
Signature of Petitioner

(7)

counsel's ineffectiveness, the second and third grounds raised herein could not be brought in petitioner's first habeas corpus petition.

Specifically, appellate counsel's failure to argue on direct appeal that the prosecutor's mistatement of the burden of proof during his closing argument was prejudicial, and trial counsel ineffective for not objecting thereto and seeking a mistrial, curative instructions or other remedial measures, constituted ineffective assistance of appellate counsel. Appellate counsel's failure to argue on direct appeal that the trial judge's exacerbation of the prosecutor's mistatement of the burden of proof, by his erroneous instruction on the issue, also warranted appellate relief, constituted ineffectiveness of appellate counsel.

Appellate counsel's failure to argue on direct appeal that trial counsel was ineffective for failing to object to the mistatement of the burden of proof by the prosecutor, and the incorrect definition of same by the trial judge, as well as trial counsel's non-strategic failure to prepare defendant to testify, to interview witnesses and to call the state's main witness's mother to testify, constituted ineffectiveness of appellate counsel as well.

B.  Ground Two: The convictions were unlawfully obtained by two related mistatements of proof beyond a reasonable doubt in prosecutor's closing argument and in the jury instructions, in violation of the Sixth and Fourteenth

-2-

Amendments and Article 12 of the Massachusetts Declaration
of rights.

Supporting Facts: Because the prosecutor during closing
statements mistated the burden of proof, and the trial judge
compounded the error by himself giving an incorrect definition
of what constitutes proof beyond a reasonable doubt, peti-
tioner received an unconstitutional trial in violation of
rights secured to him by the Sixth and Fourteenth Amendments
to the United States Constitution and Article 12 of the
Massachusetts Declaration of rights.

C.   Ground Three:   The conviction was unlawfully obtained
through multiple non-strategic omissions by incompetent
ineffective counsel at trial in violation of the Sixth and
Fourteenth Amendments and Article 12 of the Massachusetts
Declaration of rights.

Supporting Facts: Through trial counsel's non-strategic
failure to object to the improper and prejudicial mistatement
of the burden of proof by the prosecutor during his closing,
and the exacerbation of the error by the trial judges who
gave an incorrect and prejudicial definition of proof beyond
a reasonable doubt, as well as his failure to prepare the
defendant to testify, to interview witnesses and to call
the main state witness's mother to testify that he was with
her at the time of the alleged crimes, trial counsel ren-
dered ineffective assistance in violation of petitioner's
Sixth and Fourteenth Amendment rights and Article 12 of
the Massachusetts Declaration of rights.

-3-

D.    Ground Four:    The conviction was unlawfully obtained by the
prosecution's knowing and deliberate presentation of false testimony
and concealment of exculpatory evidence in violation of the Fourteenth
Amendment and Artikcle 12 of the Massachusetts Declaration of rights.

Supporting Facts:   Because the prosecutor knowingly and
deliberately presented false testimony to the jury and concealed
evidence that was clearly exculpatory in nature (i.e. a bail releease
deal with the key prosecution witness who was a co-defendant in the
case), the convictions at issue were unlawfully obtained in violation
of rights secured to petitioner by the Fourteenth Amendment to the
United States Constitution and Article 12 of the Massachusetts
Declaration of rights. See affidavit of Jose Pacheco, and attached
New Trial Motion, incorporated herein by references.

For the foregoing reasons, the petition for writ of habeas
corpus should be granted.

Respetcfully submitted,

Dated: December 20, 2004

Luis Rivera, pro se
Box 100
South Walpole, MA 02071

### VERIFICATION

I Luis Rivera declare under the pains and penalties of
perjury that the foregoing is true and correct to the best of my
personal knowledge.

Dated: December 20, 2004

Luis Rivera

4

```
*************************************************
***   THIS CASE CONTAINS IMPOUNDED MATERIAL   ***
*************************************************
```

11/30/05                    COMMONWEALTH OF MASSACHUSETTS                    Page 1
                              SUPREME JUDICIAL COURT
                                FOR SUFFOLK COUNTY

                                 SJ-2004-0338

                        COMMONWEALTH vs. LUIS RIVERA (W-52832)

```
    ENTRY DATE 08/05/04        CASE STATUS Decided: petition denied
   STATUS DATE 12/14/04             NATURE Gatekeeper   c 278 s 33E
       JUSTICE S                SUB NATURE Mot for New Trial
 PET ROLE L CT defendant    TC DISPOSITION Motion denied
 SJ DISPO DATE 12/14/04     SJ DISPOSITION Relief partly denied/R&R
     LEAD CASE                    RELATION
  TRIAL JUDGE Ford D.A.           TRIAL CT Hampden Superior Court
 TC ENTRY DATE              TC RULING DATE 11/20/03          CLERK LCA
 TC DOCKET NO HDCR1991-0224 FC/OE DKT NO SJC-06734           PUBLIC p
```

Luis Rivera (W-52832)
Pro Se Defendant/Petitioner
MCI Norfolk
P.O. Box 43
Norfolk MA 02056
Active 08/05/04 Notify

Commonwealth                         Jane Davidson Montori
Plaintiff/Respondent                 Assistant District Attorney
Active 08/05/04                      Office of the District Attorney/Hampde
                                     Chief, Appellate Division
                                     Hall of Justice, 50 State Street
                                     Springfield MA 01102-0559
                                     Phone: 413-452-1103
                                     Fax: 413-781-4745
                                     546543 Active 08/05/04 Notify

Hampden Superior Court Dept.
(Lower Court: criminal)
Clerk for Criminal Business
50 State Street - P.O. Box 559
Springfield MA 01102
Phone: 413-735-6035 FAX: 413-737-1611
Active 08/05/04 Notify

                          * * *   D O C K E T   * * *
---------------------------------------------------------------------------
 PAPER DATE     ENTRY
------ --------  -----------------------------------------------------------

        08/05/04 Case entered.

   1.0 08/05/04 Affidavit Of Indigency And Request For Waiver, Substitution Or
                State Payment Of Fees And Costs filed. (IMPOUNDED PAPER)

        08/05/04 Filing fee waived. (Per lca)

```
*************************************************
***   THIS CASE CONTAINS IMPOUNDED MATERIAL   ***
*************************************************
```

11/30/05                    COMMONWEALTH OF MASSACHUSETTS                    Page 2
                               SUPREME JUDICIAL COURT
                                 FOR SUFFOLK COUNTY

                                   SJ-2004-0338

                       COMMONWEALTH vs. LUIS RIVERA (W-52832)

                            * * *   D O C K E T   * * *
----------------------------------------------------------------------------------
PAPER DATE     ENTRY
------ -------- ------------------------------------------------------------------
    2.0 08/05/04 C. 278, s 33E Application For Leave To Appeal Summary Denial Of
                 First New Trial Motion To The Full Court With Assignment Of
                 Counsel Or To Remand For Findings And Evidentiary Hearing,
                 filed by Luis Rivera, pro se with attachments and certificate
                 of service.

    3.0 08/05/04 MOTION For Assignment Of Counsel With Leave To Late File For
                 Good Cause, filed by Luis Rivera, pro se. (08/31/04 MOTION for
                 Assignment of Counsel with Leave to Late File for Good Cause is
                 DENIED WITHOUT HEARING. By the Court. (Sosman, J.))

    4.0 08/05/04 MOTION For Leave Of Court To Add To The Record Affiavit Of
                 Francis Pabon, filed by Luis Rivera, pro se with attachment and
                 certificate of service.

    5.0 08/05/04 COPY of letter to Mr. Luis Fernando Rivera from William J.
                 Leahy, Chief Counsel stating "...We have decided not to assign
                 a lawyer to represent you..."

    6.0 08/19/04 Letter to Maura S. Doyle, Clerk from ADA Jane Davidson Montori
                 saying.."It is the Commonwealth's intention to oppose the
                 defendant's petition for leave to appeal under G.L. c. 278, s.
                 33E and to file its opposition on or before Nobember 1, 2004,
                 unless directed otherwise by the Court......"

    7.0 08/25/04 Defendant-Appellant's Motion for Disposition on His Motion for
                 Assignment of Counsel filed by Luis Rivera pro se with
                 certificate of service. (see endorsement on paper no. 3)

    8.0 08/31/04 Notice to counsel/parties: regarding paper number 3 filed.

    9.0 09/09/04 Letter to SJC Clerk Maura Doyle from Luis Rivera, pro se
                 stating "... I am requesting you send me a copy of my #04-0338
                 docket entries...Please bring this letter to the attention of
                 Justice Sosman in form of pro se request for reconsideration of
                 her denial of counsel..."

        09/13/04 An updated docket sheet was mailed to Mr. Luis Rivera as
                 requested. (see paper no. 9) (ml)

   10.0 09/14/04 MODIFIED ORDER:...."it is ORDERED that the leave to late file
                 the application is ALLOWED without hearing." (Sosman, J.)

   11.0 09/14/04 Notice to counsel/parties: regarding paper number 10 filed.

```
*************************************************
***   THIS CASE CONTAINS IMPOUNDED MATERIAL   ***
*************************************************
```

11/30/05                    COMMONWEALTH OF MASSACHUSETTS                    Page 3
                              SUPREME JUDICIAL COURT
                                FOR SUFFOLK COUNTY

                                  SJ-2004-0338

                      COMMONWEALTH vs. LUIS RIVERA (W-52832)

                            * * *  D O C K E T  * * *
---------------------------------------------------------------------------------
PAPER DATE     ENTRY
------ -------- ------------------------------------------------------------------
 12.0 11/01/04 Commonwealth's Opposition To Defendant's Application For Leave
               To Appeal Under G.L. c. 278, s 33E, filed by ADA Jane Davidson
               Montori with attached certificate of service.

 13.0 11/30/04 Defendant's Reply To Commonwealth's Opposition To Section 33E
               Leave To Appeal (Hearing Requested With Assignment Of Counsel),
               filed by Luis Rivera, pro se with attachments.

      12/08/04 Under advisement. (Spina, J.).

 14.0 12/14/04 Memorandum and Order...."The defendant's petition is hereby
               DENIED." (Spina, J.)

 15.0 12/14/04 Notice to counsel, regarding paper number 14 filed.

 16.0 01/12/05 Letter to Maura S. Doyle, Clerk from Iran Diaz, pro se stating
               "...I am wondering if I can get a copy of paper no. 4
               (affidavit of Francis Pabon)..."

      01/19/05 A copy of paper no. 4 was mailed to Mr. Iran Diaz. (see paper
               no. 16) (ml)

 17.0 11/30/05 Letter to Clerk from Luis Rivera saying.."send me a copy of My
               #04-0338 docket entries..."

      11/30/05 A copy of docket entries were mailed to Luis Rivera as
               requested. (see paper #17) (lav)

C.4.5

COMMONWEALTH OF MASSACHUSETTS

Hampden, ss
HAMPDEN COUNTY
SUPERIOR COURT
FILED
FEB 2 2 1993

*William J. Martin Jr.*

COMMONWEALTH OF MASSACHUSETTS

v.

JOSE A. PACHECO

Superior Court Department
of the Trial Court
Nos. 91—2243 through 2246

6-1-93
Allowed
(Spirit 3)
A Hest william J Egan
aut Co's

DEFENDANT'S MOTION TO
DISMISS INDICTMENTS ~ off.

Now comes the defendant and, in accordance with the
procedure adopted in *Commonwealth* v. *Brandano*, 359 Mass.
332, 337 (1971), moves to dismiss the above—captioned
indictments. As cause therefore, as set forth more fully in
the attached affidavit and memorandum, were there a trial of
the indictments, the prosecution could not adduce sufficient
evidence to permit a finder of fact to conclude that, as is
alleged, the defendant knowingly and willingly associated
himself with his named co—defendants in a conspiracy to
commit murder (nos. 91—2245 and 2246,) or that he committed
murder, either by his own acts or as a joint venturer (nos.
91—2243 and 2244.)

1

$C.4. 6$

In further support of his motion, the defendant states that although all available evidence establishes that he was made aware of his co-defendants' intention to murder Guillermo Santiago and Angel Carcano, and drove the victims and two of his co-defendants to the place where their murders were committed, he acted only under coercion, in response to direct threats against his own life, and those of his pregnant common law wife and three children. Under such circumstances, the prosecution can prove neither that he had or shared his co-defendants' intent to commit murder, *Commonwealth* v. *Armand*, 411 Mass. 167, 170 (1991), nor disprove his defense of duress. *Commonwealth* v. *Robinson*, 382 Mass. 189, 199-209 (1981). *Commonwealth* v. *Melzer*, 14 Mass. App. Ct. 174, 180-185 (1982).

Respectfully submitted,

JOSE A. PACHECO

by his attorney:

Charles K. Stephenson
15 Lyn Drive
Granby, Massachusetts
(413) 467-7227
B.B.O. #479150

2.

C.A. 7

AFFIDAVIT

My name is Charles K. Stephenson. Under oath, I depose
and say that:

> 1.   I am an attorney licensed to practice law
> in the Commonwealth of Massachusetts.   My
> Board of Bar Overseers registration number is
> 479150.   I represent Jose A. Pacheco in
> connection with Hampden County indictments
> 91-2243 and 2244, alleging murder, and 91-
> 2245 and 2246, alleging conspiracy to commit
> murder.
>
> 2.   Jose Pacheco is functionally illiterate
> in both English and Spanish, the languages he
> can speak.   By this affidavit, I affirm that
> I have read to him the attached affidavit,
> that he has sworn to me, under oath, that the
> facts it recites are true, and that he signed
> the affidavit freely and knowingly, after
> having been informed of the penalties
> prescribed by G.L. c. 268, § 1 for the
> offense of perjury.

Signed under penalties of perjury, this first day of
February, 1993, at Granby, Massachusetts.

_____
Charles K. Stephenson

1

## C.A. 8

COMMONWEALTH OF MASSACHUSETTS

Hampden, ss.

Superior Court Department
of the Trial Court
Nos. 91-2243 through 2246

COMMONWEALTH OF MASSACHUSETTS
                    HAMPDEN COUNTY
                    SUPERIOR COURT
                    FILED
v.                  FEB 22 1993

                    *William J. Martin, Jr.*

JOSE A. PACHECO
                    CLERK/MAGISTRATE

MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION TO
DISMISS INDICTMENTS

### Facts

Early on the morning of August 24, 1991, Guillermo
Santiago and Angel Carcano were murdered at a factory
loading dock in an industrial area of Holyoke.  The
defendant, Jose A. Pacheco, drove the car that was used to
take the victims to the place where they were killed; the
government alleges that by performing that act, he conspired
with others and was a co-venturer in committing the murders.

The government's only evidence as to what occurred
immediately prior to and during the murders is the statement
Jose Pacheco voluntarily gave police the morning after the
shooting, and his testimony at the prior trials of Iran

1

C.4.9

Diaz, Luis Rivera, Pedro Ramos, and Raymond Rebello.   Mr.
Pacheco has consistently admitted that he knew that the
victims were to be murdered, that he followed orders to pick
them up and drive them to the scene, and that he witnessed
their deaths.   But he has also consistently stated that
Rebello ordered the murders, which were carried out by Diaz
and Rivera, and that he cooperated only because those men
threatened to kill him and members of his family after
showing him their guns, indicated that they knew where he
lived, and held a gun to his head.

     ,  In every significant respect, his testimony--which has
been critical to the successful prosecution of Rebello,
Diaz, and Rivera--is consistent with other available
evidence.   Other witnesses at the five preceding trials
stemming from this incident confirm that Mr. Pacheco was
widely known to be a close friend to the victims; forensic
evidence confirms his description of the manner in which the
victims were murdered and their physical condition at the
time; one or more witnesses confirm that before their
arrests, Rebello, Diaz, and Rebello were privately claiming
responsibility for the murders.

## Issues Presented

1.   In a prosecution in which all available evidence
establishes that the defendant acted under duress, should
the indictments be dismissed because the prosecution cannot

2

$C.A.: 10$

prove that he willingly joined in a criminal venture,
sharing others' intent?

2.  Should the indictments be dismissed when the prosecution
cannot offer any affirmative evidence to rebut the defense
of duress?

### Discussion

I.  The indictments should be dismissed because all
available evidence establishes that the defendant acted
under duress and neither joined a criminal enterprise
voluntarily nor shared others' criminal intent.

The government does not allege that Jose Pacheco shot
either of his friends; he is being prosecuted as a
conspirator and joint venturer to their murder.  To obtain a
conviction on that theory, the government must prove beyond
reasonable doubt both that Mr. Pacheco voluntarily joined in
that enterprise, and that he did so sharing the intent to
commit murder.  *Commonwealth* v. *Armand*, 411 Mass. 167, 170-
171 (1991) (on a joint venture theory for an offense
requiring proof of malice, government must prove shared
malicious intent.)  *Commonwealth* v. *Mandile*, 403 Mass. 93,
101-102 (1988).

While there is evidence that Jose Pacheco was aware
that the other participants intended to kill the victims,
all the evidence establishes that his own participation was
not voluntary, and that he even took affirmative, if
ineffectual steps to disrupt the venture.  One of the

3

$c.A. 1.1$

victims was Mr. Pacheco's closest friend; he twice refused to participate in the plan; he twice warned the victims that they were going to be killed; and he attempted to attract police attention while the plan was underway. He was enlisted only by direct threats, underscored by a menacing show of weapons, against his life and the lives of his family. When questioned by police, after the safety of his family had been assured, he cooperated fully in the investigation and prosecution of the other participants.

In the face of such evidence, affirmatively demonstrating that Jose Pacheco acted only under duress, no reasonable inference could be drawn that he was a willing co-venturer in the murders of Guillermo Santiago and Angel Carcano. See generally *Commonwealth v. Salemme*, 395 Mass. 594, 599-600 (1985) (when necessary element of offense charged is left to speculation, government has failed its burden of proof.) *Commonwealth v. Mazza*, 399 Mass. 395, 398-400 (1987). The weight of that evidence is not in question; it is unrebutted. Accordingly, the indictments should be dismissed.

II.  The indictments should be dismissed because there is no evidence to rebut the defense of duress.

In Massachusetts, duress is recognized as a complete defense to criminal charges. See *Commonwealth v. Melzer*, 14

4

$C. A. 12$

Mass. App. Ct. 174, 180–184 (1982) and authorities cited.
And although there is a split of authority in other
jurisdictions, in Massachusetts, it has been assumed that a
duress defense is available even in a homicide prosecution.
*Commonwealth* v. *Robinson*, 382 Mass. 189, 201–202, 206 (1981)
and authorities collected in nn. 15–16.  When, as here,
there is evidence of coercion or duress, it becomes the
government's burden to disprove the defense beyond
reasonable doubt.  *Id.* at 204–206.

On the available evidence, that is a burden the
government cannot satisfy, because the factual basis of the
defense is wholly unrebutted.  When Jose Pacheco was ordered
to pick up and drive the victims to the place where they
were murdered, he was told that if he failed to cooperate,
he also would be killed.  The threat to his life was
imminent, and emphasized by the display of two guns.  See
*id.* at 199 ("'duress' is usually taken to require a present,
immediate, and impending threat of such a nature as a induce
a well-founded fear of death or of serious bodily injury
... ")  The threats made against his family, who lived less
than two blocks away, and whose whereabouts were known, were
equally serious and imminent.  Compare *State* v. *Toscano*, 74
N.J. 421 [378 A.2d 755, 761–765] (1977) (duress defense
available when threat of force made against another whose
safety is of concern to defendant.)  *People* v. *Graham*, 57

5

C.A. 13

Cal. App. [129 Cal.Rptr. 31] (1976) (duress defense available when threats were made against defendant's girlfriend and her child.) See also *Commonwealth* v. *Melzer*, 14 Mass. App. Ct. at 181—182 (assuming without deciding that threats against a significant other constitutes duress.) Model Penal Code § 2.09(1).

Although there might have been a momentary opportunity for Mr. Pacheco to take flight, when as here, the risk was substantial that either the members of his family or he would have been killed in the attempt, he was under no duty to assume that risk. *White* v. *State*, 203 S.W.2d 222, 223 (Tex.Cr.App. 1947) (defendant, who had witnessed earlier homicide and who was forced at gunpoint to participate in robbery, was not obliged to flee when left momentarily unattended.) The weight of the threats was underscored by the reputation for violence of the narcotics ring whose members were threatening him. See *Koontz* v. *State*, 204 So.2d 224, 225—227 (Fla.App. 1967) (duress defense, predicated in part on reputation and past threats, sufficient to be decided by jury.) *Williams* v. *State*, 22 Ark.App. 253 [739 S.W.2d 174, 176] (1987) (same.) Additionally, there is unrebutted evidence that Jose Pacheco, as the result of a near—fatal injury suffered as a child, is uneducated, emotionally unstable, and particularly subject to the threats made against him. *State* v. *St.*

6

*C.A. 14*

*Clair*, 262 S.W.2d 25, 26-28 (Mo. 1953) (defendant's lack of education and history of mental illness relevant to duress defense.) *State* v. *Milam*, 156 N.E.2d 840, 846 (Ohio 1959) (duress defense enhanced by defendant's circumstance as a "guileless tyro of metropolitan life ... ")

Because there is unchallenged evidence that Jose Pacheco was threatened with his imminent death, and the deaths of his immediate family, because those threats were offered by men with a reputation for violence and emphasized by a direct show of force, and because Mr. Pacheco, by circumstance and character, was unable to resist the force of those threats, he acted only under duress. Duress is therefore a complete defense to the charges against him, and the indictments should be dismissed.

## Conclusion

For the foregoing reasons, there are no issues of fact to be resolved by a finder of fact. The government cannot present any evidence to permit an inference that the defendant acted voluntarily, and not under duress. The indictments should be dismissed.

C.A. 15

Respectfully submitted,

JOSE A. PACHECO

by his attorney:

Charles K. Stephenson
15 Lyn Drive
Granby, Massachusetts
(413) 467-7227
B.B.O. #479150

8

$C.A. 16$

AFFIDAVIT

My name is Jose A. Pacheco.  Under oath, I depose and
say that:

> 1.  I am twenty-six years old.  I am the
> defendant named in Hampden County indictments
> 91-2243 through 2246.

> 2.  I have lived with my common law wife,
> Marisol Ortiz, for the past five years.
> During that time, although I am not their
> natural father, I have acted as father to my
> wife's two eldest children, Marimel (age 6)
> and Josenia (age 3.)  I am the father to my
> wife's two youngest children, Anna (age 2)
> and Jose (age 1).  In August 1991, my wife
> was four months pregnant with our youngest
> child, Jose.

> 3.  In August 1991, I lived with my wife and
> children at 413 Pleasant Street, Holyoke,
> approximately one block from 828 Hampden
> Street, a building where both Pedro Ramos and
> Guillermo Santiago rented apartments on the
> second floor.

> 4.  Prior to August 1991, I had known
> Guillermo Santiago for approximately three
> years.  He had become my best friend.  We
> socialized together almost every day, and we
> often worked together repairing our own and
> other people's cars in the garages and
> parking area behind Guillermo's apartment.
> In May 1991, after Guillermo broke up with
> his girlfriend, he lived with my family for
> one or two weeks.  Because we were so often
> together, it was well known to people in
> Holyoke that Guillermo and I were very close
> friends.

1

C.A. 17

5.  I also was a friend to Guillermo
Santiago's friend Angel Carcano, although I
did not know him as well as I knew Guillermo.
Angel frequently hung around with Guillermo,
and helped us when we were repairing cars.

6.  I knew that Pedro Ramos was a big cocaine
dealer in Holyoke.  I had met him when I
worked with Guillermo, with whom Ramos had
made arrangements to repair his Chevy Blazer.
On at least two occasions when I was helping
Guillermo work on Ramos' car, I saw Ramos
with Raymond Rebello, who I was told worked
with Ramos dealing drugs.  One day, Ramos
also pointed out to Guillermo and me that
there were drugs and a gun in the Blazer, and
he warned us to leave everything as we found
it.

7.  During the summer of 1991, people on the
streets talked about how dangerous Pedro
Ramos and his gang were, and that they had
threatened to kill people who caused them
problems.  On at least one occasion when we
were working on his car, I heard Pedro Ramos
say that he would have someone killed.

8.  In the middle of August, the police
raided Pedro Ramos' apartment across the hall
from Guillermo Santiago's apartment.  Ramos
was arrested and held in jail.  A couple of
days later, Guillermo told me that he and
Angel had broken into Ramos' apartment after
the police had left, had taken some jewelry,
and had trashed some of the rooms.

9.  A few days before Guillermo and Angel
were killed, I saw Raymond Rebello on the
street.  He asked my neighbor Pedro Figueroa
and me to take him to 828 Hampden Street and
to identify Guillermo and Angel.  We did.
Rebello said that he knew they had ratted out
Pedro Ramos and had broken into his
apartment, and that Ramos had ordered that
they be killed.  I told Rebello to leave me
out of it, and that same day I warned

2

C.A. 18

Guillermo and Angel, but they did not believe me.

10.  Late in the evening on Friday, August 23, after I had dropped my family off at our apartment, I drove to downtown Holyoke to try to buy some marihuana.  When I stopped, Raymond Rebello, Iran Diaz (who I also knew), and Luis Rivera (who I did not), came up to my car and asked for a ride to the 7-11 near my building.  I gave them a ride.  Rebello sat in the front and the others in the back.

11.  As we were stopping at the 7-11, Rebello told me that he wanted me to go pick up Guillermo and Angel and bring them back to the 7-11, because they would get into my car and ride along with me.  Rebello again told me that they were going to be killed.  When I told him to leave me alone, he said, "It's either you or them."  He then asked the men in the back seat, "Who has the big gun?" Diaz said, "I've got the nine," and pulled a black gun out of his pants.  When all three men were getting out of the car, Rebello said to me, "Remember, do what I said, because we know where your family lives," and he nodded up Pleasant Street in the direction of my building.  I understood him to mean that if I did not pick up Guillermo and Angel, he would have my family and me killed, and I was afraid.

12.  As I drove toward 828 Hampden Street, I saw Diaz and Rivera heading in the same direction.  They were at one corner of the parking lot behind the building watching me when I was calling to Guillermo and Angel.

13.  When I arrived at 828 Hampden Street, I called to Angel to get Guillermo and told them I wanted them to come with me to get high.  When they got into the car, I could see that Guillermo was very drunk, and Angel was either drunk or high.  I told them that Rebello had sent me to get them so that they

3

$C.A.$ 19

could be killed, and that they should get
away, but they thought I was joking.  Diaz
and Rivera were still watching from the
corner, and I drove back to the 7-11.

14.  At the 7-11, I saw Rebello inside, and
went into the store.  Rebello again warned me
to cooperate or my family and I would be
killed.  When I went back to my car, which is
a two door model, Guillermo was still sitting
in the front seat, and Rivera, Diaz, and
Angel were in the back, from left to right.

15.  As I stopped at the traffic light by the
7-11, Rivera put his gun to the back of my
neck and told me to follow Diaz' orders.
Diaz directed me toward the Flats.  On the
way, I ran a stop sign and a red light,
trying to attract attention.  Diaz warned me
that if I did so again, they would kill me
also.

16.  At a loading dock by a factory in the
Flats, Diaz ordered me to turn the car around
and park.  Rivera pushed me out of the car,
still holding the gun to my neck.  Diaz
ordered Guillermo and Angel out the other
door.  Angel started to run.  Diaz shot him
in the back.  Guillermo ran around the front
of the car.  Rivera grabbed him, spun him
around, and shot him in the chest.  He
ordered me to get back into the car and he
climbed into the back seat.  As Diaz was
getting into the car, Rivera said, gesturing
toward Angel, "He's still alive."  Diaz went
back and shot Angel again.

17.  Diaz directed me to drive to Jackson
Parkway.  On the way, Rivera said that they
should have killed me, too, but Diaz said,
"Don't worry, he's too scared to talk."  He
again threatened to kill me if I ever told
what had happened.

4

## C.A. 20

18.  At a building on Jackson Parkway, they
ordered me to get out of the car.  Rebello
was waiting at the door to an apartment.  He
again told me that he would kill me if I told
the police what had happened.

19.  Later that night, I told my mother and
my wife what had happened.  Because I was
afraid for my family and myself, I did not
call the police.  But the next morning, when
the police came to arrest me and promised to
move my family out of Holyoke, I told them
what had happened.  Since that time, I have
served ten months in jail awaiting trial, and
I have testified about the murders of
Guillermo Santiago and Angel Carcano at the
trials of Iran Diaz, Luis Rivera, Pedro
Ramos, and Raymond Rebello (twice).

Signed under penalties of perjury, this first

day of February, 1993, at Springfield, Massachusetts.

JOSE A. PACHECO

On February 1, 1993, the above named Jose A. Pacheco
personally appeared before me, the undersigned authority,
and under oath, acknowledged the foregoing to be true, and
his free act and deed.

Charles K. Stephenson
Notary Public

My commission expires on November 2, 1995.

5

COMMONWEALTH OF MASSACHUSETT

HAMPDEN, ss.                    **C.A. 91**                    SUPERIOR COURT
                                                              CRIMINAL
                                                              NO..
                          COMMONWEALTH                          91-2244

                              vs.
                        Jose A. Pacheco

Joint
DEFENDANT'S MOTION TO CONTINUE AND WAIVER OF RULE 36 RIGHTS

Now come(s) the defendant(s)   Jose A. Pacheco
in the above-entitled case and move(s) that the matter be continued to the
date of  January 23  , 198 92, for trial        -pleas
all purposes

The reason for this request is  the defendant is a material
witness in other prosecutions and it is in the interests
of justice that those matters be disposed of before further
proceedings on these indictments

I/We request this continuance and waive my/our right to a speedy trial
under Rule 36 of the Massachusetts Rules of Criminal Procedure to the extent
that the period of time from this date until the new date to which the matter
is continued shall be excluded in computing the time within which my/our trial
must commence under that rule. I/We give up this right voluntarily, appreciating
what I/We am/are doing, after having had my/our right to a speedy trial under
Rule 36 explained to me/us.

Approved:                              Signed:

                                       Defendant

Attorney for the Defendant

                                       Defendant
assented to:
           Howard I. Safford, ADA
    I hereby find and rule that the ends of justice served by granting a
continuance in this matter outweigh the best interests of the public and the
defendant(s) in a speedy trial. Accordingly, it is ordered that the trial
of this case be continued to _____ , 198__, for the reason(s)
stated above and/or for reasons stated in the transcript., which are hereby
incorporated herewith as my findings.

Motion Allowed by the Court

                                       Justice of the Superior Court

Dated: _____ , 198__.

*Exhibit # 10*
*165 pages*

1                  COMMONWEALTH OF MASSACHUSETTS

2

3    Hampden, ss.              Superior Court Department
                               of the Trial Court
4                              Criminal Action No.
                               91-2284-85
5

6    _____

7    Commonwealth                **RECEIVED**

8    V                          FEB 17 2006

                                **CLERK OF COURTS**
9    Raymond Rebello           **HAMPDEN COUNTY**

10   _____

11

              Motion for a new trial held in the
12   Hampden County Superior Court, 50 State Street,
     Springfield, Massachusetts, before Sweeney, J., on
13   January 25, 2005.

14

     APPEARANCES:
15

     Jim Orenstein, First Assistant District Attorney.
16   Jane Montori, Assistant District Attorney.

17   Leslie O'Brien, Esq., representing Mr. Rebello.

18   Charles Groce, Esq., representing Mr. Pacheco.

19

20               CHRISTIE L. AARONS, RPR
                 OFFICIAL COURT REPORTER
21

22

23

| 1 | Exhibit | Page |

2    Exhibit 8
     Rule 36 waiver .......... 127
3
     Exhibit 9
4    Notification of
     awards and promises. .... 132
5
     Exhibit 10
6    Receipt of 5/19/92 ...... 145

7    Exhibit 11
     Receipt of 5/27/92 ...... 145
8
     Exhibit 12
9    Mr. Pacheco's
     testimony in the Diaz
10   trial. ................. 158

11   Exhibit 13
     Mr. Pacheco's
12   testimony in the
     Rivera trial. .......... 158
13
     Exhibit 14
14   Mr. Pacheco's
     testimony in the
15   Rebello trial. ......... 158

16

17

18

19

20

21

22

23

```
 1        Your Honor indicated we should suspend so
 2        we can hear this and we'll later conclude
 3        the jury --
 4            THE COURT:   Or in response to my
 5        agitation, one or the other.
 6            MR. ORENSTEIN:    I didn't say that,
 7        Your Honor.
 8            THE COURT:   I'm just kidding.
 9            Now to the matter at hand.   We have
10        before us for hearing today the matter of
11        the evidentiary portion of a motion for new
12        trial filed with the Supreme Judicial Court
13        and remanded to the Superior Court for
14        determination, a stay entering in the
15        appeal while the motion for new trial is
16        under consideration in this Court.
17            I have on past conferences in court,
18        on the record of course, set up the
19        parameters for the hearing, for the
20        evidentiary hearing portion of this motion.
21            MS. O'BRIEN:   Yes, Your Honor.
22            THE COURT:   And that's how I intend
23        to proceed.  And I'll be glad to hear
```

1          to the Court, Your Honor.

2                    THE COURT:    All right.    Thank you.

3          Is there anything preliminarily from the

4          Commonwealth's perspective?

5                    MR. ORENSTEIN:    One preliminary

6          procedural matter is that Mr. Charles

7          Stephenson, who was the attorney for the

8          witness, Jose Pacheco, is here in the

9          building and we anticipate he will be a

10         witness.

11                   In discussions with him about his

12         testimony he was very cautious to indicate

13         that he did not wish to get into matters of

14         issues that he may have discussed with his

15         client, Mr. Pacheco, without a waiver of

16         attorney/client privilege from Mr. Pacheco.

17         So before Mr. Pacheco is done with his

18         testimony or leaves the courtroom, I would

19         like to have Mr. Stephenson come -- he

20         asked to be present just so that a question

21         may be put to him as to whether the witness

22         would be willing to waive his

23         attorney/client privilege with

```
 1          going to be in the law library.

 2                    THE COURT:   Could we get

 3          Mr. Stephenson from the law library and

 4          we'll bring out Mr. Pacheco as well.

 5                    MR. ORENSTEIN:    Your Honor, an

 6          additional procedural matter to remind the

 7          Court is that last week on the motion filed

 8          by the Commonwealth Your Honor appointed

 9          Charles Groce to represent this witness,

10          Mr. Pacheco, with respect to his

11          forthcoming testimony.   And so I wanted

12          to --

13                    THE COURT:   Is Mr. Groce available?

14          I know he was going to -- he assured us he

15          would be in the courthouse.

16                    MR. ORENSTEIN:    I saw him just a

17          little while ago.

18                    THE COURT:   Okay.  Thanks.

19                    As we gather these people, may I have

20          the indictment numbers of the charges

21          against Mr. Pacheco as they originally

22          existed.

23                    MR. ORENSTEIN:    Indictments from
```

1          murder of Angel Carcano.  2245 a was

2          conspiracy to murder Guillermo Santiago.

3          And 2246 was conspiracy to commit murder of

4          Angel Carcano.

5                    THE COURT:    Thank you.

6                    (Attorney Groce enters the courtroom.)

7                    THE COURT:    Mr. Groce.

8                    MR. GROCE:    Yes, Your Honor.

9                    THE COURT:    Mr. Groce, I'm waiting

10         for Attorney Charles Stephenson, who should

11         be coming in from the law library in a

12         moment.   Thank you for representing

13         Mr. Pacheco's interests in this hearing.

14                   MR. GROCE:    Absolutely.

15                   THE COURT:    Before we begin the

16         evidentiary portion of the motion for new

17         trial I have to engage in a colloquy with

18         Mr. Pacheco so that he understands clearly

19         that he is giving -- if he chooses to, that

20         he is waiving his attorney/client privilege

21         with Attorney Stephenson with respect to

22         their communications between them and the

23         advice Mr. Stephenson gave him with respect

1          that are in issue here and the

2          conversations you may have had with

3          Attorney Charles Stephenson, your then

4          attorney, and any advice he may have given

5          you.  Mr. Stephenson is present in the

6          courtroom.

7               The reason I'm having this discussion

8          with you, sir, is you have an absolute

9          right, fully protected by the law, that any

10         communications and -- between you and your

11         attorney -- at the time it was

12         Mr. Stephenson -- and any advice he gave to

13         you may not be divulged, may not be

14         testified to by Mr. Stephenson.  He has an

15         absolute obligation as an attorney sworn by

16         oath as an attorney to keep confidential

17         all legal advice and communications

18         relating to the case at hand.

19               Likewise, you can never be required,

20         except under certain circumstances, but as

21         a general proposition you can never be

22         required to testify or tell anyone what you

23         told Mr. Stephenson or what advice

```
 1          outside the courtroom.

 2               Terry, he might be on the second

 3          floor.

 4               THE CLERK:    They're looking, Judge.

 5               COURT OFFICER:    He's on his way,

 6          Your Honor.

 7               THE COURT:    Thank you.  And I take it

 8          Mr. Pacheco is on his way?

 9               (Mr. Stephenson enters courtroom.)

10               Mr. Stephenson, you can have a seat in

11          the audience.  That's fine.  I'm going to

12          conduct a colloquy momentarily with

13          Mr. Pacheco regarding the attorney/client

14          privilege as it attaches between yourself

15          and Mr. Pacheco and the waiver thereof.

16          Mr. Groce has been appointed to represent

17          Mr. Pacheco with respect to any of the

18          legal interests he may have in this matter.

19          Mr. Groce is -- Mr. Groce is where?  He was

20          right here a minute ago.  I can't be losing

21          people on this hearing.

22               (Attorney Groce and Mr. Pacheco enter

23          the courtroom.)
```

1       worked out with the district attorney's

2       office and Mr. Stephenson relating to the

3       prosecution of the murders of two young men

4       in Holyoke over a decade ago, Mr. Angel

5       Carcano and Mr. Santiago.

6       In addition to that you gave testimony

7       in trial, and in particular the trial

8       that's at issue here, the trial of the

9       Commonwealth versus Raymond Rios Rebello.

10      Do you understand all of that?

11      MR. PACHECO:   Yes, ma'am.

12      THE COURT:    The Court has received

13     information through filings by

14      Mr. Rebello's defense counsel that you are

15      now stating certain matters regarding your

16      arrangement with the Commonwealth and what

17      would happen to you if you testified

18      against Mr. Rebello.

19      In addition, those statements contain

20      your representation of what you discussed

21      with Mr. Stephenson, what he discussed with

22      you and advice Mr. Stephenson gave to you.

23      By discussing those matters you have waived

2 mode

```
 1              MR. PACHECO:   No, ma'am.

 2              THE COURT:   Mr. Groce, do you have

 3         anything you wish to bring to my attention

 4         regarding your client's knowledge of the

 5         privilege, his recognition that he has

 6         waived the privilege or anything relating

 7         to the privilege at this point?

 8              MR. GROCE:    No, Your Honor.   Thank

 9         you.  I'm confident after speaking to this

10         gentleman and I'm confident he is very much

11         aware of the waiver and his rights and is

12         willing to proceed.

13              THE COURT:   Thank you.  Attorney

14         Stephenson, from your perspective as an

15         attorney, is there any matter that you wish

16         the Court to make inquiry of Mr. Pacheco

17         with regard to his understanding of the

18         fact that you will now be compelled to

19         testify as to what would have otherwise

20         been privileged matters?

21              MR. STEPHENSON:  Your Honor, there is.

22              THE COURT:   Yes, sir.

23              MR. STEPHENSON:   It was my
```

```
 1        Safford.  And I leave it to the Court
 2        whether or not he made these
 3        representations by way of affidavit
 4        concerning certain conversations that he
 5        had with Mr. Safford while he was
 6        represented by Mr. Stephenson, if in affect
 7        he waived his attorney/client privilege
 8        with respect to the matters in this
 9        affidavit.
10             THE COURT:   Thank you.  I think that
11        the evidence as it unfolds will indicate
12        whether or not what Mr. Pacheco claims are
13        conversations he had with Mr. Safford were
14        intertwined with anything he is claiming in
15        terms of communications with Mr. Stephenson
16        leading to those conversations.  I don't
17        know where that evidence will lead.  I
18        don't know if it's there.  I don't know if
19        it's not there.  I simply want him to
20        understand the attorney/client privilege
21        and that to the extent he refers to
22        communications with his attorney or advice
23        given with any specificity, he would be
```

```
 1                    *      *      *      *      *      *

 2                    THE COURT:    Thank you.

 3              Attorney O'Brien.

 4                    MS. O'BRIEN:    Thank you, Your Honor.

 5    DIRECT EXAMINATION BY MS. O'BRIEN:

 6        Q.    Sir, please state your name.

 7        A.    Jose Pacheco.

 8        Q.    Sir, are you incarcerated at this time?

 9        A.    Yes.

10        Q.    Where are you incarcerated?

11        A.    Norfolk.

12        Q.    Would you repeat that?

13        A.    Norfolk.

14                    THE COURT:    Norfolk County?

15                    THE WITNESS:    Yeah, upstate, Norfolk.

16        Q.    Sir, did you have a friend by the name

17    of Guillermo Santiago?

18        A.    Yes.

19        Q.    And did you ever testify regarding

20    Guillermo Santiago's death?

21        A.    Yes.

22        Q.    Were you also charged in Guillermo

23    Santiago's death?
```

1       five?

2               A.      I don't remember because it's been so

3       long but I know it was a lot of times, yeah.

4               Q.      In preparation for your testimony in

5       those cases did you ever speak with the assistant

6       district attorney Howard Safford?

7               A.      Yes, I did.

8               Q.      Could you say approximately how many

9       times you spoke with Howard Safford?

10              A.      A few times.  I don't remember how

11      many.

12              Q.      When you say a few times, I'm just

13      asking you to approximate.

14              A.      I don't recall.  More than -- more than

15      three times, I recall that.

16              Q.      Did you speak with Mr. Safford each of

17      the times that you testified in these various

18      cases?

19              A.      Yeah, I spoke to him.  I spoke to him,

20      my lawyer.

21              Q.      And you testified in a case,

22      Aran (phonetic) Diaz case, is that correct?

23              A.      Yes.

1    but then after that we spoke alone a couple of

2    times.

3         Q.    A couple of times?

4         A.    Yeah.

5         Q.    And where was it that you would speak

6    with Mr. Safford when you had your interviews with

7    him?

8         A.    In the office.

9         Q.    In his office?

10        A.    Yes, ma'am.

11        Q.    And did you and he visit anywhere else

12   other than in his office?

13        A.    That I don't remember, outside, being

14   somewhere else.  But I think he came up to the

15   jail, if I'm not mistaken.  But most of the time

16   it was here in court, in the office.          .

17        Q.    Now, would you describe your

18   relationship with Mr. Safford; did you have a good

19   relationship with him?

20        A.    He was pretty fair with me that time,

21   yeah.

22        Q.    And would you say that he treated you

23   kindly?

1       Q.    When you say they helped you out to get

2   you there, how did they help you to get there?

3       A.    They paid for everything and I got --

4   because I didn't have the money.  I was just

5   coming out of jail.

6       Q.    So what did they pay for to get to you

7   Puerto Rico?

8       A.    The tickets.

9       Q.    How many tickets?

10      A.    Me and my girlfriend and one kid.

11      Q.    And one kid?

12      A.    (Witness gesturing affirmatively.)

13      Q.    Three tickets.  Did they pay for

14  anything else?

15      A.    Hotels where I was staying at.

16      Q.    Hotels where?

17      A.    I don't remember the names of the

18  hotels.

19      Q.    And how long did you stay at hotels?

20      A.    Maybe a couple days here and a couple

21  days there.  It's been so long that I don't recall

22  how many days.

23      Q.    And that was paid for by the

1              THE COURT:    Thank you.   Sustained.

2       A.    I don't remember that.

3       Q.    Did you ever refuse an offer of a plea

4    bargain from the Commonwealth?

5       A.    Well, they never gave me a bargain,

6    that's what I'm saying.

7       Q.    Your recollection is that you were

8    never given an offer?

9       A.    No.   They say if you cooperate we'll be

10   fair with you.   You know, like, I'm figuring

11   they're going to do the same thing to me so.

12             THE COURT:    Who told you this?

13             THE WITNESS:    What?

14             THE COURT:    Who told you this?

15             THE WITNESS:    Well, the DA verbally

16        told me.

17             THE COURT:    Who?

18             THE WITNESS:    Mr. Howard Safford let

19        me know -- said to me that we'll treat you

20        fair, you know, just do the right thing.

21       Q.    He said that he would be fair to you?

22       A.    Yes.

23       Q.    What did you understand that to mean?

```
 1          Q.    Mr. Pacheco, if after you had testified

 2    these five times Mr. Safford had told you that you

 3    were going to trial for first degree murder, what

 4    would you have felt about your relationship of

 5    trust with Mr. Safford?

 6                MR. ORENSTEIN:    Objection.

 7                THE COURT:    I'll allow him to answer

 8          it.

 9          A.    I'd say they be playing me, basically.

10          Q.    Repeat that.

11          A.    That he played me.  He used me to get a

12    conviction.  That's what I look at it.  That's the

13    way I looked at it in my mind, behind my mind.

14          Q.    When you say you would think that he

15    played you, what does that mean?  What does the

16    word mean?

17          A.    Mean he used me to get his convictions.

18                MR. ORENSTEIN:    Objection.

19                THE COURT:    Overruled.  He is just

20          saying what he means by the phrase play.

21          Q.    When you used the word play, would you

22    think that he had been honest with you?

23          A.    Well, he was coming through for me on
```

1    testimony today?

2           A.    Well, I was speaking yesterday to my

3    lawyer and to see what was going on --

4                THE WITNESS:  Excuse me, Your Honor,

5           can I speak to my lawyer for a minute.

6                THE COURT:    No.  You shouldn't tell

7           us -- if you're talking about Mr. Groce,

8           you should not tell us what you and

9           Mr. Groce talked about.

10               THE WITNESS:   Okay.

11          A.    I can't say.

12          Q.    Do you have an understanding now as to

13   whether there is any -- whether you have been

14   offered anything in regard to your testimony

15   today?

16          A.    Right now I'm just here to say the

17   truth, which I'm doing right now, because

18   Mr. Rebello was never near the issue of the matter

19   which they charged him with.  Basically I lied

20   before because I was coached by the Detective

21   Valentine because they wanted him so they put

22   pressure on me.

23               MR. ORENSTEIN:   I object.  This is

1   understanding?

2          A.    My understanding is I'm here to say the

3   truth and that's what I'm doing.  You know,

4   whatever the Court decides, that's on them.  But

5   right now I'm just standing here and make sure

6   that the truth comes out.

7          Q.    After you completed your testimony at

8   the second trial of Raymond -- strike that.  When

9   you testified at that last trial, did you believe

10  that you were going to be prosecuted for murder?

11         A.    Yeah, I had a lot of the doubt in my

12  mind.  Yes, I did.  It's been a long time with

13  this case.  It's been so long that I cannot recall

14  exactly.  I know in my heart I thought I was going

15  to go down, too.  So I said to myself, well, if

16  you want to make a deal with me, I guess.

17         Q.    Once you satisfactorily completed --

18  once you had testified five times, what did you

19  think was going to happen with your case?

20         A.    I didn't have no clue.

21                MS. O'BRIEN:   I have nothing further.

22                THE COURT:   Thank you, Attorney

23         O'Brien.  Attorney Orenstein, please.

1      A.    Yes, sir, I lied.

2      Q.    So you also lied during the Aran Diaz

3  trial, is that right?

4      A.    I'm talking about Mr. Rebello, sir.

5      Q.    I'm going to ask you about Aran Diaz.

6  You testified there under oath about the same

7  case.  Different defendant, same case.  Did you

8  lie in that case as well?

9      A.    Yes, I did.

10      Q.    What did you lie about in that case?

11      A.    What they was coaching me to say.

12      Q.    No, what did you say that was a lie?

13      A.    I don't remember, sir.  I don't recall.

14  It's been too long.

15      Q.    Well, you testified that you were

16  present when Aran Diaz shot and killed Santiago,

17  right?

18      A.    Yes, I did.

19      Q.    And was that a lie or were you there?

20      A.    I wasn't there.

21      Q.    So you lied about that?

22      A.    That's correct.

23      Q.    You testified that you were present

```
 1   you were the first one arrested, weren't you, in

 2   that case?

 3        A.    No, I was the last one.

 4        Q.    The last one that was arrested?  I see.

 5        A.    That I remember.

 6        Q.    When you were arrested, though, you

 7   gave a statement to Sergeant Valentine, didn't

 8   you?

 9        A.    Yes, I said Mr. -- Sergeant Valentine.

10        Q.    Is your answer yes, you did give a

11   statement?

12        A.    Yes, I did.  Yes, I did.

13        Q.    And Sergeant Valentine read you your

14   rights, correct?

15        A.    I don't remember but yeah, I guess he

16   did.

17        Q.    Isn't this your signature, Jose

18   Pacheco, on this Miranda warning card?

19        A.    Yes.

20        Q.    Does that refresh your memory that

21   Sergeant Valentine read you your rights?

22        A.    Yes.  Thank you.

23        Q.    Did you give a three-page statement to
```

```
 1              admitted and marked.

 2                   THE CLERK:    Number 1.

 3                   (Exhibit 1 was entered into evidence.)

 4         Q.    Now, in this statement that you gave to

 5    Sergeant Valentine -- first of all, let me stop

 6    for a moment.  Are you telling us today -- are you

 7    telling Judge Sweeney you had nothing do with

 8    these murders?

 9         A.    That's correct.

10         Q.    You weren't even there?

11         A.    That's correct.

12         Q.    I see.  But on the evening when you

13    gave the statement to Sergeant Valentine, what you

14    said in that statement was you were there, didn't

15    you?

16         A.    That's correct.

17         Q.    And you said that you had driven Aran

18    Diaz or Luis Rivera there, didn't you?

19         A.    Yes.

20         Q.    You were present when you saw them

21    shoot and kill the two victims?

22         A.    That's what the statement says, sir.

23         Q.    That's what the statement says, isn't
```

45

1          A.      That's correct.

2          Q.      Mr. Stephenson was appointed as your

3     lawyer?

4          A.      Yes.

5          Q.      And despite the fact that you had an

6     attorney representing you, you proceeded on, and

7     not only did you make this statement to Sergeant

8     Valentine in the absence of counsel after you had

9     counsel, you continued to testify in five

10    different trials that, in fact, you were present

11    when those murders occurred, isn't that right?

12         A.      That's correct.

13         Q.      Now, Mr. -- you met Mr. Safford at some

14    point, is that right?

15         A.      Yes.

16         Q.      And Mr. Stephenson was with you when

17    you met with Mr. Safford?

18         A.      That I recall. I don't remember but I

19    think I did, yeah.

20         Q.      Okay. And do you recall that there was

21    discussions as to whether you would cooperate in

22    the cases against all of these men against Diaz

23    and Rebello and the others, is that right?

1    testifying, you still didn't know what was going

2    to happen to your case, right?

3         A.   That's correct, yeah.

4         Q.   So Mr. Safford then never told you that

5    you weren't going to face prosecution, did he?

6         A.   I don't recall. It's been too long so

7    I don't -- I don't want to say something that's

8    going to --

9         Q.   You just said here this morning before

10   Judge Sweeney that the only thing Mr. Safford told

11   you is that you would get some consideration?

12        A.   That's correct. I said that again over

13   and over.

14        Q.   And when the cases in which you

15   testified were done, you still didn't know what

16   was going to happen to your case, isn't that

17   right?

18        A.   That's correct.

19        Q.   And so you didn't know that the case

20   was going to be dismissed, did you?

21        A.   Nope.

22        Q.   So I want to show you an affidavit and

23   ask if you recognize this. Do you recognize this

```
  1          A.     That's correct.

  2          Q.     And during that trial you were

  3   convicted of armed robbery and assault and battery

  4   by means of dangerous weapon?

  5          A.     Yes, that's correct.

  6          Q.     What sentence did you get?

  7          A.     Six, six and a day and five years

  8   probation.

  9          Q.     You're currently serving a six-year

 10   prison sentence for armed robbery and assault and

 11   battery by means of dangerous weapon.

 12                 THE COURT:   And again, the sentence?

 13                 MR. ORENSTEIN:   On the armed robbery

 14            he received six years to six years and a

 15            day.

 16          A.     Mm-mm.

 17          Q.     And on assault and battery by means of

 18   dangerous weapon you received probation to be

 19   served from and after your sentence, is that

 20   right?

 21          A.     After I finish my sentence, yeah.

 22          Q.     Right.   Now, when you were --

 23                 THE COURT:   This is Bristol County?
```

    1        A.      That is right.

    2        Q.      And Mr. Rivera in the trial in which

    3    you testified was doing first degree life without

    4    parole, isn't that right?

    5        A.      That's correct.

    6        Q.      And so Mr. Rivera approached you about

    7    helping him, didn't he?

    8        A.      No.  I approached him.

    9        Q.      You approached him?

   10        A.      That's right.

   11        Q.      I see.  And when you approached him,

   12    was it -- did you approach him to say, how can I

   13    help you, Luis?

   14        A.      Well, I got a conscience, sir.  So you

   15    know, it bothered me a lot.

   16        Q.      I see.  Well, in fact, what happened

   17    was you were approached by some Latin Kings,

   18    weren't you, in the prison?

   19        A.      Nope.

   20        Q.      Never happened?  And are there Latin

   21    Kings at MCI Cedar Junction?

   22        A.      I don't know, sir, because I don't run

   23    with gangs.

1        A.     That's correct.

2        Q.     Did you type this up on your own or did

3     somebody type this up for you?

4        A.     Somebody typed it up for me.

5        Q.     And you signed it?

6        A.     Yeah, that's correct.

7        Q.     You said this is true?

8        A.     Yeah.

9        Q.     And in this affidavit you said, "I had

10    an agreement with Mr. Safford that after

11    testifying against the defendant, Rivera, I would

12    be released on low bail and I would not face

13    prosecution," is that right?

14       A.     That's what it says there.

15       Q.     So that's a lie also, isn't it?

16       A.     Well, I guess so.   That's a lie too.

17       Q.     That's a lie too.   But you made this

18    lie because you were in prison with Mr. Rivera,

19    right?

20       A.     No, sir.

21       Q.     You wanted to help out Mr. Rivera,

22    right?

23       A.     That's correct.

1   did you?

2          A.    No, I didn't have nothing do with them.

3          Q.    You didn't have to do anything after

4   that.  So in 1994 did you contact Mr. Rivera and

5   say, jeez, Mr. Rivera, I have a conscience, I want

6   to help you out, did you do that?

7          A.    No, sir.

8          Q.    Did you do that in '95, '96 or '97?

9          A.    No, sir, but that doesn't mean it ain't

10  bothering me.

11         Q.    You didn't do anything until after you

12  are incarcerated in MCI Cedar Junction with the

13  man you testified against, Mr. Rivera, correct?

14         A.    Well, I had the opportunity there so I

15  decided to help him out.

16         Q.    So this then -- this is a lie in this

17  affidavit, correct?

18         A.    Well, Mr. Safford said he would take

19  consideration.

20         Q.    Give you consideration?

21         A.    That's correct.

22         Q.    He didn't say you wouldn't face

23  prosecution, did he?

```
 1          Q.    By the way, after you were -- how long
 2    did you remain at Cedar junction?
 3          A.    Almost two years.
 4          Q.    Two years.  And from there where did
 5    you go?
 6          A.    I went to Norfolk.
 7          Q.    Once you got to Norfolk you were now
 8    housed with Mr. Raymond Rebello, is that right?
 9          A.    That's correct.
10          Q.    Now, Mr. Rivera then came back to you
11    and asked you for another affidavit, didn't he?
12          A.    Yeah.
13          Q.    I'm showing you this.  Do you recognize
14    this two-page document?
15          A.    Mm-mm.
16          Q.    Is that your signature again?
17          A.    Yes.
18          Q.    So in September of 2002 you provided
19    another affidavit to Mr. Rivera, right?
20          A.    Yes.
21          Q.    And you did this because you knew that
22    Mr. Rivera was going to try and get a new trial,
23    right?
```

1    were there?

2           A.    Yes, even though I lied that I wasn't

3    there.  I repeat myself again, sir, I was coached

4    to do this so I did it.

5                 MS. O'BRIEN:    No objection.

6                 THE COURT:    Thank you.  That may be

7           admitted and marked.

8                 THE CLERK:    Number 3.

9                 (Exhibit 3 was entered into evidence.)

10          Q.    Mr. Pacheco, Mr. Rivera then approached

11    you about a third affidavit, is that right?

12          A.    Yeah.

13          Q.    Is this another affidavit that you gave

14    him?

15          A.    Yes, sir.

16          Q.    Who prepared this one, by the way?

17          A.    Like I said, I don't know how to write

18    that good but that's my signature.

19          Q.    Okay.  Who typed it?  If you know.

20          A.    I don't know the person.

21          Q.    You don't know the person.  Was it

22    someone in the prison, though?

23          A.    Yes.

1    testimony, isn't that right; and didn't

2    Mr. Safford ask you, "Do you know of any other

3    agreement for your cooperation," and you said,

4    "Just consideration," isn't that right?

5         A.    Yeah.

6         Q.    And while you didn't know exactly what

7    that was going to be, you were hoping you would do

8    less time, right?

9         A.    That's correct.

10        Q.    And Mr. Safford never promised you

11   anything other than you will get consideration for

12   your cooperation and we'll be fair to you, isn't

13   that right?

14        A.    That's correct, sir.

15             MR. ORENSTEIN:    Your Honor, I would

16        like to offer the transcript of the trial.

17        I think you may already have it.  I would

18        like to be sure of that.

19             THE COURT:    I gave it back to the

20        clerk's office because there was such

21        confusion over where the various parts of

22        the transcript were, and I wanted them all

23        in the same place.  So assuming that they

```
 1          A.     Oh, yes, a lot of statements that were

 2     written so I don't recall which one but.

 3          Q.     I'm talking about your statement?

 4          A.     Yeah, my statement.

 5          Q.     He talked to you about your statement?

 6          A.     Yeah.

 7          Q.     He talked to you about what questions

 8     he was going to ask you at the trial?

 9          A.     Mm-mm.

10          Q.     And Mr. Stephenson was present during

11     some of those meetings, if not all of them, is

12     that right?

13          A.     That's correct.

14          Q.     You remember Mr. Safford telling you

15     that he was going to ask you in Court if you were

16     going to be receiving consideration for your

17     cooperation?

18          A.     I don't remember.

19          Q.     You don't remember that?

20          A.     I think I don't recall that.

21          Q.     But you recall --

22          A.     He refreshed my memory and bring me

23     some type --
```

1   bail?

2        A.    I don't remember.  I don't remember

3   that.

4        Q.    While you were incarcerated you were

5   moved from Hampden County to a different jail so

6   you wouldn't be with these other people, is that

7   right?

8        A.    I was in Northampton, yeah.

9        Q.    You were in the Northampton jail and

10  you testified in the trial against Mr. Diaz,

11  right?

12       A.    Yes.

13       Q.    You testified in the trial against

14  Mr. Rivera?

15       A.    That's correct.

16       Q.    And after those two trials that's when

17  you were released on bail, isn't that right?

18       A.    I think so.  I don't recall the date.

19       Q.    Okay.

20       A.    But I know I was released.

21       Q.    When you were released, it came as

22  somewhat of a surprise to you that you were

23  released, isn't that right?

    1    get released on bail, that came as surprise to

    2    you, didn't it?

    3         A.    Yes, it did, but I didn't know the date

    4    or nothing.

    5         Q.    All right.  When you were first

    6    arrested in this case, you were quite concerned

    7    about the welfare of your family, isn't that

    8    right?

    9         A.    The welfare of my mother because she

   10    had two strokes and a heart attack.

   11         Q.    Of your mother?

   12         A.    That's right.  So at that point they

   13    grabbed me noble, which I was -- my concern was my

   14    mother and my family, yes.

   15         Q.    And your family -- you had concerns

   16    about your family, is that correct?

   17         A.    That's correct.

   18         Q.    Because your concerns were since you

   19    were cooperating in this case you were concerned

   20    about retaliation against your family, isn't that

   21    right?

   22         A.    I wouldn't say that.  I was more

   23    concerned about my mother passing away.

1    time.  Of course, I'm concerned about my family.

2            Q.    You had given a statement to Sergeant

3    Valentine where you identified two people who had

4    just executed your friend and a second man, isn't

5    that right?

6            A.    I testified what Mr. Valentine --

7            Q.    No.  No.  My question to you is, did

8    you give a statement on August 24th of 1991 in

9    which you identified Aran Diaz and Luis Rivera as

10    the men that just murdered Carcano and Santiago?

11            A.    That's correct, yes.

12            Q.    And you were concerned about

13    retaliation because of that statement, weren't

14    you?

15            A.    I don't recall saying that.

16            Q.    I'm not asking you what you said.  I'm

17    asking you, weren't you concerned about

18    retaliation against your family?

19            A.    I was concerned about my family,

20    regardless.

21            Q.    And in fact, didn't you ask if your

22    family could be moved out of Holyoke because you

23    were so concerned about their safety?

1        Q.    You answered the question, thank you.

2     In fact, Mr. Pacheco, during the Raymond Rebello

3     trial didn't you testify, when you were asked

4     about getting out of jail, and your answer -- I'll

5     show it to you so you can look along.  Didn't you

6     testify -- and this would have been on January 6th

7     in 1993.  In response to a question you said,

8     "Yes, sir, I was let out because I was concerned

9     about my family.  The Commonwealth of

10    Massachusetts couldn't take care of them.  Not the

11    district attorney, not the police, and they needed

12    protection;" didn't you testify to that?

13       A.    Yeah, I testified to that.

14       Q.    Who did they need protection from,

15    Mr. Pacheco?

16       A.    Well, I don't know them because I was

17    so nervous and noble at that time so I didn't know

18    what to say so I was like what Mr. Valentine

19    wanted to hear.  I went along with Mr. Valentine

20    and that's what he put in the report.

21       Q.    You wanted protection for your family

22    because you had just given a statement against two

23    men who you knew committed a cold-blooded murder

1        Q.     Isn't that what happened, Mr. Pacheco?

2        A.     That's what I said, sir.

3        Q.     Now, after you were released you were

4     provided with funds in order to go to Puerto Rico,

5     isn't that right?

6        A.     Mm-mm.

7        Q.     That was done to get you away from

8     Holyoke, isn't that right?

9        A.     I guess so, yeah.

10       Q.     Your concern was about retaliation,

11    wasn't it?

12       A.     No.  At that point I went along with

13    the detective on the case because that's the only

14    way they could have made a case against this

15    gentleman here today.

16       Q.     So --

17       A.     If I didn't go along with it, I

18    wouldn't get what I wanted to, basically.

19       Q.     Mr. Rebello (sic), when you were

20    released -- excuse me, Mr. Pacheco -- you were

21    concerned about your safety, weren't you?

22       A.     Huh?

23       Q.     When you were released on bail, you

1          A.     That's correct.

2          Q.     And you were not afraid to come back

3     and testify, is that correct?

4          A.     You're right.  Yes, ma'am.

5          Q.     You didn't think that you were going to

6     be grabbed and prosecuted when you came back to

7     testify, did you?

8                 MR. ORENSTEIN:     Objection, Your

9            Honor, this is still her witness.

10                THE COURT:     Sustained as to form,

11           Ms. O'Brien.

12         Q.     Did you think if you came back to

13    testify you would be prosecuted?

14         A.     Went through my mind, yeah.

15         Q.     You mentioned a couple of times what

16    Mr. Safford told you verbally.  You're using the

17    word verbally.  Will you clarify what you mean by

18    that?

19         A.     Well, he spoke to me and said that I

20    would give you some consideration if you testify

21    in the trials, which that's what I did.

22         Q.     And you're using the word verbally as

23    opposed to what?

```
 1          hand, sir.

 2                  *      *      *      *      *      *

 3               C H A R L E S     S T E P H E N S O N,

 4          having been called as a witness, being duly

 5          sworn, testified as follows:

 6                  *      *      *      *      *      *

 7               THE CLERK:   You may step forward,

 8          sir, and be seated.

 9     DIRECT EXAMINATION BY MS. O'BRIEN:

10          Q.   Sir, please state your name.

11          A.   Charles Stephenson.

12          Q.   And your occupation?

13          A.   I'm a lawyer.

14          Q.   And do you practice principally

15     criminal law?

16          A.   That's correct.

17          Q.   Did you represent Jose Pacheco in

18     relation to a charge of murder in the early 90s?

19          A.   Yes.

20          Q.   And within the early weeks or months of

21     that case did you have some discussions with the

22     prosecutors about resolving that case?

23          A.   One prosecutor in particular.
```

```
 1    then more specifically that Mr. Pacheco was an

 2    appropriate candidate for immunity from

 3    prosecution.

 4         Q.    What response did you get to your

 5    suggestion of immunity?

 6         A.    I'll consider a second.

 7         Q.    Now, did you feel that Mr. Pacheco had

 8    a defense that was open to him?

 9         A.    Absolutely.

10         Q.    How soon after you got the case did you

11    feel -- did you make that decision that there was

12    a defense open to Mr. Pacheco?

13         A.    Really almost immediately, within a

14    matter of hours.

15         Q.    What defense did you identify?

16         A.    Well, two-fold.  One, an actual

17    defense, duress.  And the other, a perceived

18    inability of the Commonwealth to prove that

19    Mr. Pacheco was a willing joint venturer.

20         Q.    Did you do some research on that

21    particular defense?

22         A.    A great deal.

23         Q.    How soon in the case would you say you
```

1          Q.     Well, would you give us your best

2     estimate?

3          A.     I would say that I have some

4     recollection of meeting with Mr. Safford with

5     Mr. Pacheco four times.

6          Q.     And in addition to the times where the

7     three of you met together, were there instances

8     where you discussed the case yourself with

9     Mr. Safford?

10         A.     I can only say in all probability it's

11    a virtual certainty.  I have no clear recollection

12    of that.

13         Q.     Well, can you say whether or not you

14    urged on Mr. Safford your theory that Mr. Pacheco

15    had this clear defense of duress?

16         A.     I know that I mentioned it in reference

17    to my response to Mr. Bennett's offer.  I don't

18    know when during the process that would have

19    occurred.  But that was always my position and I

20    don't believe that it was at all a secret.

21         Q.     So can you say with some confidence

22    that you made that position well known to the

23    prosecutors?

```
 1    correct?

 2          A.    At least two, maybe three.

 3          Q.    And when he came back to testify, he

 4    was permitted to come and go like any other

 5    witness would, is that correct?

 6          A.    That's my recollection, clearly.  I

 7    only recall one instance specifically.

 8          Q.    And on that instance he came

 9    voluntarily, is that correct?

10          A.    Yes.

11          Q.    And you saw the way that Mr. Safford

12    dealt with Mr. Pacheco, did you?

13          A.    Do you mean in the courtroom?

14          Q.    While interviewing him as a witness?

15          A.    Yes.

16          Q.    And he interviewed him as one would a

17    witness, is that correct?

18          A.    Yes.

19          Q.    And did the relationship appear to you

20    to be a reasonably friendly one?

21          A.    I would characterize it as pleasant and

22    perhaps affable would be an appropriate

23    description.
```

1      delaying the filing of that motion to dismiss?

2          A.    Personal to me.

3          Q.    As you felt that they bore on whatever

4      advantage that you felt that gave your client?

5          A.    I felt that Mr. Pacheco's interests

6      throughout were best protected by putting the

7      Commonwealth in a position that they would have

8      endorsed his testimony, his version of events

9      during the time of the incident and that clearly

10     he would be further advantaged if that were to be

11     repeated three or four or five times.

12         Q.    Did you feel that the prosecutors would

13     be more sympathetic toward Mr. Pacheco if he had

14     completed his testimony in all of those cases?

15         A.    I didn't feel it but I would have hoped

16     it.

17         Q.    Now, based on your interactions with

18     Mr. Pacheco and Mr. Safford, would it be fair to

19     say that it was your expectation that Mr. Safford

20     would show substantial consideration to

21     Mr. Pacheco?

22         A.    Could you repeat that.

23         Q.    Based on your interactions with both

```
 1                  THE COURT:   Any other area you can
 2             explore with Attorney Stephenson as we wait
 3             for that?
 4                  MS. O'BRIEN:   Yes, there is, Your
 5             Honor.
 6                  THE COURT:   Thank you.
 7        Q.    Now, Mr. Stephenson, in regard to your
 8    motion to dismiss, eventually the motion to
 9    dismiss the charges against Mr. Pacheco was heard
10    before Judge Spina, is that correct?
11        A.    That's correct.
12        Q.    Would it be fair to say that before
13    that hearing with Judge Spina you had discussed
14    your motion with Mr. Safford?
15        A.    I don't have any clear recollection of
16    discussing the merits with him.  We did together
17    get summonsed into Judge Spina's office out behind
18    the courtroom where we discussed it with him.
19        Q.    So that --
20        A.    I may have, I don't recall.
21        Q.    Well, at least as of that date when you
22    discussed the matter with Judge Spina you knew
23    what Mr. -- you knew the position that Mr. Safford
```

1   was possible.

2           Q.   So you thought that whatever opposition

3   he would have would be some technical opposition

4   based on the defense of duress?

5           A.   Not technically.

6                MR. ORENSTEIN:   I'm going to object,

7           Your Honor, to that question.

8                THE COURT:   Sustained as to what

9           Mr. Stephenson thought.  As to what he

10          heard and his conclusions from what he

11          heard in that conference or otherwise he

12          can testify.

13          Q.   Mr. Stephenson, based on that

14   conference with Judge Spina you knew that the

15   charges against Mr. Pacheco were going to be

16   dismissed, is that correct?

17          A.   I walked out of his office feeling

18   confident that he understood my argument and the

19   equities of the argument, and had considerable

20   confidence that he agreed with my position.

21          Q.   And when Mr. Safford did not put up a

22   strong argument in opposition, you were not

23   surprised, would that be fair to say?

```
 1          research in other states.  At this point

 2          the only state that jumps to my mind is --

 3          I remember there were a number of cases

 4          from Ohio.  But I was confident that it was

 5          legally sound that if there were ever a set

 6          of facts, in my view, that would support

 7          the defense, it would be this case.  And I

 8          mean, from my personal perspective, you

 9          know, I don't appear here as a lawyer for

10          people charged with crimes, it's as an

11          appellate lawyer, that's my strength.  I do

12          the legal argument.  I felt confident that

13          I had a much better grasp of the law than

14          any of the other players and --

15               THE COURT:   As of today, what is your

16          understanding of duress as a recognized

17          defense to murder in the Commonwealth of

18          Massachusetts?

19               THE WITNESS:   All I know, Your Honor,

20          is that a fellow named -- I think it's --

21          his first name was Jose Robles, must have

22          been 7 or 8 years ago, in front of Judge

23          Carhart, Judge Carhart was prepared to let
```

        1    date to try Mr. Pacheco for first degree murder?

        2              MR. ORENSTEIN:    Objection.

        3              THE COURT:    Sustained as to the form.

        4              Let me interrupt you Attorney O'Brien.

        5              Mr. Groce?

        6              MR. GROCE:    Your Honor, thank you

        7         very much.  I had an opportunity to speak

        8         with Mr. Pacheco.  I spoke to him in

        9         private and in the company of a court

       10         officer, and he is prepared to waive his

       11         privilege and allow Mr. Stephenson to

       12         testify to communications between client

       13         and attorney at that time.

       14              THE COURT:    All right.  Thank you.

       15         I'll take his formal waiver on the record

       16         at 2:00 and we will continue with

       17         Mr. Stephenson's testimony.

       18              MS. O'BRIEN:    Yes, Your Honor.

       19              THE COURT:    Okay.  See you at 2:00.

       20              (A luncheon recess was taken.)

       21              THE COURT:    Attorney Stephenson,

       22         please.  Thank you.

       23              Attorney O'Brien, please.

```
 1              THE COURT:   All right.  Mr. Pacheco

 2         is present in the courtroom with his

 3         attorney Charles Groce.  Mr. Stephenson is

 4         on the stand.  Attorney O'Brien is about to

 5         begin an inquiry regarding some

 6         communications between Attorney Stephenson

 7         and Mr. Pacheco that would fall within the

 8         attorney/client privilege unless that

 9         privilege is waived.

10              Mr. Groce has been present throughout.

11         A colloquy was conducted earlier as well.

12         Mr. Groce, do you have any initial

13         questions or statements to make before I

14         make inquiry of you in your client's

15         presence as to whether or not the privilege

16         is being waived?

17              MR. GROCE:   No, Your Honor.  Thank

18         you.

19              THE COURT:   Thank you.  Is in fact

20         your client, Mr. Pacheco, waiving the

21         attorney/client privilege within the full

22         meaning of that privilege that he has with

23         Attorney Charles Stephenson.
```

```
 1            Commonwealth versus Raymond Rebello,

 2            Commonwealth versus Diaz, Commonwealth

 3            versus Rivera and Commonwealth versus

 4            Ramos?

 5                 MR. PACHECO:  Yes, Your Honor.

 6                 THE COURT:   Okay.  Thank you.

 7                 Mr. Stephenson, from your perspective

 8            is there any other specific waiver you need

 9            on the record?

10                 THE WITNESS:   No, Your Honor.  Thank

11            you.

12                 THE COURT:   Thank you, sir.  Thank

13            you, Mr. Groce.

14                 MR. GROCE:   Yes, Your Honor.

15                 (Attorney Groce and Mr. Pacheco leave

16            the courtroom.)

17    .DIRECT EXAMINATION BY MS. O'BRIEN:

18       Q.   Mr. Stephenson, as Mr. Pacheco

19    continued to testify in this series of cases you

20    shared with him your opinions about the possible

21    outcome of his own case, is that correct?

22       A.   Less so in that intermediate period

23    than in the period proceeding the first trial, but
```

 1    scared but he was also angry at the time.  That

 2    would be my read on his personal perspective.  And

 3    it happened that my strategy after I was rebuffed

 4    by Mr. Bennett was -- went with his personal

 5    feelings, which was I can testify against these

 6    four men who got me involved in this incident and

 7    were responsible for the death of my friend.

 8         Q.    And what did you convey to him about

 9    the possible benefits of his testifying?

10         A.    Well, this I remember very -- he was

11    held --

12              MR. ORENSTEIN:   I'm going to object

13         on the grounds of relevance.

14              THE COURT:   Ms. O'Brien.

15              MS. O'BRIEN:   Your Honor,

16         Mr. Pacheco's state of mind and reason for

17         bias actually go to the heart of this.  I

18         don't know what could be more relevant.

19              THE COURT:   I'll hear some of this

20         but I have a question as to its full

21         relevance at this point myself.

22         A.    Ma'am, could you repeat the question.

23         Q.    What did you advise him regarding the

        1    offer of second, is that correct?

        2         A.    I'm sure I did.  I'm sure but I don't

        3    remember.

        4              MS. O'BRIEN:  And if I may have just a

        5         moment, Your Honor.

        6              THE COURT:  Of course you can.

        7         Q.    Did you advise -- did you ever advise

        8    Mr. Pacheco regarding what you felt the prosecutor

        9    would agree to?

       10              MR. ORENSTEIN:  Objection.

       11              THE COURT:  I'm going to sustain the

       12         objection.  I have no problem with the

       13         question as to what Mr. Stephenson told

       14         Mr. Pacheco the prosecutor said to him, if

       15         in fact Mr. Stephenson relayed that

       16         information.

       17         Q.    Mr. Stephenson, did you advise

       18    Mr. Pacheco that the prosecutor's recommendation

       19    would be important?

       20         A.    To the best of my recollection I would

       21    have done the opposite.  The offer that was

       22    ultimately made to him was quote --

       23              MR. ORENSTEIN:  Objection.  The

1          A.     Well, it wasn't Mr. Safford's

2     recommendation.   But again, the assurances that I

3     tried to give my client were that I had a better

4     grasp of what the ultimate outcome of this process

5     would be than did anyone else involved in the

6     entire prosecution whether they be directly

7     involved or not.

8          Q.     Are you saying that you felt you had an

9     airtight defense of duress?

10         A.     Not that it was airtight.

11         Q.     So you're not saying that you would

12    have recommended to Mr. Pacheco that he go to

13    trial on first degree murder charge, is that

14    correct?

15         A.     I -- it never came up.  I can't answer

16    the question in the abstract.  It would not have

17    been a good thing.

18         Q.     And it certainly wouldn't be something

19    that you would have advised Mr. Pacheco would be a

20    good thing, to go to trial on a first degree

21    murder charge with that defense?

22         A.     Could you state that one more time.

23         Q.     You would not have advised Mr. Pacheco

1    second degree that Mr. Bennett made to me

2    initially.  And so it never -- but that was

3    Mr. Pacheco's decision to make.

4        Q.    Did you advise your client that he

5    should not accept anything short of a dismissal in

6    this case?

7        A.    I don't know that we ever discussed

8    that.

9            MR. ORENSTEIN:    Objection.

10           Objection.

11           THE COURT:    I'm going to sustain that

12           objection.

13           MS. O'BRIEN:    I have nothing further.

14           THE COURT:    Thank you, Attorney

15           O'Brien.    Attorney Orenstein.

16    CROSS-EXAMINATION BY MR. ORENSTEIN:

17        Q.    Mr. Stephenson, how long -- did you

18    begin your representation of Jose Pacheco in the

19    Holyoke District Court?

20        A.    Yes, it was a Monday morning sometime

21    in the summer.  I don't remember beyond that.

22        Q.    Would it have been shortly after that

23    that you obtained the discovery in the case?

1    District Attorney, Mr. Bennett, in an effort to

2    see if he might agree with your assessment of

3    Pacheco's role in the case or to see whether you

4    might convince him of your position?

5         A.    Yes.

6         Q.    And how was that done, by visit to

7    Mr. Bennett in person or by phone?

8         A.    It was by telephone.

9         Q.    And is it fair to say that Mr. Bennett

10   in no uncertain terms did not agree with your

11   assessment of Pacheco's role in the case?

12        A.    He never discussed with me what he

13   thought his role was.  He simply told me what he

14   was willing to, quote, offer my client.

15        Q.    And what was it that he said he was

16   willing to offer Mr. Pacheco?

17        A.    Second degree.  And it was my best

18   recollection that it was said in almost a

19   dismissive fashion.  That it was -- whether it was

20   a serious offer or not, I don't know, but I

21   considered it to be, as I said before,

22   inappropriate.

23        Q.    In any event, it was a clear rejection

1    going to be severed from others, it essentially

2    strengthened my position with each additional

3    trial.

4         Q.    All right.  Now, did you have a

5    discussion -- strike that.  Did you learn that

6    Assistant District Attorney Howard Safford had

7    been assigned this case fairly early on in the

8    procedure?

9         A.    I don't remember exactly when but I

10   think it would have been after the grand jury, but

11   I don't remember when the grand jury was, whether

12   it was September or October.

13        Q.    All right.  And in any event, when you

14   did discuss the case with Mr. Safford, did he

15   indicate to you or did he reach out to you to see

16   whether Mr. Pacheco was interested in cooperating

17   in the prosecution of the co-defendants?

18        A.    I don't recall who initiated the by

19   play but clearly at some point we must have had

20   that consideration.

21        Q.    At the time you had that conversation

22   did you indicate to him yes, Mr. Pacheco was

23   willing to continue to cooperate in this case?

1    any case or just murder cases because I've never

2    been involved in anything else down here -- those

3    decisions were made by Mr. Bennett and -- sorry, I

4    forgot your question.

5         Q.   My question is, did Mr. Safford

6    indicate what the Commonwealth would do for

7    Mr. Pacheco in light of his -- in exchange for his

8    cooperation?

9         A.   I don't recall any discussion about

10   that until Mr. Pacheco was physically in the

11   district attorney's office at some point, but it

12   seems inevitable that we would have had that

13   discussion.

14        Q.   When you say the district attorney's

15   office, I'm assuming you're referring to Attorney

16   Safford's as opposed to Attorney Bennett's office?

17        A.   Yes, Mr. Safford's office.

18        Q.   When you met with Mr. Safford and

19   Mr. Pacheco, was Mr. Pacheco told in your presence

20   in exchange for fruitful and full cooperation the

21   Commonwealth would take that cooperation into

22   consideration; he would be given consideration at

23   the time that this case was disposed of?

1    you believed that the likelihood -- that there was

2    a likelihood of the consideration being greater

3    than it otherwise might have been had he not

4    cooperated?

5         A.    Yes, although again, consideration is

6    an inherently nebulous term.

7         Q.    I understand.  But in addition to

8    believing that he would in fact receive

9    consideration for his ongoing cooperation, were

10   you also paving the way for what you thought might

11   be, at the end the trials of the co-defendants, a

12   motion that you might be able to press to seek to

13   dismiss the charges on grounds of duress?

14        A.    That was by far the more significant of

15   my motivations.  Although I did intend to ask

16   Mr. Safford to either convey to Mr. Bennett or

17   permit me to directly again at some point request

18   that he agree that the charges should be

19   dismissed.

20        Q.    But in any event, that was not

21   something that you were discussing with

22   Mr. Safford as these case were going along?

23        A.    No.

1    indictments against Pacheco be dismissed, is that

2    when you prepared and filed your motion to

3    dismiss?

4         A.   Well, I probably had been preparing --

5    I certainly was doing the research early on but

6    yeah, that would have been when I put -- I put the

7    package together.

8         Q.   All right. And after you filed -- you

9    filed the motion to dismiss after obtaining an

10   affidavit from Mr. Pacheco, is that right?

11        A.   Yes.

12        Q.   And did you read the affidavit to

13   Mr. Pacheco and ascertain that in fact he agreed

14   with the contents?

15        A.   I haven't reviewed those materials

16   since I submitted them or since that day of that

17   hearing.

18        Q.   Well, without having reviewed those, is

19   it fair to say that you would have, however, gone

20   over the affidavit carefully with Mr. Pacheco?

21        A.   Mr. Pacheco couldn't read English so

22   I'm sure that it involved a process by which I

23   read to him and then I would have become an

```
 1                     THE COURT:    Thank you.    That may be
 2          admitted and marked.
 3                     THE CLERK:    Number 6.
 4                     (Exhibit 6 was entered into evidence.)
 5          Q.    Mr. Stephenson, were you present in
 6    court when Mr. Pacheco testified during the trials
 7    of the co-defendants?
 8          A.    My best recollection is that my father
 9    was ill at the time and I think I might have
10    missed -- I know I missed a trial, and I think it
11    may have been Mr. Rebello's first trial.    But I
12    was present for the others.    I remember the last
13    trial was in one of these courtrooms over that
14    (indicating) way.
15          Q.    Now, is it fair to say Mr. Pacheco's
16    testimony during those trials was consistent with
17    the statement with which he had initially given to
18    the police on the night following the murders?
19                     MS. O'BRIEN:    I object.
20                     THE COURT:    Overruled.
21          A.    I always felt it was.
22          Q.    All right.    With respect to the
23    affidavit that he provided to you, was his version
```

1   that Mr. Safford never agreed to the allowance of

2   that motion?

3        A.   No, he did not.  He did agree to have a

4   hearing on it.

5        Q.   All right.  And on the day that it was

6   heard was the case sent to Judge Spina?

7        A.   I don't remember being sent.  I

8   remember it was -- I think it's called courtroom

9   one, if this is courtroom two.

10       Q.   Yes.

11       A.   That's where Judge Spina was.  That's

12   where Mr. Pacheco and I were, and the office that

13   we went to was back behind that courtroom.

14       Q.   All right.  At some point in the

15   morning did Judge Spina indicate that he wished to

16   see counsel in chambers?

17       A.   Yes, and it may have been at the very

18   outset of the morning.

19       Q.   All right.  When you say the outset of

20   the morning, was there a first call at which time

21   the judge was alerted that there was a motion to

22   dismiss to be heard that day?

23       A.   I read the transcript of that hearing a

1    made your respective positions known in chambers

2    to Judge Spina, he indicated that you would go out

3    to the courtroom where you would argue it on the

4    record, isn't that right?

5         A.    Yes.

6         Q.    He did not make a ruling on the motion

7    while were you in chambers, did he?

8         A.    No.

9         Q.    Now, when you went out into the

10   courtroom and once again you argued -- you and

11   Mr. Safford argued the respective positions before

12   the court and on the record, is that right?

13        A.    Yes.

14        Q.    And before you got into a discussion,

15   however, with Judge -- on the record before

16   Judge Spina about the motion to dismiss, you dealt

17   with another matter first, didn't you?

18        A.    Yes, although, I mean, my memory is

19   refreshed by having looked at the transcript.  But

20   when Mr. Pacheco -- sorry, you asked for a

21   question --

22        Q.    Yes.  Before you addressed the motion

23   to dismiss, you actually went out and first

1    surety to personal recognizance, is that right?

2         A.    Yes.

3         Q.    And this was done in order to allow

4    Mr. Pacheco to travel across state lines for

5    purposes of seeing his family?

6         A.    I'm not sure if it was for purposes of

7    seeing his family or in order to move to

8    Connecticut.  It was one or the other.

9         Q.    All right.  But in any event, you

10   indicated to the Court that there was an agreement

11   with the Commonwealth to modify the bail and then

12   the Court allowed that modification of bail, did

13   they not?

14        A.    Yes.

15        Q.    And only after amending or changing the

16   conditions of bail did you then address the motion

17   to dismiss?

18        A.    Yes.

19        Q.    Have you had a chance to review this

20   transcript?

21        A.    I have.

22        Q.    Mr. Stephenson --

23             MS. O'BRIEN:  There is no objection.

1       A.    No.

2            Q.    Mr. Stephenson, while the case was

3       pending did there come a time when your client,

4       Mr. Pacheco, waived his right to a speedy trial

5       under Rule 36?

6            A.    Yes, I recall that.

7            Q.    And I show you this document and ask if

8       you recognize it?

9            A.    Yes.

10           Q.    Does that appear to be a copy of the

11      Rule 36 waiver signed by Mr. Pacheco?

12           A.    It does, and I think by me.

13                 MS. O'BRIEN:    No objection, Your

14           Honor.

15                 THE COURT:    Thank you.    That may be

16           admitted and marked.

17                 THE CLERK:    Number 8.

18                 (Exhibit 8 was entered into evidence.)

19           Q.    And is it fair to say that in deciding

20      to waive -- strike that.  Do you recall at what

21      point in the proceedings Mr. Pacheco executed this

22      Rule 36 waiver?

23           A.    My recollection is that it was after,

1          A.      Since 1991.

2          Q.      And who was the District Attorney when

3      you were hired in 1991?

4          A.      The current district attorney, William

5      Bennett.

6          Q.      Now, you prosecuted the murders of

7      Guillermo Santiago and Angel Carcano, is that

8      correct?

9          A.      That's correct.

10          Q.      And those were not the first murder

11      cases that you had prosecuted, is that correct?

12          A.      I had prosecuted one other in a

13      different administration.

14          Q.      In a different administration.   What

15      other administration had you served under?

16          A.      In Hampshire County under District

17      Attorney Michael Ryan and Judd Carhart.

18          Q.      And would you consider the fact that

19      you were prosecuting murder cases that that was

20      certainly evidence that you were one of the

21      trusted assistant district attorneys under

22      Mr. Bennett?   That he would entrust you with a

23      murder case was some evidence of that, is that

1    correct?

2         A.    Yes, I would say that's some evidence

3    of it.

4         Q.    Now, in this case Jose Pacheco

5    testified, correct?

6         A.    Yes, he did.

7         Q.    And you had a discovery document drawn

8    up to memorialize the agreement between yourself

9    and Mr. Pacheco, is that correct?

10        A.    Discovery agreement between Mr. Pacheco

11   and myself or --

12        Q.    Yes.  Well, I ask you to examine this

13   document, that's with the letter CA1 at the top,

14   and it's entitled rewards and promises.  The

15   second page in particular.

16        A.    Yes.  I wouldn't call it an agreement

17   between Mr. Pacheco and myself.  It was noticed to

18   essentially the other attorneys involved in the

19   various cases of the agreement between

20   Mr. Pacheco's attorney and myself.

21        Q.    And this is an accurate reflection of

22   what it was that you notified Mr. Rebello's

23   attorney concerning that agreement, is that

```
1              THE COURT:   Sorry, excuse me.  I
2         thought that's why I was confused.  I
3         thought you were saying it was Mr. Pacheco,
4         and I knew he had been with Mr. Lauro at
5         trial.  That's my confusion.  I'm fine now.
6         Thank you.
7              MS. O'BRIEN:   Thank you, Your Honor.
8         Q.   Now, Mr. Pacheco testified five
9    different times in murder cases that you
10   prosecuted, is that correct?
11        A.   I believe so, yes.
12        Q.   And after the first or second he was
13   released on bail, is that correct?
14        A.   That's my memory, around there perhaps.
15        Q.   And that was --
16        A.   I'm not sure if it was the second or
17   third but it was in that area.
18        Q.   That was with your agreement, correct?
19        A.   Yes.
20        Q.   Now, at some point would it be fair to
21   say that during your contact -- strike that.  You
22   had a number of occasions to sit down and
23   interview Mr. Pacheco, is that correct?
```

1    defendant.

2         Q.    But at some point a defense -- a

3    specific defense of coercion or duress was

4    discussed between you and Mr. Stephenson, is that

5    correct?

6         A.    I can't say that we discussed it.  I

7    have no memory of that, and it may just be because

8    of the length of time.  I do recall getting the

9    motion to dismiss after the last trial that

10   obviously eluded to duress as the defense.

11        Q.    Well, before you got that motion is it

12   your testimony that you had no -- you had no

13   information that Mr. Pacheco intended to rely on a

14   defense of coercion or duress?

15        A.    To be honest with you, a great deal of

16   thought wasn't given to Mr. Pacheco's defenses at

17   the time.  I was essentially consumed with trying

18   five different murder trials in a year,

19   essentially.  And I probably argued some form of

20   duress during the trials.  Whether Mr. Stephenson

21   and I discussed it, argued it prior to that, I

22   have no memory of that.  I don't really think we

23   did.  I think he had his initial discussions with

1    second degree, and it appeared to me that that was

2    not acceptable by Mr. Stephenson.  That left me

3    with the assumption that this was going to be a

4    trial.

5         Q.   So you assumed that you would be

6    trying -- that because there would be a rejection

7    of the second degree murder offer, that

8    Mr. Pacheco would be tried for first degree

9    murder, is that correct?

10        A.   I thought that that was certainly a

11   distinct possibility.

12        Q.   You knew that at some point you would

13   be speaking with the District Attorney about the

14   resolution of Mr. Pacheco's case, is that correct?

15        A.   That's correct.

16        Q.   And you knew that you would be making a

17   recommendation, is that a fair assumption?

18        A.   I would be discussing Mr. Pacheco's

19   role and what he had done in the various trials.

20   Not that the District Attorney wasn't aware of

21   that.  I think he was acutely aware of what was

22   going on throughout the process that year.

23        Q.   Well, you certainly expected your

1    that defense it also had to be such that a person

2    of reasonable firmness could not have behaved

3    otherwise under the circumstances, is that

4    correct?

5         A.    I understand it now.  Whether or not --

6    I mean, you know, I understand that's probably the

7    language of the case.  It's been ages since I've

8    read the cases, and if that's the language of the

9    case, then I probably read it.

10        Q.    You were certainly aware that there was

11   some question whether the defense was even

12   available in a murder case, is that correct?

13        A.    It was my understanding that it wasn't.

14   It was the District Attorney's understanding that

15   it wasn't.

16        Q.    And with that understanding and having

17   taken that position, you did not file any written

18   opposition to Mr. Stephenson's motion, is that

19   correct?

20        A.    That's correct.

21        Q.    Now, you did not memorialize any

22   research that you had done regarding the defense,

23   is that correct?

1    plan to object strenuously, is that a fair

2    statement?

3         A.    I thought that I made an argument that

4    was relevant and that was -- that cited the

5    appropriate cases that were on point and in my

6    opinion that stood for the proposition that murder

7    was not in fact -- excuse me, duress was not in

8    fact a defense to murder.

9         Q.    So you felt that you were in the right

10   in making that objection, you're telling us?

11        A.    Yes.

12        Q.    And you felt that Judge Spina made the

13   wrong decision in dismissing a first degree murder

14   case, is that your testimony?

15        A.    I don't know that I had a strong

16   opinion about it one way or the other.  I know the

17   District Attorney felt that it was wrongful.

18        Q.    And you did not appeal, is that

19   correct?

20        A.    I did not appeal, no.

21        Q.    And you knew you had a right of appeal,

22   is that correct?

23        A.    Yes.

1      Q.     And with respect to your handling of

2    the cases in which Mr. Pacheco was a witness, did

3    you ever make a representation to Mr. Pacheco

4    other than that his cooperation would be taken

5    into consideration?

6          A.    No, I did not.

7          Q.    Did you tell Mr. Stephenson that that

8    was what would be done for Mr. Pacheco?

9          A.    His cooperation would be taken into

10   consideration?

11         Q.    Yes.

12         A.    His cooperation would be taken into

13   consideration, yes.

14         Q.    Did you have a meeting with Mr. Pacheco

15   with Mr. Stephenson present when you explained to

16   him that that was what would be done for him in

17   exchange for his cooperation?

18         A.    I had an initial meeting with both of

19   them where I went into great detail relative to

20   what that meant, and there were subsequent times

21   in both their presence and just Mr. Pacheco's

22   presence alone where that was reiterated to a

23   lesser degree.

 1        A.    Yes, he was.   Twice.

 2        Q.    I'm showing you two documents,

 3   Mr. Safford.   Those documents, do you recognize

 4   those as being copies of receipts which were

 5   signed by counsel for Mr. Rebello indicating

 6   receipt of the notice concerning the promise of

 7   consideration for Pacheco's cooperation?

 8        A.    Yes.   One was signed by Phillip Lauro,

 9   5/19/92, and the other was signed by, I believe,

10   James Berganis (phonetic), who I think was

11   clerking or interning for Mr. Lauro, and that was

12   given on 5/27/92 or a week or so later.

13             MR. ORENSTEIN:    Thank you, Your

14        Honor.   I offer the copies of the two

15        receipts as the next two exhibits.

16             MS. O'BRIEN:    No objection.

17             THE COURT:    Thank you.

18             THE CLERK:    Number 10 and 11, Your

19        Honor.

20             (Exhibits 10 and 11 were entered into

21        evidence.)

22        Q.    Now, when Mr. Pacheco testified,

23   Mr. Safford, in the various trials in which he did

1     men for murder was virtually the same as the

2     version which he had made to the statement of

3     police upon Pacheco's arrest?

4          A.   Yes, it was.

5          Q.   In the testimony of those two trials

6     did you elicit from Mr. Pacheco the fact he would

7     receive consideration in exchange for his

8     cooperation?

9          A.   Yes.

10         Q.   At the time of those two trials,

11    Mr. Safford, was Mr. Pacheco still in custody?

12         A.   I believe the first two trials he was.

13         Q.   Was he subsequently released on bail?

14         A.   At sometime either after the second or

15    third trial, yes.

16         Q.   Is it fair to say that the decision to

17    release him on bail was only made after those

18    trials were completed?

19         A.   Yes.

20         Q.   And was he free on bail at the time

21    that he testified against Mr. Rebello?

22         A.   Yes.

23         Q.   And was that made known to Mr. Lauro,

1        A.      Yes, it did.

2        Q.      And it was retried to a conclusion?

3        A.      Yes.

4        Q.      Those trials were before Judge Sweeney,

5    correct?

6        A.      Yes.

7        Q.      Following that last trial do you recall

8    if there was a meeting with the District Attorney

9    in order to determine what sort of consideration

10   was going to be given to Mr. Pacheco?

11       A.      There was at least one meeting, maybe

12   more.

13       Q.      All right.  Was there ever -- is it

14   fair to say that with respect to the determination

15   of what the consideration will be for a

16   cooperating witness or a cooperating co-defendant,

17   that that decision rests with the District

18   Attorney?

19       A.      Yes.

20       Q.      Is it fair to say that individual

21   assistant district attorneys do not have the

22   discretion or authority to make that decision?

23       A.      That's correct.

1    to that witness?

2         A.    That's correct.

3         Q.    Does that remain the policy of the

4    office today?

5         A.    It is written policy.

6         Q.    Now, do you have any memory of whether

7    there was a resolution of the issue as to what the

8    consideration should be for Jose Pacheco?

9         A.    No.

10        Q.    All right. And as that process was

11   going on to try to determine what was going to be

12   done for Mr. Pacheco, did you receive a motion

13   from Charles Stephenson?

14        A.    Yes, I did.

15        Q.    Was that a motion to dismiss raising a

16   legal question of -- or raising the defense of

17   duress of extreme duress?

18        A.    Yes, it was.

19        Q.    Did you make the District Attorney

20   aware of the fact that that motion had been filed?

21        A.    I did.

22        Q.    Is it fair to say that the District

23   Attorney indicated that you were to oppose that

     1          A.    Yes.

     2          Q.    Is it fair to say that you -- while in

     3    chambers you laid out the Commonwealth's position

     4    with respect to your view of the case?

     5          A.    That's correct.

     6          Q.    Is it fair to say that you did not at

     7    any time agree that that motion should be allowed?

     8          A.    I did not.

     9          Q.    Did you then go before Judge Spina in

    10    the courtroom and once again argue your respective

    11    merits of that motion?

    12          A.    Yes, we did.

    13          Q.    Do you recall, Mr. Safford, whether or

    14    not the conference that you had with Judge Spina

    15    in his chambers, whether that was a lengthier

    16    conference than the length of time it took you to

    17    argue the matter once you were in court?

    18          A.    Yes, it was.

    19          Q.    Could you describe -- describe how that

    20    was?

    21          A.    We discussed our respective positions.

    22    The facts were essentially laid out for him in

    23    court in chambers.  He wanted to know what the

1          Q.      And in fact had you not advanced or --

2    strike that.  During the various trials which had

3    preceded this hearing on the motion to dismiss,

4    hadn't you argued to the various juries that

5    Mr. Pacheco had been a credible witness?

6          A.      Yes.

7          Q.      Didn't you -- while you cannot vouch

8    for the credibility of the witness, did you not to

9    some extent indicate to various juries that

10   Mr. Pacheco's version of events was an accurate

11   one?

12         A.      Yes.

13         Q.      Did you therefore -- as you stood

14   before Judge Spina did you agree that the facts as

15   laid out by Mr. Stephenson in support of his

16   motion were facts that we were not disagreeing

17   with?

18         A.      I conceded that those -- that it was a

19   fair representation of the facts.

20         Q.      But we did not agree with the legal

21   conclusion that Mr. Stephenson asked Judge Spina

22   to draw, is that right?

23         A.      That's correct.

1    exhibit in this case, he gave that to Sergeant

2    Harold Valentine of the Holyoke Police Department?

3        A.    That's correct.

4        Q.    Is it fair to say Sergeant Valentine is

5    no longer alive?

6        A.    That's correct.

7            MR. ORENSTEIN:   Your Honor, the only

8           other matter that I have is I have copies

9           of Mr. Pacheco's testimony at the other

10          trials and I would seek to offer those to

11          the Court.  I think they're relevant with

12          respect to Mr. Pacheco's testimony

13          concerning what promises or offers were

14          made to him by Mr. Safford.

15            THE COURT:   Any objection, Attorney

16          O'Brien?

17            MS. O'BRIEN:   No objection.

18            THE COURT:   Thank you.  Those may be

19          admitted and marked.

20            MR. ORENSTEIN:   Your Honor, I'm

21          handing up first Mr. Pacheco's testimony in

22          Commonwealth versus Aran Diaz.  Secondly,

23          this is Commonwealth versus Luis Fernando

1        Q.    And you had an opinion about what that

2   consideration should be, didn't you?

3        A.    I may have.  I may have had a nebulous

4   opinion.  I don't recall anything concrete other

5   than he should get consideration.  Whether it be

6   manslaughter with little time or second, I don't

7   have a memory as to what it would be.

8        Q.    So you would have sat and expressed no

9   opinion or recommendation during these

10  conversations with the District Attorney, is that

11  your testimony?

12       A.    No, it's not.  I don't have a specific

13  memory of what my opinion was.  I don't know that

14  I had a strong opinion about how it should be

15  disposed of, to be honest.

16       Q.    You didn't have a strong opinion about

17  what the right thing would be to do for

18  Mr. Pacheco, is that your testimony?

19       A.    I will tell you that I truly deferred

20  to the District Attorney in making those kind of

21  decisions.  He was well aware of what it was that

22  Mr. Pacheco had done during the last six months of

23  trial, and I deferred to him to a great extent.

 1              MS. O'BRIEN:   I have nothing further.

 2              THE COURT:   Thank you, Attorney

 3         O'Brien.  Attorney Orenstein.

 4              MR. ORENSTEIN:   One moment, please.

 5              I have no further questions.

 6              THE COURT:   Thank you very much,

 7         Attorney Safford, you're excused.

 8              (The witness was excused.).

 9              THE COURT:   Attorney O'Brien.

10              MS. O'BRIEN:   I have nothing further,

11         Your Honor.  That is all the testimony.

12              THE COURT:   Thank you.

13              Attorney Orenstein.

14              MR. ORENSTEIN:   There is no evidence

15         on behalf of the Commonwealth, Your Honor.

16              THE COURT:   All right.  Thank you.

17              Would you like to be heard in argument

18         or would you like to include it in any

19         supplemental filings or both?

20              MS. O'BRIEN:   Actually, Your Honor,

21         you had given me permission to file an

22         amendment.

23              THE COURT:   Yes, I did.

```
 1              at where we are.  How about we make it

 2              three-and-a-half weeks to Friday, February

 3              18th, Attorney O'Brien?

 4                   MS. O'BRIEN:   Yes, Your Honor.

 5                   THE COURT:   Okay.  How is the 16th

 6              for the Commonwealth?

 7                   MR. ORENSTEIN:   Fine, Your Honor.

 8                   THE COURT:   Is that agreeable?  Of

 9              March.

10                   MR. ORENSTEIN:   Of March, yes.

11                   THE COURT:   And Attorney O'Brien, you

12              will be filing a status report with the SJC

13              as to the scheduling?

14                   MS. O'BRIEN:   Yes, Your Honor.

15                   THE COURT:   And I will -- I do

16              expect, absent anything unusual, that my

17              decision will be -- I do not know about

18              anything unusual, in terms of something

19              that comes up that I don't have -- normally

20              I would expect to be able to render a

21              decision within probably four weeks from

22              the supplementation, the last

23              supplementation in March, if that's any
```

1

2

3

4          I, Christie L. Aarons, Registered

5     Professional Reporter, hereby certify that the

6     foregoing is a true and accurate transcript of my

7     stenographic notes to the best of my knowledge and

8     ability.

9

10

11

12     _____
       Christie L. Aarons

13       Registered Professional Reporter

14

15

16

17

18

19

20

21

22

23

# COMMONWEALTH

**v.**

# REBELLO

NOTICE All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, Pemberton Square, Suite 2500, Boston, MA 02108-1750, (617) 557-1030, SJCReporter@sjc state ma.us

SJC-09174

COMMONWEALTH vs RAYMOND RIOS REBELLO

Hampden  September 7, 2007. - November 27. 2007

Present  Marshall, C J , Greaney, Cowin, Cordy, & Botsford, JJ

Accessory and Principal  Practice, Criminal, Agreement between prosecutor and witness, Argument by prosecutor, New trial, Assistance of counsel, Judicial discretion, Capital case, Confrontation of witnesses  Constitutional Law, Confrontation of witnesses, Assistance of counsel  Evidence, Prior misconduct, Motive

Indictments found and returned in the Superior Court Department on September 4, 1991

The cases were tried before Constance M  Sweeney, J ; a motion for a new trial, filed on April 9, 2004, was heard by her; and a second motion for a new trial, filed on March 13, 2006, was considered by her

Leslie W  O'Brien for the defendant

Jane Davidson Montori, Assistant District Attorney, for the Commonwealth

BOTSFORD  J  After a trial that resulted in a hung jury, the defendant was convicted at a second trial on two indictments charging him with being an accessory before the fact to murder in the first degree on a theory of deliberate premeditation [1] Represented by new counsel, he appeals from these convictions and from the denials of two motions for a new trial  The defendant claims on appeal that (1) omissions and misstatements by the prosecutor, not adequately explored or corrected by defense counsel, misled the jury about the inducements to the key prosecution witness, (2) the trial judge erroneously admitted irrelevant and inflammatory evidence of the defendant's prior bad acts  and (3) the judge also committed error by denying him discovery and an evidentiary hearing on his second motion for a new trial  We reject the defendant's claims and affirm the convictions  After reviewing the entire record pursuant to G. L  c  278 § 33E  we also decline to

1

degree. one convicted as an accessory before the fact to murder in the first degree is entitled to review under G. L. c. 278. § 33E. See Commonwealth v. Francis. 432 Mass. 353. 354 n. 1 (2000) Commonwealth v. Angiulo. 415 Mass. 502. 509-510 (1993)

b. Alleged inducements to the key witness. There is no disagreement that the Commonwealth has an obligation to disclose the terms of any agreement. promise or inducement proffered to a testifying witness before trial. and that a failure to do so may violate the defendant's right to due process. See. e.g.. Commonwealth v. Birks. 435 Mass. 782. 787 (2002). The defendant claims that he was denied his right of confrontation at trial because the prosecutor misled the jury concerning the terms of the Commonwealth's agreement with its key witness. Jose Pacheco. As a result. he says. the jury were not given the correct and necessary information with which to make a fair assessment of Pacheco's credibility.

The defendant presents this claim in two sections (1) the prosecutor misled the jury by indicating that Pacheco would be tried on the murder charges pending against him. even though the prosecutor must have known that this was not likely to occur: and (2) the prosecutor permitted Pacheco to obfuscate the terms of the cooperation agreement between them an error that the defendant's counsel failed to correct. The implicit underpinning of both sections is the contention that there was an undisclosed. tacit agreement between Pacheco and the Commonwealth that contemplated the dismissal of the charges against Pacheco after he testified at the trials of his various codefendants. We address this underlying contention first.

Before testifying as a witness in any of the trials. Pacheco had entered into a written agreement with the Commonwealth that stated: "Your cooperation will be taken into consideration by this office. Your complete and truthful testimony will benefit you upon disposition of your case. It is our intention to treat you fairly." The Commonwealth provided the defendant's counsel with a copy of this agreement in discovery long before his trials. However. the defendant asserts this written agreement did not represent the entire understanding between Pacheco and the Commonwealth. The defendant points to the following facts: only five weeks after the defendant's second trial. the attorney representing Pacheco on the indictments against him moved to dismiss the charges. the prosecutor mounted. in the defendant's words. only a "pro forma" objection to that motion: and when the motion was thereafter allowed. the Commonwealth did not appeal from the ruling. In the defendant's view these events convincingly support the existence of a secret agreement between Pacheco and the Commonwealth concerning the disposition of Pacheco's charges at the time of the defendant's trial.

The difficulty confronting the defendant here is that the judge after an evidentiary hearing on the defendant's new trial motion. specifically found there was no tacit or sub rosa agreement between Pacheco and the Commonwealth. and that "[w]hat was brought to the jury's attention in the defendant's case was that which the Commonwealth had [in fact] promised to Pacheco in exchange for his testimony." The judge found "highly credible" the testimony provided by both Pacheco's attorney and the assistant district attorney about the events leading up to the dismissal of the indictments against Pacheco.[4] That testimony established to her satisfaction that there had been no agreement at any time between Pacheco and the Commonwealth about the dismissal of Pacheco's charges. Rather. when Pacheco's counsel filed the motion to dismiss the charges following the defendant's trial. the Commonwealth opposed the motion.[5] and a judge in the Superior Court granted the motion after hearing from both Pacheco's counsel and the assistant district attorney.

The defendant is left with arguing that the judge's findings on the motion for a new trial are not substantiated. and suggesting that the attorney witnesses who testified were less than candid. However. the motion record amply supports the judge's findings. we leave undisturbed the judge's determinations about the credibility of witnesses testifying before her.[6] See Commonwealth v. Schand. 420 Mass. 783. 787 (1995): Commonwealth v. Grace. 397 Mass. 303. 307 (1986). In light of the judge's findings. the defendant's "implied contention that some undisclosed inducement existed which. if exposed to the jury. would render [Pacheco's] testimony less credible. is nothing but surmise." Commonwealth v. Jackson. 428 Mass. 455. 458 (1998).

We return to the two sections of the defendant's claim. The defendant first focuses on the prosecutor's statement during closing argument that "[i]t's up to the court to decide" on Pacheco's guilt or innocence. he asserts that the statement inaccurately indicated to the jury that Pacheco would stand trial on the murder charges against him. when the prosecutor had to have known that this was unlikely to occur. There are two problems with the defendant's position. First. the evidence presented at the hearing on the motion for a new trial supports the good faith of the prosecutor's statement. As just discussed. the motion judge found there was no agreement that Pacheco's charges would be dismissed. and she credited the prosecutor's testimony that at the time of trial he thought the witness might well go to trial on the murder charges against him. See id. at 458 (prosecutor did not mislead jury in stating that critical prosecution witness would be tried for murder where. after conviction of defendant. judge dismissed charges against witness for lack of sufficient evidence).

at 353 (finding prejudicial error in part because prosecutor relied on improperly admitted evidence in closing argument)  The judge made clear in her instructions to the jury that they were to consider the evidence of "drug activities" strictly in relation to motive, and she took care during voir dire to screen the jury pool for bias against drug activity and guns  See Commonwealth v  John, 442 Mass  329 338 (2004) (jury instructions and voir dire as to bias served to "minimize the prejudicial effect that gang evidence might have had on the jury").  Finally  the objectionable evidence consists of three fleeting references in the course of seven days of testimony and a great deal of evidence supporting the jury's verdicts  We conclude that the judgment in this case ' was not substantially swayed by the error[s] " Commonwealth v  Flebotte, supra at 353

d  Denial of second motion for a new trial. Last, the defendant objects to the denial without an evidentiary hearing of his second motion for new trial  The theory of the motion was that jail housing arrangements made it impossible for the defendant ever to have met Frederick Suttles, who testified to admissions he claimed the defendant had made to him in jail, and that the defendant's trial counsel was ineffective for failing to investigate this assertion  In denying the motion, the judge called Suttles's testimony "probably the last in terms of importance" and "essentially devoid of detail."  The defendant contends, nevertheless  that the potential to discredit Suttles completely would have improved his case significantly, and that he is entitled to discovery and an evidentiary hearing to determine whether conclusive evidence that they had never met was available, and to assess the reasonableness of his trial counsel in failing to investigate the matter.

The decision whether to hold an evidentiary hearing is within the motion judge's discretion; the judge may rule on the motion for a new trial without a hearing "if no substantial issue is raised by the motion or affidavits " Mass  R  Crim  P  30 (c) (3), as appearing in 435 Mass. 1501 (2001)  See Commonwealth v  Denis  442 Mass  617, 628 (2004)  Our review focuses on whether there was an abuse of discretion  Commonwealth v  Candelario, 446 Mass  847, 858 (2006)

The defendant supported his motion with two affidavits. The first, from the defendant himself, stated that the housing and recreational arrangements in the jail where he was held pending trial prevented him from ever coming in contact with Suttles and that he had informed his trial counsel of this fact  The second affidavit, from the defendant's appellate counsel, stated that trial counsel told her he did receive this information from his client but did not investigate it because he believed he could discredit Suttles by other means. The judge was entitled to discredit the defendant's own statement as self-serving and to ignore the hearsay statement of trial counsel contained in appellate counsel's affidavit. See Commonwealth v. Goodreau, 442 Mass  341, 351 & n 6  353-354 (2004). See also Commonwealth v  Grant  426 Mass  667, 673 (1998) ("The judge, of course, had the right to reject as not credible the defendant's self-serving, conclusory affidavit")

Suttles's testimony was cumulative of the testimony of other witnesses except in two particulars  the defendant had told Suttles that he had driven to the scene of the murders in a red truck; and the defendant had talked about planning to kill a witness, Yolanda Reyes, to prevent her from testifying against him and his codefendants. As the judge made clear in her instructions, however, presence at the scene of the murders is not an element of the crime of accessory before the fact. Furthermore, the judge admitted the testimony regarding the plan to kill Yolanda Reyes only on the issue of consciousness of guilt and instructed the jury that they could not convict solely on evidence suggesting consciousness of guilt  In addition, the defendant's counsel discredited Suttles by thoroughly cross-examining him regarding his potential bias or motive to testify falsely and by presenting an alternate theory to account for his knowledge of the case [15]

The issue is not whether we, in reading the record, might reach a different conclusion as to the weight of Suttles's testimony, but whether the motion judge, properly relying on her "knowledge and evaluation of the evidence at trial," abused her discretion in finding that the defendant's motion and affidavits failed to cast doubt on the effectiveness of his trial counsel. Commonwealth v. Croken, 432 Mass  266, 271 (2000), quoting Commonwealth v  Carver, 33 Mass. App  Ct. 378, 381 (1992)  See Commonwealth v  Goodreau, 442 Mass  at 355  We conclude that she did not, and affirm the denial of the defendant's second motion for new trial

3  We have reviewed the entire record as required by G  L  c  278, § 33E, and find no reason to reduce the convictions to a lesser degree of guilt or to order a new trial

Judgments affirmed

Orders denying motions for a

new trial affirmed