**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                )
LUIS RIVERA,                    )
                                )
          Petitioner,           )
                                )
v.                              )          Civil Action No. 04-12717-RCL
                                )
DAVID NOLAN,                    )
                                )
          Respondent.           )
_____)


**RESPONDENT'S MEMORANDUM OF LAW IN OPPOSITION TO**
**PETITION FOR WRIT OF HABEAS CORPUS**

### Introduction

The respondent, David Nolan, hereby submits this memorandum in opposition to the

petition for writ of habeas corpus filed by Luis Rivera ("the petitioner").  As set forth below, the

petition pursuant to 28 U.S.C. § 2254 should be denied where the Massachusetts state court

decision denying the petitioner's *Brady* claim was neither contrary to, nor an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court, because the

petitioner cannot show that the prosecution possessed and withheld exculpatory evidence.

Moreover, even if this Court were to review the petitioner's claim *de novo*, it would necessarily

deny habeas relief where plaintiff cannot present any facts which would support his claim.

### Background

#### State Court Proceedings

In 1991, a Hampden County grand jury brought two indictments against the petitioner for

murder in the first degree and one indictment charging unlawful carrying of a firearm.

*Commonwealth v. Rivera,* 424 Mass. 266, 266-267 (1997). The petitioner was convicted on these charges on June 29, 1992, after having been tried before a jury and Justice Ford of the Superior Court. *See* Docket Sheet for Hampden County Superior Court Criminal Action No. 1991-02247 (hereinafter, "Docket Sheet"), attached as Exhibit A to the memorandum in support of respondent's motion to dismiss, filed February 1, 2005. The petitioner appealed his conviction to the Massachusetts Supreme Judicial Court ("the SJC"), and the SJC affirmed petitioner's conviction on February 13, 1997. *See Commonwealth v. Luis Fernando Rivera,* 424 Mass. 266 (1997). The petitioner applied for a writ of certiorari in the United States Supreme Court, but his petition was denied on October 13, 1998. *See Petition for Writ of Habeas Corpus* (hereinafter "Petition"), ¶ 9(f).

On November 10, 2003, the petitioner filed a motion for a new trial in the Superior Court. *See* Docket Sheet. On November 20, 2003, the Superior Court, Ford, J. (who had been the judge on the petitioner's trial and the separate trial of a co-defendant), denied the motion without a hearing and stated in the endorsement:

> I have a fairly clear memory of the witness Jose Pacheco's testimony, having heard it twice – both at this trial and at the trial of a co-defendant, Iran Diaz. I simply do not believe his alleged recantation, having given the matter serious consideration. *See Commonwealth v. Raymond*, 424 Mass. 382, 397 (1997). The other allegations set forth herein do not raise a substantial issue requiring an evidentiary hearing. Therefore, the motion is <u>Denied</u> without a hearing.

*See* Endorsement on Defendant's First Verified Mass. Crim. P. Rule 30(b) Motion, attached hereto as Exhibit A.

The petitioner filed an application for review pursuant to G.L. c. 278, § 33E (a "Gatekeeper Petition") with the SJC. A single justice of the SJC denied the application on December 14, 2004. *See Petition*, ¶ 11(b)(6).

<u>Federal Habeas Proceedings</u>

The petitioner filed his federal habeas petition was filed in this Court on December 28, 2004. *See* Docket Sheet in Case No. 1:04-cv-12717-RCL, item no. 1. On February 1, 2005, the respondent moved to dismiss the petition on statute of limitations grounds; the motion to dismiss was granted on June 17, 2005. *Id.*, items nos. 5-6, 12. On July 12, 2005, the petitioner moved for reconsideration of the decision to grant the motion to dismiss; the motion for reconsideration was denied on September 8, 2005. *Id.*, items nos. 16 & 17.

The petitioner appealed the dismissal of his petition to the United States Court of Appeals for the First Circuit. *See* First Circuit Docket No. 05-2418. On May 15, 2007, the First Circuit vacated the denial of petitioner's motion for reconsideration and remanded the matter to the district court "with instructions to consider the petitioner's argument with respect to § 2244(d)(1)(D)." *Id.*, Order of May 15, 2007.

On remand to the district court, the parties presented further briefing on the issue of whether the petition was timely pursuant to 28 U.S.C. § 2244(d)(1)(D). On March 10, 2008, the Court issued an order that the petition was found to be timely.

The petition initially stated four claims. In his memorandum in support of his motion for a certificate of appealability to the First Circuit, the petitioner admitted that Grounds One through Three of the petition "were not timely exhausted in the state court and waived his rights with respect to them." *See* Memorandum and Ruling on Petitioner Luis Rivera's Claim that His Petition is Timely Applying 28 U.S.C. § 2244(d)(1)(D), item no. 30.

In Ground Four of the petition, the sole surviving ground for the habeas claim, the petitioner asserts that the petitioner's "conviction was unlawfully obtained by the prosecution's knowing and deliberate presentation of false testimony and concealment of exculpatory

3

evidence." The petitioner claims that "the prosecutor knowingly and deliberately presented false testimony to the jury and concealed evidence that was clearly exculpatory in nature (*i.e.*, a bail release deal with the key prosecution witness who was a co-defendant in the case)." Petition, p. 4. The petitioner supports the claim advanced in Ground Four of the petition by reference to affidavits of Jose Pacheco, dated September 15, 2002, May 10, 2003, and October 7, 2003, which the petitioner claims to have received in 2003. *Id.*, and attachments thereto; *see also* Petitioner's Memorandum Setting Forth the Facts and Law of the Petitioner's 2244(d)(1)(D) Claim.

## **Facts**

The state court's recitation of facts is entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). *See Coombs v. Maine*, 202 F.3d 14, 18 (1st Cir. 2000); *Avellar v. DuBois*, 30 F.Supp.2d 76, 79 (D.Mass. 1998); *Otsuki v. DuBois*, 994 F.Supp. 48, 51 & n.3 (D.Mass. 1998); *cf. Sumner v. Mata*, 449 U.S. 539, 545-46 (1981)(holding that the presumption of correctness under former habeas statute applied to "factual determinations made by state courts, whether the court be a trial court or appellate court"). This deference extends to inferences drawn by the state court from those factual determinations as well. *See Parke v. Raley*, 506 U.S. 20, 35 (1992); *Flores v. Marshall*, 53 F.Supp.2d 509, 514 (D.Mass. 1999). The fact that the jury handed down a guilty verdict necessarily means that jury accepted the testimony inculpating the defendant and "necessarily rejected" the defendant's contrary testimony. *See McCambridge v. Hall*, 303 F.3d 24, 40 (1st Cir. 2002). *See also Marshall v. Lonberger*, 459 U.S. 422, 433-34 (1983).

The SJC found the following facts with respect to the crimes of which the petitioner was convicted:

> The evidence in the light most favorable to the Commonwealth, *Commonwealth v. Salemme*, 395 Mass. 594, 595, 481 N.E.2d 471 (1985), showed that Pedro

Ramos, the head of an extensive drug organization in Holyoke, ordered the killing of two persons to avenge wrongs which Ramos believed those persons had committed against him and his operation. One had assisted the police in the preparation for the execution of several search warrants which had led to the seizure of extensive physical evidence and to the arrest of Ramos and several other members of his drug organization.[1]

The evidence warranted the jurors' concluding that a member of Ramos's drug organization planned the murders and hired the [petitioner] to carry out Ramos's order. The girl friend of one of the victims told police about an eyewitness, who, in turn, waived his Miranda rights and gave a detailed statement implicating the [petitioner] and others in the murders. The police arrested the [petitioner] based on this information. The eyewitness[2] said that he was ordered to drive the two victims, the [petitioner], and a co-defendant, Iran Diaz,[3] to the scene of the murders. The eyewitness said that the victims were dragged from the vehicle, and that the [petitioner] shot one victim in the chest. That victim dies within minutes. The other victim attempted to flee, and Diaz shot him in the back. The victim fell to the pavement but was still alive and trying to crawl away. The [petitioner] alerted Diaz, and Diaz then shot the victim several times.

*Commonwealth v. Rivera*, 424 Mass. 266, 267-268 (1997).

<u>**Argument**</u>

**The Petitioner Is Not Entitled to Habeas Corpus Relief Where the Supreme Judicial Court's Adjudication of His Claims Was Not Contrary To, or an Unreasonable Application Of, Clearly Established Supreme Court Law.**

**I.     <u>Standard of Review</u>**

Since the instant petition was filed after the effective date of the Antiterrorism and

Effective Death Penalty Act ("AEDPA"), this Court's review is governed by that act. *Lindh v.*

---

1  The SJC noted that "[t]hese events ultimately led to the convictions of Ramos and several others for drug and firearm offenses. See *Commonwealth v. Alvarez*, 422 Mass. 198, 661 N.E.2d 1293 (1996)." *Commonwealth v. Rivera*, 424 Mass. 266, 267 n.1 (1997).

2  In a footnote, the SJC observed that "[t]he eyewitness testified that he was an unwilling participant who drove the vehicle on pain of threat to his and his family's safety." *Rivera*, 424 Mass. at 267 n.2.

3  "Diaz was tried separately and convicted on two indictments charging murder in the first degree and also of unlawfully carrying a firearm. See *Commonwealth v. Diaz*, 422 Mass. 269, 661 N.E.2d 1326 (1996)." *Rivera*, 424 Mass. at 267 n.3.

*Murphy*, 521 U.S. 320, 336 (1997).  *See also* 28 U.S.C. § 2254.  AEDPA "places a new constraint on the power of a federal habeas court to grant a state petitioner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court."  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Williams v. Matesanz*, 230 F.3d 421, 426 (1st Cir. 2000)("a federal [habeas] court operates within a closely circumscribed sphere").  As the Supreme Court has reiterated, AEDPA requires a "'highly deferential standard for evaluating state-court rulings' . . . which demands that state court decisions be given the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 23 (2002)(*per curiam*), *quoting Lindh*, 521 U.S. at 333, n.7.  In relevant part, AEDPA precludes a federal court from granting habeas relief, unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *See* 28 U.S.C. §2254(d)(1-2); *see also Tyler v. Cain*, 533 U.S. 656, 660 (2001).   In addition, under AEDPA, state court determinations of factual issues "shall be presumed to be correct" unless the petitioner rebuts this "presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Coombs*, 202 F.3d at 18.

A.     The "Contrary To" Prong

A state court decision is "contrary to" clearly established Supreme Court precedent in only two circumstances: (a) where "the state court applies a rule that contradicts the governing law set forth in" Supreme Court cases or (b) where "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent."  *Williams v. Taylor,* 529 U.S. at 405-06.  Under either scenario, in order to fall within the "contrary to" clause, the state court decision

must be "substantially different," diametrically different," "opposite in character or nature," or "mutually opposed" to clearly established Supreme Court law. *Id.*

B.    The "Unreasonable Application Of" Prong

A state court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams v. Taylor*, 529 U.S. at 407-09, 413.  Merely that the state court reached an incorrect result is not sufficient -- the result also must be unreasonable.  *L'Abbe v. DiPaolo*, 311 F.3d 93, 96 (1st Cir. 2002), *citing Williams v. Taylor*, 529 U.S. at 411; *see also McCambridge v. Hall*, 303 F.3d 24, 36-37 (1st Cir. 2002)(en banc)("'some increment of incorrectness beyond error is required' . . . The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court"), *quoting Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000).  Where, for instance, the state court reaches a result that is "devoid of record support for its support for its conclusion or is arbitrary," the unreasonable application prong likely will be satisfied."  *McCambridge*, 303 F.3d at 37, *citing O'Brien v. DuBois*, 145 F.3d 16, 25 (1st Cir. 1998).  *See also Kibbe v. DuBois*, 269 F.3d 26, 35 (1st Cir. 2001), *cert. denied* 535 U.S. 960 (2002); *Hurtado v. Tucker*, 245 F.3d 7, 16 (1st Cir.), *cert. denied* 534 U.S. 925 (2001).   In order for a federal habeas court to find that the "unreasonableness" prong has been met, the state court's determination of either the law or the facts must be *objectively* unreasonable.  *See Williams v. Taylor,* 529 U.S. at 411; *Williams v. Matesanz*, 230 F.3d at 426-27; *Torres v. Prunty*, 223 F.3d 1103, 1108 (9th Cir. 2000).

There is no bright-line rule as to what constitutes an "objectively unreasonable" application of federal law or determination of facts. *Williams v. Taylor*, 529 U.S. at 410 ("[t]he

term 'unreasonable' is no doubt difficult to define").  As the Supreme Court has made clear,

however, an incorrect state court determination is not necessarily an unreasonable one.  *Id.* ("the

most important point is that an unreasonable application of federal law is different from an

*incorrect* application of federal law")(emphasis in original).   It is well-settled that "a federal

habeas court may not issue the writ simply because the court concludes in its independent

judgment that the relevant state-court decision applied clearly established federal law

erroneously or incorrectly.  Rather, that application [or determination] must also be

unreasonable." *Id.* at 411. This same standard should be applied to determine whether a state

court's decision was based on "an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding" under 28 U.S.C. § 2254(d)(2).  *See Torres*, 223

F.3d at 1108 (reasonableness standards under § 2254(d)(1) and (d)(2) are the same).

**II.     The State Court's Determination of the Petitioner's Claim Did Not Run Contrary to
        or Constitute an Unreasonable Application of Established Supreme Court
        Precedent.**

> A.    Standard for *Brady* claims

To find constitutional error based on the government's alleged failure to turn over evidence, a

defendant must demonstrate that (1) the government both possessed and suppressed the

evidence; (2) the evidence was favorable to the defendant because it was "exculpatory, or ...

impeaching;" and (3) the defendant was prejudiced by the suppression.  *Strickler v. Greene*, 527

U.S. 263, 281-82 (1999).  *See also Brady v. Maryland*, 373 U.S. 83, 87 (1963).  To satisfy the

"prejudice" prong, moreover, the defendant must establish a reasonable probability that the trial

would have ended differently if the evidence had been disclosed.  *Pennsylvania v. Ritchie*, 480

U.S. 39, 57 (1987).   Put another way, "the question is whether 'the favorable evidence could

reasonably be taken to put the whole case in such a different light as to undermine confidence in

the verdict.'" *Strickler*, 527 U.S. at 290, quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

*See also United States v. Agurs*, 427 U.S. 97, 109-10 (1976) ("The mere possibility that an item

of undisclosed information might have helped the defense, or might have affected the outcome of

the trial, does not establish" prejudice "in a constitutional sense").

    B.    <u>State Court Resolution of Petitioner's Claims</u>

    The petitioner's claim founders on the first prong of the *Brady* analysis.  The testimony

of Jose Pacheco, on which the petitioner's claim rests, has been rejected as not credible by the

state Superior Court judge on the motion for new trial.  *See* Endorsement on Defendant's First

Verified Mass. Crim. P. Rule 30(b) Motion, attached hereto as Exhibit A.  Moreover, even if

believed, the affidavits and other evidence proffered by the petitioner do not permit a finding that

prosecutors knew of or withheld exculpatory evidence from the petitioner.

    1.    *Determination that Pacheco's Affidavits were not Credible*

    The petitioner's claim (in both the state and federal courts) is based wholly on the

affidavits of Jose Pacheco.[4]  These affidavits were, however, explicitly rejected as not credible

by the judge on the motion for a new trial, who had heard Pacheco's testimony at the petitioner's

trial and at the trial of the petitioner's co-defendant, Iran Diaz. *See* Endorsement on Defendant's

First Verified Mass. Crim. P. Rule 30(b) Motion, attached hereto as Exhibit A.  The state court's

findings of fact, including credibility determinations, are binding on a habeas court in the

absence of a showing of clear and convincing evidence. 28 U.S.C. § 2254(e)(1)(under AEDPA,

state court determinations of factual issues "shall be presumed to be correct," unless the

petitioner rebuts this "presumption of correctness by clear and convincing evidence"); *see also*

---

4  To the extent that the petitioner seeks to rely on the statements in the Affidavit of Francis
Pabon, such statements constitute inadmissible hearsay which cannot support a habeas claim. *See*
n. 5, below.

*Thompson v. Keohane*, 516 U.S. 99, 110-12 (1995) (on habeas review, presumptively-correct facts encompass "what happened" at trial, including factual findings that require the trial court to assess the credibility and demeanor of the parties); *Burden v. Zant*, 498 U.S. 433, 436-37 (1991) (state-court finding that co-defendant testified pursuant to an immunity agreement was a historical fact entitled to presumption of correctness on habeas review).

The state Superior Court judge acted appropriately in considering and rejecting the statements offered in Pacheco's affidavits. *See Commonwealth v. Raymond*, 424 Mass. 382, 397 (1997)("a new trial is not required based on affidavits or testimony that a key prosecution witness may have been lying, although . . . such testimony warrants 'serious consideration from the motion judge'"), quoting *Commonwealth v. Watson*, 377 Mass. 814, 837-839 (1979). The Superior Court judge had had the opportunity to observe Pacheco's demeanor in both the petitioner's trial and the trial of a co-defendant, and was well within his rights to determine that the proffered affidavits – which largely contradicted Pacheco's trial testimony were not credible. *See Caldwell v. Murphy*, 159 F.3d 639, 650 (1st Cir. 1998), *cert. denied*, 526 U.S. 1009 (1999)(federal habeas court "has 'no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them' and must 'more than simply disagree with the state court' to reach a different result."), quoting *Marshall v. Lonberger*, 459 U.S. 422, 432-34 (1983); *see also Mastracchio*, 274 F.3d at 598; *Sanna*, 265 F.3d at 10 ("[c]redibility is quintessentially a matter of fact, reserved in almost every circumstance for the trier").

The petitioner does not offer any evidence to show that the Superior Court judge's credibility determination was clearly erroneous. Rather, to the contrary, the affidavit from Charles Stephenson, who represented Pacheco in connection with the petitioner's criminal trial

and the related charges against Pacheco, provides support for the Superior Court judge's decision. Stephenson's affidavit suggests that Pacheco's trial testimony – as opposed to his later recantation – is consistent with Stephenson's recollection of Pacheco's version of the events. *See* Stephenson Aff., attached to Petitioner's Memorandum, ¶ 3. Stephenson's affidavit indicates that at the time of the prosecutions counsel had the "impression that Mr. Pacheco had been an unwilling participant in the offense," which is consistent with Pacheco's trial testimony and not with his current recantations. *Id.*; *see also* Pacheco Affs., Exhibit B-D. In short, the proffered affidavits of Jose Pacheco do not provide a colorable factual basis for a habeas claim.

2.    *The Evidence Proffered by the Petitioner Does Not Show that the Prosecution Withheld Evidence.*

To prevail on a *Brady* claim, a petitioner must first show that the government both possessed and suppressed evidence. *See Strickler*, 527 U.S. at 281-82; *Brady*, 373 U.S. at 87. The petitioner's *Brady* claim is fatally flawed because there is no evidence from which it could be determined that the prosecution either possessed or suppressed evidence favorable to the petitioner. *Compare Strickler,* 527 U.S. at 273-275 (finding that prosecution had withheld documents showing that witness had fabricated virtually her entire testimony).

At the outset, even if the affidavits of Jose Pacheco were credited, there would still be no support for the petitioner's claim that the prosecution knew that Pacheco would offer false testimony or knew that Pacheco's trial testimony regarding petitioner's involvement in the shooting was falsified. Pacheco's affidavits do not contain any statement that the prosecution knew that he gave or planned to give false testimony.[5] *See* Pacheco Aff. dated September 15,

---

5 The sole document which provides any backing for the petitioner's claim is the affidavit of Francis Pabon, which states that Pacheco told Pabon that a prosecutor had coached Pacheco or encouraged Pacheco to lie. *See generally,* Pabon Aff.. These statements are, however, inadmissible hearsay which cannot form the basis for habeas claim. Moreover, the veracity of

2002, attached hereto as Exhibit B (no mention that prosecution knew of allegedly false testimony); Pacheco Aff. dated May 16, 2003, attached hereto as Exhibit C (although prosecutor allegedly agreed to release Pacheco after Pacheco testified against petitioner no claim that prosecutor knew Pacheco's testimony would be false[6]); Pacheco Aff. dated October 7, 2003 (same).

Likewise, there is no credible support for the assertion that the prosecution had entered into an agreement with Pacheco in which Pacheco would be released on bail on favorable terms in exchange for his testimony against the petitioner. While Pacheco's affidavits of May 16 and October 7, 2003, state that such an agreement was in place, he subsequently testified at the new trial hearing of petitioner's co-defendant Raymond Rebello that he had lied in his affidavit.[7] Transcript of Rebello Motion for New Trial Hearing (hereinafter, "Rebello Trans."), attached hereto as Exhibit E, pp. 53-55, 61. In his testimony at the Rebello motion for new trial hearing – which mirrored his testimony at the petitioner's trial -- Pacheco affirmed that he had never received any promise from prosecutors relative to his testimony against the petitioner other than the assurance that his testimony would be taken into consideration in the prosecution of charges against him. *See* Rebello Trans., pp. 46-47, 55-56. This absence of any further promise or inducement was confirmed in the Rebello motion hearing by the prosecutor who tried the

---

Pabon's assertions is undercut by the fact that there is no statement in any of Pacheco's own affidavits to the effect that a prosecutor coached him or encouraged him to lie. *See* Pacheco Affs. attached hereto as Exhibits B-D.

6 In a hearing on a motion for a new trial in a related case, Pacheco admitted that he had lied when he said that there was an agreement with prosecutors to release him on bail in exchange for his testimony. *See* Rebello Hearing Transcript, pp. 53-55, 61, attached hereto as Exhibit E (referred to and relied on by petitioner, attached to petitioner's memorandum as Exhibit 10).

7 The petitioner cites to the testimony at the Rebello hearing in support of his petition. *See, e.g.,* Petitioner's Memorandum pp. 3, 7 & 9, and Exhibit 10 thereto.

petitioner's case, Howard Safford, and by Pacheco's attorney in connection with the petitioner's

trial, Charles Stephenson, who was present at conversations between Pacheco and prosecutors.

Rebello Trans., pp. 113-114 (Stephenson did not recall any promise other than that cooperation

would be taken into consideration), 143-148 (Safford never told Pacheco that charges against

him would go away, only that his testimony would be taken into consideration).

Likewise, there is no evidence that prosecutors entered into an agreement to release the

petitioner on bail in exchange for his testimony against the petitioner, much less that prosecutors

withheld such an agreement from the petitioner.  In the Rebello motion hearing, the trial

prosecutor, ADA Safford, testified that there was no agreement to release the Pacheco on bail in

exchange for his testimony and that the decision to release Pacheco on bail was made only after

the Rivera trial had been completed. *See* Rebello Trans., pp. 143-148; *see also* pp. 53-55, 61

(Pacheco admitted statements in affidavits about getting promises from prosecutor were lies).

This absence of any agreement to release Pacheco on bail in exchange for testimony is confirmed

by the affidavit of Attorney Stephenson, Pacheco's trial counsel, who stated that "at no time in

my presence did Mr. Safford [the assistant district attorney prosecuting the crimes] make any

offers to Mr. Pacheco, except on their first meeting, when he explained that all he could promise

Mr. Pacheco was that his 'cooperation would be taken into consideration' when his case was

evaluated."  Stephenson Aff., ¶ 7.  The state court did not, therefore, err in determining that the

petitioner had not made out a valid *Brady* claim. *See* Exhibit A; *see also Strickler*, 527 U.S. at

281-82; *Brady*, 373 U.S. at 87.

### III.    Even if this Court Concludes that the State Court Did Not Decide the Merits of Petitioner's Claim and Reviews the Claim De Novo, the Petition Should be Denied.

A federal court will review a habeas claim *de novo* "if the habeas petition presents a

federal claim that was raised before the state court but was left unresolved[.]"  *Lynch v. Ficco*,

438 F.3d 35, 44 (1st Cir. 2006)(citing *Horton v. Allen*, 370 F.3d 75, 80 (1st Cir. 2004), *cert. denied*, 543 U.S. 1093 (2005)).  *See also Fortini v. Murphy*, 257 F.3d 39, 47 (1st Cir. 2001).  Even if this Court reviews *de novo* the petitioner's *Brady* claim, it must deny habeas relief because the petitioner cannot satisfy the first prong of the *Brady* test.   As stated in Section II, above, a review of the petition and the documents submitted in support thereof shows no basis for the claim that the prosecutor knew that Pacheco would offer false testimony against the petitioner.  Likewise, there is no support for the claim that prosecutors withheld evidence of promises or inducements to Pacheco; rather, the record shows that Pacheco was told nothing more than that his cooperation would be taken into consideration as the state proceeded on the charges against him. Rebello Trans., Ex. E hereto (and Exhibit 10 to petitioner's memorandum), pp. 46-47, 55-56, 113-114, 143-148.

The Superior Court judge on the motion for new trial explicitly found the testimony set forth in Pacheco's affidavits to be incredible.  *See* Exhibit A.  Even if this Court conducts *de novo* legal analysis, it is not free to disregard state court determinations of credibility in the absence of clear and convincing evidence that the factual findings were in error. 28 U.S.C. § 2254(e)(1); *Marshall*, 459 U.S. at 432-34; *Caldwell*, 159 F.3d at 650.  No such showing of clear and convincing evidence has been made here.  Because there is no evidence to support the petitioner's *Brady* claim, this Court must, even under *de novo* review, deny the habeas petition.

## Conclusion

For the foregoing reasons, the respondent requests that this Court deny the petition for a writ of habeas and dismiss the petitioner's complaint in its entirety.

Respectfully submitted,

MARTHA COAKLEY
ATTORNEY GENERAL


/s/ Maura D. McLaughlin
Maura D. McLaughlin (BBO # 634923)
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200, ex. 2857

Dated: July 2, 2008

### Certificate of Service

I hereby certify that on July 2, 2008, I served a copy of the above document to be served via first class mail, postage prepaid, upon Mr. Luis Rivera, petitioner *pro se*, W-52832,  P.O. Box 43, Norfolk, Massachusetts 02056.


/s/ Maura D. McLaughlin
Maura D. McLaughlin

COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, SS.                          SUPERIOR COURT DEPT.

                                     No. 91-2247 THRU
COMMONWEALTH                    X          91-2251
                                X
V.                              X    HAMPDEN COUNTY
                                X    SUPERIOR COURT
                                X    FILED          RECEIVED
LUIS    RIVERA              X X       NOV 10 2008    JUN 20 2008
X X X X X X X X             X X                      OFFICE OF THE ATTORNEY GENERAL
                                                     CRIMINAL BUREAU
                                     CLERK-MAGISTRATE

DEFENDANT'S FIRST VERIFIED
MASS. CRIM. P. RULE 30 (b) MOTION
FOR A NEW TRIAL WITH EVIDENTIARY
HEARING AND ASSIGNMENT OF COUNSEL REQUESTS

        Now comes the defendant, in the
above-entitled matter, and moves this court
For A NEW TRIAL pursuant to MASS. CRIM. P.
Rule 30 (b), while Requesting an evidentiary
hearing and also Requesting Assignment
of counsel for such hearing, pursuant to
S.J.C. Rule 3:10 and MASS. GiL. c. 211D, §14,
Presenting the following meritorious Ground
ONE Issue of Ineffective Appellate counsel,
Ground Two Issue of both the Prosecutor
And Trial Judge misstating the meaning of
Reasonable doubt, Ground three Issue of
INeffective TRIAL counsel who failed to
                —1 of 2 —

[left margin vertical text:] I have a fairly clear memory of the witness Jose Pacheco's testimony, having heard it twice — both at this trial and at the trial of a co-defendant, Juan Diaz. I simply do not believe his alleged recantation, see Commonwealth v. Raymond, 424 Mass 382, 397 (1997). The other allegations set forth in Thefor the motion allegations set forth. The other allegations set forth in Thefor the motion require an evidentiary hearing without a hearing is Denied.

[bottom section:]
01/ All STATEMENTS MADE HEREIN ARE MADE UNDER
PAIN AND PENALTY OF Perjury And All TRIAL
TRANSCRIPT CITATIONS ARE TRUE AND ACCURATE.
Also AFFIDAVITS FROM Jose PAcheco And Francis Aabon.

[bottom left corner:] 1016

COMMONWEALTH OF MASSACHUSETTS

HAMPDEN COUNTY                                    SUPERIOR COURT
                                                 NO(S) 91-2247-2251


COMMONWEALTH

V.

LUIS FERNANDO RIVERA, JR.


AFFIDAVIT TO RECANT FACTS OF TESTIMONY
I GAVE AT THE DEFENDANT'S TRIAL

I, Jose Pacheco, do hereby swear and attest that the following facts are true to the best of my knowledge and belief.

I make this affidavit in support of my wish to recant certain facts I gave in my testimony at the trial of the above named defendant.

1. I am presently an inmate incarcerated at M.C.I. Concord. My inmate identification number is W 70663

2. At trial, in June of 1992, I testified that the defendant held a gun to my head because I was running traffic lights and was likely to call attention my vehicle. The defendant never held a gun to my head or to any other part of my person.

3. At trial, I testified that I witnessed the defendant shoot Angel Carcano and Guillermo Santiago as I claimed I was at the scene of this crime. I was not at this, or any other crime scene, during the commission of the aforementioned shootings and did not witness any crime being committed by the defendant.

4. At trial, I testified that I accompanied the defendant to the stated crime scene. I did not as the defendant dropped me off at my mother's home on Main Street in Holyoke prior to the time

the alleged crime was said to have been committed.

I am willing to testify to the above matters in court and under oath.

Signed and sworn to under the pains and penalties of perjury on this   *15th*   day of November, 2002, at M.C.I. Concord in Concord, Massachusetts.

_JOSE PACHECO_                    9/15/02

_WITNESSED BY_                    9/15/02

COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, ss                          SUPERIOR COURT DEPARTMENT
                                     CRIMINAL DIVISION

                                     Docket No.(s) 91-2247-2251


                        Commonwealth

                              v.

                    Luis Fernando Rivera, Jr.

              AFFIDAVIT TO RECANT FACT OF TESTIMONY
              I GAVE AT THE DEFENDANT'S TRIAL


     I, Jose Pacheco, do hereby swear and attest that the
following facts are true to the best of my knowledge and
belief.

     I make this affidavit in support of my wish to recant
certain facts I gave in my testimony at the trial of the
above named defendant.

     1. I am presently an inmate incarcerated at M.C.I.
_____, my inmate identification number is
W-70663.

     2. At trial, in June of 1992, I testified that I did
not get a deal or promises for my testimontagainst the
defendant, when in fact I had a verbal agreement with the
A.D.A. Howard Safford, that after testifiying against the
defendant that I would be released on low bail and would
not face prosecution.

     3. I am willing to testify to the above matters in
Court and under oath. Also, I am willing to take a
Polygraph if all parties agree.  Signed and sworn under
the pains and penalties of perjury on this _16_ day, of _May_
2003, at M.C.I. _Cedar Junction_ in _Walpole_ , Massachusetts.


                              _____
                              Jose Pacheco, W-70663


                              _____
                              Witnessed by

                              Comm. expire 10/14/2007

Superior Court No.(S)91-2247-2251

COMMONWEALTH

V.

Luis Fernando Rivera, Jr.

### AFFIDAVIT TO RECANT FACTS OF TESTIMONY I GAVE AT THE DEFENDANT'S TRIAL

I, Jose Pacheco, do hereby swear and attest that the following facts are true to the best of my knowledge and belief.

I make this affidavit in support of my wish to recant certain facts I gave in my testimony at the trial of the above named defendant.

1.) I am presently an inmate incarcerated at M.C.I. Walpole. My inmate identification number is W70663.

2.) At trial, in June of 1992, I testified that the defendant held a gun to my head because I was running traffic lights and was likely to call attention to my vehicle. The defendant never held a gun to my head or to any other part of my person.

3.) At trial, I testified that I witnessed the defendant shoot Angel Carcano and Guillermo Santiago as I claimed I was at the scene of this crime. I was not at this, or any other crime scene, during the commission of the aforementioned shootings and did not witness any crime being committed by the defendant.

4.) At trial, I testified that I accompanied the defendant to the stated crime scene. I did not, as the defendant dropped me off at my mother's home on Main Street in Holyoke prior to that time.

5.) At trial, in June of 1992, I testified that I did not get a deal or promises for my testimony against the defendant, when in fact I had a verbal agreement with A.D.A. Howard Safford, that after testifying against the defendant that I would be released on low bail and would not face prosecution.

6.) I am willing to testify to the above matters in Court and under oath. Also, I am willing to take a Polygraph if all parties agree.

Signed and sworn under the pains and penalties of perjury

on this __7th__ day, of __October__ 2003, at M.C.I.

Cedar Junction _____ in Walpole _____, Massachusett.

_Jose Pacheco_

Jose Pacheco, W70663

_____

Witnessed by

_Ethel A. Lavalley, Notary_

_Comm. exp 10/18/2107_

Exhibit #20
165 pg

1              COMMONWEALTH OF MASSACHUSETTS

2

3    Hampden, ss.           Superior Court Department
                              of the Trial Court
4                               Criminal Action No.
                              91-2284-85
5

6    ----------------------------------------

7    Commonwealth              **RECEIVED**

8    V                           FEB 17 2006

9    Raymond Rebello         CLERK OF COURTS
                              HAMPDEN COUNTY

10    ----------------------------------------

11

12        Motion for a new trial held in the
   Hampden County Superior Court, 50 State Street,
   Springfield, Massachusetts, before Sweeney, J., on
13    January 25, 2005.

14

   APPEARANCES:
15

   Jim Orenstein, First Assistant District Attorney.
16    Jane Montori, Assistant District Attorney.

17    Leslie O'Brien, Esq., representing Mr. Rebello.

18    Charles Groce, Esq., representing Mr. Pacheco.

19

20             CHRISTIE L. AARONS, RPR
            OFFICIAL COURT REPORTER
21

22

23

1                        I N D E X

2

3  WITNESS                DIRECT   CROSS   RE-      RE-
                                           DIRECT   CROSS
   Jose Pacheco . . . . . . . . . . . . 23   37      74

4

   Charles Stephenson . . . . . . . 77   107     128

5

   Howard Safford . . . . . . . . . 129   142     158

6

7                    E  X  H  I  B  T  S

8

   EXHIBIT                    PAGE
9  Exhibit 1
   Miranda card and
10 statement of
   Mr. Pacheco . . . . . . . . . . . . 42

11

   Exhibit 2
12 Affidavit of
   Mr. Pacheco . . . . . . . . . . . . 56

13

   Exhibit 3
14 Affidavit from
   Mr. Pacheco. . . . . . . . . . . . 59

15

   Exhibit 4
16 Affidavit from
   Mr. Pacheco. . . . . . . . . . . . 60

17

   Exhibit 5
18 Motion to dismiss
   filed on behalf of
19 Mr. Pacheco . . . . . . . . . . . 118

20 Exhibit 6
   Affidavit of
21 Mr. Pacheco . . . . . . . . . . . 119

22 Exhibit 7
   Transcript . . . . . . . . . . . . . 126

23

1    Exhibit                          Page

2    Exhibit 8
     Rule 36 waiver .......... 127
3
     Exhibit 9
4    Notification of
     awards and promises. .... 132
5
     Exhibit 10
6    Receipt of 5/19/92 ...... 145

7    Exhibit 11
     Receipt of 5/27/92 ...... 145
8
     Exhibit 12
9    Mr. Pacheco's
     testimony in the Diaz
10   trial. ................. 158

11   Exhibit 13
     Mr. Pacheco's
12   testimony in the
     Rivera trial. .......... 158
13
     Exhibit 14
14   Mr. Pacheco's
     testimony in the
15   Rebello trial. ......... 158

16

17

18

19

20

21

22

23

1      A.    Yes, sir, I lied.

2      Q.    So you also lied during the Aran Diaz

3   trial, is that right?

4      A.    I'm talking about Mr. Rebello, sir.

5      Q.    I'm going to ask you about Aran Diaz.

6   You testified there under oath about the same

7   case.  Different defendant, same case.  Did you

8   lie in that case as well?

9      A.    Yes, I did.

10     Q.    What did you lie about in that case?

11     A.    What they was coaching me to say.

12     Q.    No, what did you say that was a lie?

13     A.    I don't remember, sir.  I don't recall.

14   It's been too long.

15     Q.    Well, you testified that you were

16   present when Aran Diaz shot and killed Santiago,

17   right?

18     A.    Yes, I did.

19     Q.    And was that a lie or were you there?

20     A.    I wasn't there.

21     Q.    So you lied about that?

22     A.    That's correct.

23     Q.    You testified that you were present

1    when Luis Rivera also was there and shot one of

2    these men, is that correct?

3        A.    That's correct.

4        Q.    So that was a lie, also?

5        A.    Yes.

6        Q.    So you lied in Mr. Rivera's trial?

7        A.    Yes.

8        Q.    You lied in Mr. Diaz's trial?

9        A.    That's correct.

10       Q.    You lied in Mr. Rebello's trial?

11       A.    Yes.

12       Q.    Was there also a co-defendant by the

13   name of Pedro Ramos?

14       A.    Yeah, I think so.  Yeah.

15       Q.    And did you testify that was his name,

16   Pete, a street name of Pete?

17       A.    Mm-mm.

18       Q.    So you lied in his case, too?

19       A.    That's correct.

20       Q.    And in all those cases you were under

21   oath, weren't you?

22       A.    I recall, yeah.

23       Q.    And when those murders first occurred,

1    you were the first one arrested, weren't you, in

2    that case?

3        A.    No, I was the last one.

4        Q.    The last one that was arrested?  I see.

5        A.    That I remember.

6        Q.    When you were arrested, though, you

7    gave a statement to Sergeant Valentine, didn't

8    you?

9        A.    Yes, I said Mr. -- Sergeant Valentine.

10        Q.    Is your answer yes, you did give a

11    statement?

12        A.    Yes, I did.  Yes, I did.

13        Q.    And Sergeant Valentine read you your

14    rights, correct?

15        A.    I don't remember but yeah, I guess he

16    did.

17        Q.    Isn't this your signature, Jose

18    Pacheco, on this Miranda warning card?

19        A.    Yes.

20        Q.    Does that refresh your memory that

21    Sergeant Valentine read you your rights?

22        A.    Yes.  Thank you.

23        Q.    Did you give a three-page statement to

1      A.    That's correct.

2      Q.    Mr. Stephenson was appointed as your

3  lawyer?

4      A.    Yes.

5      Q.    And despite the fact that you had an

6  attorney representing you, you proceeded on, and

7  not only did you make this statement to Sergeant

8  Valentine in the absence of counsel after you had

9  counsel, you continued to testify in five

10  different trials that, in fact, you were present

11  when those murders occurred, isn't that right?

12      A.    That's correct.

13      Q.    Now, Mr. -- you met Mr. Safford at some

14  point, is that right?

15      A.    Yes.

16      Q.    And Mr. Stephenson was with you when

17  you met with Mr. Safford?

18      A.    That I recall.  I don't remember but I

19  think I did, yeah.

20      Q.    Okay.  And do you recall that there was

21  discussions as to whether you would cooperate in

22  the cases against all of these men against Diaz

23  and Rebello and the others, is that right?

1        A.      That's correct.

2        Q.      You said you would cooperate, didn't

3    you?

4        A.      That is right.

5        Q.      And Mr. Safford told you in exchange

6    for your cooperation you would get consideration,

7    isn't that right?

8        A.      That's correct.

9        Q.      And that's all he ever told you in

10   terms of what you would get?

11       A.      Verbally, yes, sir.

12       Q.      Is that right?

13       A.      Verbally, yes, sir.

14       Q.      Verbally.  The only thing Mr. Safford

15   told you is that the Commonwealth would take your

16   cooperation into consideration in deciding what to

17   do with your case, correct?

18       A.      That's correct.

19       Q.      So you didn't know what was going to

20   happen to your case, is that correct?

21       A.      That's correct.

22       Q.      You said even here today, even after

23   you testified in all the cases, when you were done

1    testifying, you still didn't know what was going

2    to happen to your case, right?

3         A.    That's correct, yeah.

4         Q.    So Mr. Safford then never told you that

5    you weren't going to face prosecution, did he?

6         A.    I don't recall.  It's been too long so

7    I don't -- I don't want to say something that's

8    going to --

9         Q.    You just said here this morning before

10   Judge Sweeney that the only thing Mr. Safford told

11   you is that you would get some consideration?

12        A.    That's correct.  I said that again over

13   and over.

14        Q.    And when the cases in which you

15   testified were done, you still didn't know what

16   was going to happen to your case, isn't that

17   right?

18        A.    That's correct.

19        Q.    And so you didn't know that the case

20   was going to be dismissed, did you?

21        A.    Nope.

22        Q.    So I want to show you an affidavit and

23   ask if you recognize this.  Do you recognize this

1    document?

2            A.    Yes, sir.

3            Q.    What is that?

4            A.    That's my name.

5            Q.    Yeah.  And this is a statement you gave

6    to Luis Rivera, Junior?

7            A.    Yes, I did.

8            Q.    And when -- your case did get dismissed

9    in 1993, isn't that right?

10           A.    That's correct.

11           Q.    And then some years went by and then

12   you got arrested for a robbery, didn't you, and

13   that happened in the year 2000?

14           A.    Yes, sir.  But what that got to do with

15   this?

16           Q.    What town did you get arrested in?

17           A.    Attleboro.

18           Q.    What Court -- did you eventually plead

19   guilty to the armed robbery?

20           A.    No, I took it to the hoop.

21           Q.    You took it to the hoop?

22           A.    That's correct.

23           Q.    That means you had a trial?

1          Q.      Having spent -- now you have been in

2     jail and in prison for a number of years, correct?

3          A.      That's correct.

4          Q.      So you know who the Latin Kings are?

5          A.      I don't associate with gang members.    I

6     repeat myself.

7          Q.      Okay.   What colors do Latin Kings wear?

8          A.      I don't know.

9          Q.      Do they wear yellow and black?

10         A.      I don't know, sir.

11         Q.      Do they where yellow and black like the

12    gentlemen sitting in the audience today?

13         A.      I don't know.

14         Q.      Did you tell Trooper Dipetro two weeks

15    ago you got approached when you first went to

16    prison by Latin Kings; do you recognize Trooper

17    Dipetro over here?

18         A.      Yes, I do.

19         Q.      You don't remember telling him that?

20         A.      No, I don't remember saying that.

21         Q.      So you approached Mr. Luis Rivera then

22    in prison, right, MCI Cedar Junction, and you

23    suggested to him you would help him out?

1        A.        That's correct.

2        Q.        Did you type this up on your own or did

3    somebody type this up for you?

4        A.        Somebody typed it up for me.

5        Q.        And you signed it?

6        A.        Yeah, that's correct.

7        Q.        You said this is true?

8        A.        Yeah.

9        Q.        And in this affidavit you said, "I had

10    an agreement with Mr. Safford that after

11    testifying against the defendant, Rivera, I would

12    be released on low bail and I would not face

13    prosecution," is that right?

14        A.        That's what it says there.

15        Q.        So that's a lie also, isn't it?

16        A.        Well, I guess so.  That's a lie too.

17        Q.        That's a lie too.  But you made this

18    lie because you were in prison with Mr. Rivera,

19    right?

20        A.        No, sir.

21        Q.        You wanted to help out Mr. Rivera,

22    right?

23        A.        That's correct.

1       Q.      Because now you were serving a sentence

2    with this man against whom you had testified,

3    right?

4       A.      I just wanted to help him out because I

5    have a conscience, sir.

6       Q.      Well, you have a conscience but

7    apparently your conscience wasn't bothering you in

8    1994, was it?

9       A.      When you getting coached by somebody,

10   they want you to get a conviction.

11      Q.      Well, now --

12      A.      What do you expect me to do, sir?  If I

13   knew what I knew now --

14      Q.      Mr. Pacheco.

15      A.      -- then it would be different, sir.

16      Q.      Your case was over in June of 1993,

17   wasn't it?

18      A.      Yes, sir.

19      Q.      That's when the charges were dismissed?

20      A.      Yes, sir.

21      Q.      And so after your case was dismissed,

22   you didn't have anything to do with Mr. Safford at

23   all or Sergeant Valentine or anybody after that,

1    did you?

2         A.    No, I didn't have nothing do with them.

3         Q.    You didn't have to do anything after

4    that.  So in 1994 did you contact Mr. Rivera and

5    say, jeez, Mr. Rivera, I have a conscience, I want

6    to help you out, did you do that?

7         A.    No, sir.

8         Q.    Did you do that in '95, '96 or '97?

9         A.    No, sir, but that doesn't mean it ain't

10   bothering me.

11        Q.    You didn't do anything until after you

12   are incarcerated in MCI Cedar Junction with the

13   man you testified against, Mr. Rivera, correct?

14        A.    Well, I had the opportunity there so I

15   decided to help him out.

16        Q.    So this then -- this is a lie in this

17   affidavit, correct?

18        A.    Well, Mr. Safford said he would take

19   consideration.

20        Q.    Give you consideration?

21        A.    That's correct.

22        Q.    He didn't say you wouldn't face

23   prosecution, did he?

1        A.    That's the way I looked at it.

2        Q.    Didn't you say that the only thing you

3    were told was that you were -- would receive some

4    consideration?

5        A.    So I look at it like that. I looked at

6    it like that. I might have wrote it wrong because

7    I'm not a great writer.

8        Q.    Didn't you say when the cases were over

9    you didn't know what was going to happen to you,

10    didn't you?

11        A.    That's correct, I said that.

12        Q.    And you didn't know what was going to

13    happen to you because Mr. Safford never guaranteed

14    you that you wouldn't face prosecution, did he?

15        A.    He never said that but he verbally said

16    consideration, sir.

17            MS. O'BRIEN:    No objection.

18            MR. ORENSTEIN:    I'm offering this

19        affidavit, Your Honor, as the next exhibit.

20            THE COURT:    Thank you. That may be

21        admitted and marked.

22            THE CLERK:    Number 2.

23            (Exhibit 2 was entered as evidence.)

57

1        Q.      By the way, after you were -- how long
2    did you remain at Cedar Junction?

3        A.      Almost two years.

4        Q.      Two years.  And from there where did
5    you go?

6        A.      I went to Norfolk.

7        Q.      Once you got to Norfolk you were now
8    housed with Mr. Raymond Rebello, is that right?

9        A.      That's correct.

10       Q.      Now, Mr. Rivera then came back to you
11   and asked you for another affidavit, didn't he?

12       A.      Yeah.

13       Q.      I'm showing you this.  Do you recognize
14   this two-page document?

15       A.      Mm-mm.

16       Q.      Is that your signature again?

17       A.      Yes.

18       Q.      So in September of 2002 you provided
19   another affidavit to Mr. Rivera, right?

20       A.      Yes.

21       Q.      And you did this because you knew that
22   Mr. Rivera was going to try and get a new trial,
23   right?

1      A.    Yes.

2      Q.    And you knew that Mr. Rivera was going

3   to say Pacheco made the whole thing up, right?

4      A.    Well, I did that on my own.

5      Q.    You did this on your own?

6      A.    Yes.

7      Q.    Okay.  In this affidavit you went

8   beyond what you said in the other one.  You said

9   in this affidavit that Mr. Rivera -- that you

10   testified that Mr. Rivera had held a gun to your

11   head, right?

12      A.    Yeah, I testified that years ago.

13      Q.    You testified that years ago, and now

14   you -- while in prison with Mr. Rivera you gave

15   them an affidavit saying that he never put a gun

16   to your head, right?

17      A.    That's correct.

18      Q.    You went on to say that you were not

19   even at the crime scene?

20      A.    No, I wasn't there.  No.

21      Q.    Even though --

22      A.    Even though.

23      Q.    -- you testified five times that you

1  were there?

2          A.    Yes, even though I lied that I wasn't

3  there.  I repeat myself again, sir, I was coached

4  to do this so I did it.

5                  MS. O'BRIEN:   No objection.

6                  THE COURT:   Thank you.  That may be

7          admitted and marked.

8                  THE CLERK:     Number 3.

9                  (Exhibit 3 was entered into evidence.)

10         Q.    Mr. Pacheco, Mr. Rivera then approached

11  you about a third affidavit, is that right?

12         A.    Yeah.

13         Q.    Is this another affidavit that you gave

14  him?

15         A.    Yes, sir.

16         Q.    Who prepared this one, by the way?

17         A.    Like I said, I don't know how to write

18  that good but that's my signature.

19         Q.    Okay.  Who typed it?  If you know.

20         A.    I don't know the person.

21         Q.    You don't know the person.  Was it

22  someone in the prison, though?

23         A.    Yes.

1      Q.    Another inmate?

2      A.    Yeah.

3      Q.    And did the inmate talk to you about

4    what to put down in there?

5      A.    No, sir.

6      Q.    So the inmate just -- he typed it, came

7    to you and asked to you sign it?

8      A.    That's right.

9            MS. O'BRIEN:    No objection.

10           THE COURT:    That will be marked as

11        the next exhibit.

12           THE CLERK:    4.

13           (Exhibit 4 was entered into evidence.)

14    Q.    Now, I believe what you're telling us

15    today is that you recognize that the only promise

16    that Mr. Safford made to you about your case was

17    that you would get some consideration, is that

18    right?

19      A.    That's correct.

20      Q.    And in fact when you testified in the

21    Rebello case on January 6th, 1993, before Her

22    Honor, Judge Sweeney, you were asked about whether

23    you were going to receive anything for your

6

1    testimony, isn't that right; and·didn't

2    Mr. Safford ask you, "Do you know of any other

3    agreement for your cooperation," and you said,

4    "Just consideration," isn't that right?

5         A.    Yeah.

6         Q.    And while you didn't know exactly what

7    that was going to be, you were hoping you would do

8    less time, right?

9         A.    That's correct.

10        Q.    And Mr. Safford never promised you

11   anything other than you will get consideration for

12   your cooperation and we'll be fair to you, isn't

13   that right?

14        A.    That's correct, sir.

15             MR. ORENSTEIN:    Your Honor, I would

16        like to offer the transcript of the trial.

17        I think you may already have it.  I would

18        like to be sure of that.

19             THE COURT:    I gave it back to the

20        clerk's office because there was such

21        confusion over where the various parts of

22        the transcript were, and I wanted them all

23        in the same place.  So assuming that they

1          are in there in their entirety, yes.

2                    MR. ORENSTEIN:    Okay.  Before the

3          hearing is over then, at some point I would

4          like to provide Your Honor with a copy then

5          for your own use.

6                    THE COURT:    That will be fine.  Thank

7          you.

8        Q.    Now, when Mr. Safford told you that you

9   would receive consideration for your cooperation,

10   Mr. Stephenson was there too, wasn't he?

11        A.    I don't remember, sir.

12        Q.    You don't remember whether he was or

13   not?

14        A.    I don't remember.

15        Q.    Do you remember having several

16   conversations with Assistant District Attorney

17   Safford while your lawyer Mr. Stephenson was

18   present?

19        A.    I remember a couple of them, yeah.

20        Q.    And do you recall that at those

21   meetings that Mr. Safford would go over with you

22   the statement that you had given to the police, is

23   that right?

1    any case or just murder cases because I've never

2    been involved in anything else down here -- those

3    decisions were made by Mr. Bennett and -- sorry, I

4    forgot your question.

5         Q.    My question is, did Mr. Safford

6    indicate what the Commonwealth would do for

7    Mr. Pacheco in light of his -- in exchange for his

8    cooperation?

9         A.    I don't recall any discussion about

10   that until Mr. Pacheco was physically in the

11   district attorney's office at some point, but it

12   seems inevitable that we would have had that

13   discussion.

14        Q.    When you say the district attorney's

15   office, I'm assuming you're referring to Attorney

16   Safford's as opposed to Attorney Bennett's office?

17        A.    Yes, Mr. Safford's office.

18        Q.    When you met with Mr. Safford and

19   Mr. Pacheco, was Mr. Pacheco told in your presence

20   in exchange for fruitful and full cooperation the

21   Commonwealth would take that cooperation into

22   consideration; he would be given consideration at

23   the time that this case was disposed of?

1        A.    Yes.

2        Q.    Was Mr. Pacheco ever offered or

3    promised anything other than consideration for his

4    cooperation?

5        A.    Not in my presence.

6        Q.    And you indicated that -- did

7    Mr. Safford tell you that he did not have the

8    personal authority to make -- to enter into any

9    sort of other cooperation agreement with your

10   client?

11       A.    You mean make any more specific offers

12   than that?

13       Q.    Yes.

14       A.    No.  He never -- I understood that he

15   had no authority.

16       Q.    Now, once you had -- once Mr. Pacheco

17   had agreed to cooperate with the Commonwealth in

18   the ongoing cases, is it fair to say that you were

19   pursuing to some extent a two-fold strategy; is it

20   fair to say on the one hand you felt the more

21   often that Mr. Pacheco did testify, was

22   cooperative, was forthright, the more trials in

23   which he testified against the co-defendants, that

1  Q. And with respect to your handling of

2 the cases in which Mr. Pacheco was a witness, did

3 you ever make a representation to Mr. Pacheco

4 other than that his cooperation would be taken

5 into consideration?

6  A. No, I did not.

7  Q. Did you tell Mr. Stephenson that that

8 was what would be done for Mr. Pacheco?

9  A. His cooperation would be taken into

10 consideration?

11  Q. Yes.

12  A. His cooperation would be taken into

13 consideration, yes.

14  Q. Did you have a meeting with Mr. Pacheco

15 with Mr. Stephenson present when you explained to

16 him that that was what would be done for him in

17 exchange for his cooperation?

18  A. I had an initial meeting with both of

19 them where I went into great detail relative to

20 what that meant, and there were subsequent times

21 in both their presence and just Mr. Pacheco's

22 presence alone where that was reiterated to a

23 lesser degree.

1       Q.      And with respect to disclosing that

2   agreement that you made with Mr. Pacheco, in terms

3   of disclosing it to counsel for the other

4   attorneys -- strike that -- counsel for the other

5   defendants, did you disclose that that arrangement

6   had been made?

7       A.      Yes, I did.

8       Q.      Did you do that by way of a written

9   notice such as -- such as the document that's been

10  marked as Exhibit Number 9?

11      A.      Yes, 229 A and 230 A are the Bates

12  numbered pages that were given to counsel.

13      Q.      Would those numbers at the bottom of

14  this form, 229 A and 230 A, be reflective of

15  discovery numbers -- discovery documents that were

16  provided to counsel?

17      A.      Correct.

18      Q.      And was Mr. Rebello's -- first of all,

19  was Mr. Rebello's attorney at trial Phillip Lauro?

20      A.      Yes, it was.

21      Q.      Was Mr. Lauro given a copy of this

22  document disclosing what promises had been made to

23  witnesses or co-defendants?

1       A.      Yes, he was.   Twice.

2       Q.      I'm showing you two documents,

3   Mr. Safford.   Those documents, do you recognize

4   those as being copies of receipts which were

5   signed by counsel for Mr. Rebello indicating

6   receipt of the notice concerning the promise of

7   consideration for Pacheco's cooperation?

8       A.      Yes.   One was signed by Phillip Lauro,

9   5/19/92, and the other was signed by, I believe,

10  James Berganis (phonetic), who I think was

11  clerking or interning for Mr. Lauro, and that was

12  given on 5/27/92 or a week or so later.

13              MR. ORENSTEIN:    Thank you, Your

14          Honor.   I offer the copies of the two

15          receipts as the next two exhibits.

16              MS. O'BRIEN:    No objection.

17              THE COURT:    Thank you.

18              THE CLERK:    Number 10 and 11, Your

19          Honor.

20              (Exhibits 10 and 11 were entered into

21          evidence.)

22      Q.      Now, when Mr. Pacheco testified,

23  Mr. Safford, in the various trials in which he did

1    testify, did you elicit from him on direct

2    examination the fact that he had been told that he

3    would receive consideration for his cooperation?

4          A.    Sorry, repeat the beginning of that

5    question.

6          Q.    When Mr. Pacheco testified, did you

7    elicit from him on direct examination the fact

8    that he had been told that he was going to receive

9    consideration for his cooperation?

10         A.    Yes.

11         Q.    And now, did Mr. Pacheco testify in

12   cases, murder cases, against first a Luis Rivera

13   and an Aran Diaz?

14         A.    Yes.

15         Q.    Would that have been in June of 1992?

16         A.    Yes.

17         Q.    And did Mr. Pacheco testify -- strike

18   that.  Did you have a copy of a statement which

19   Mr. Pacheco had given to the Holyoke Police

20   Department immediately upon his arrest?

21         A.    Yes, I did.

22         Q.    Would you tell us whether or not

23   Mr. Pacheco's testimony at the trial of those two

1  men for murder was virtually the same as the

2  version which he had made to the statement of

3  police upon Pacheco's arrest?

4      A.    Yes, it was.

5      Q.    In the testimony of those two trials

6  did you elicit from Mr. Pacheco the fact he would

7  receive consideration in exchange for his

8  cooperation?

9      A.    Yes.

10     Q.    At the time of those two trials,

11 Mr. Safford, was Mr. Pacheco still in custody?

12     A.    I believe the first two trials he was.

13     Q.    Was he subsequently released on bail?

14     A.    At sometime either after the second or

15 third trial, yes.

16     Q.    Is it fair to say that the decision to

17 release him on bail was only made after those

18 trials were completed?

19     A.    Yes.

20     Q.    And was he free on bail at the time

21 that he testified against Mr. Rebello?

22     A.    Yes.

23     Q.    And was that made known to Mr. Lauro,